# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| RANDY CLAWSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) 1:23CV937 |
| | ) |
| LESLIE COOLEY DISMUKES, Secretary, | ) |
| North Carolina Department of | ) |
| Adult Correction, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1; see also Docket Entry 6 (Amended Petition).) Respondent has moved for summary judgment (Docket Entry 25; see also Docket Entry 26 (Supporting Brief)), Petitioner has responded in opposition (Docket Entry 29), and Respondent has replied (Docket Entry 33). For the reasons that follow, the Court should grant Respondent's Motion for Summary Judgment.

## I. Procedural History

On March 29, 2017, in the Superior Court of Guilford County, a jury found Petitioner guilty of two counts of first degree kidnapping in cases 14 CRS 68712 and 16 CRS 24496, two counts of indecent liberties with a child in cases 14 CRS 68714 and 16 CRS 24497, as well as first degree sex offense with a child and felony sex act with a student by a teacher in case 16 CRS 24493. (See

Docket Entry 6 at 16; see also Docket Entry 1-1 at 39, 42-45 (verdict forms).)[1] The trial court arrested judgment on the first degree kidnapping convictions (see Docket Entry 1-1 at 48), and imposed a sentence of imprisonment for 1) 300 to 420 months on the first degree sex offense with a child conviction (see id. at 51-52 (judgment and commitment form)), 2) a consecutive term of 12 to 24 months on the felony sex act with a student by a teacher conviction (see id. at 49-50 (judgment and commitment form)), and 3) a consecutive term of 15 to 27 months on the consolidated indecent liberties with a child convictions (see id. at 59-60 (judgment and commitment form)), along with a requirement that Petitioner register as a sex offender and submit to satellite-based monitoring upon release (see id. at 55, 58, 61 (judicial findings and order for sex offenders forms)). Petitioner's direct appeal raised solely ineffective assistance of counsel claims (see Docket Entry 11-4 (Petitioner's opening appellate brief)), and the North Carolina Court of Appeals held that, "[a]fter a thorough review of the cold record before [the court], [it was] unable to determine whether trial counsel's performance fell below an objective standard of reasonableness," and "dismiss[ed] th[e] appeal without prejudice," State v. Clawson, No. COA18-57, 263 N.C. App. 710, 822 S.E.2d 795 (table), 2019 WL 438428, at *2 (Feb. 5, 2019)

---

[1] Throughout this document, pin citations to page numbers refer to the page numbers that appear in the footer appended to documents upon their docketing in the CM/ECF system.

(unpublished).  Petitioner did not further pursue his direct appeal.  (See Docket Entry 6 at 81.)

Petitioner, through counsel, thereafter submitted a motion for appropriate relief ("MAR") to the trial court (Docket Entry 1-1 at 112-69), along with a Motion for Post-Conviction Discovery (id. at 170-75).  After the state filed an answer to the MAR (id. at 176-89), the trial court entered an order summarily denying Petitioner's MAR on its merits (id. at 190-91).  Petitioner, through counsel, subsequently submitted a "Motion to reconsider and ultimately quash the [trial c]ourt's June 10, 2020 dismissal order and to stay [Petitioner]'s MAR proceedings until the MAR discovery process is completed" (id. at 192-95), which the trial court granted, "postpon[ing] adjudication of [Petitioner]'s MAR until his attorney . . . ha[d] reviewed the complete files of the Guilford County District Attorney's Office and the Greensboro Police Department, completed his MAR investigation based on this review, and filed [Petitioner]'s amended MAR" (Docket Entry 11-10 at 2).

Petitioner, through counsel, submitted an amended MAR ("Amended MAR") to the trial court (Docket Entry 1-1 at 196-352), which that court summarily denied (see id. at 410).  Petitioner's counsel then submitted a petition for writ of certiorari to the North Carolina Court of Appeals seeking review of the trial court's denial of Petitioner's Amended MAR (id. at 411-61), which that court denied (see id. at 468).

Petitioner, through counsel, subsequently commenced this action by filing a petition under Section 2254 in this Court (Docket Entry 1), which he amended as of right (Docket Entry 6). Respondent thereafter filed the instant Motion (Docket Entry 25; <u>see also</u> Docket Entry 26 (Supporting Brief)), Petitioner submitted a response in opposition to the instant Motion (<u>see</u> Docket Entry 29), and Respondent replied (Docket Entry 33). For the reasons that follow, the Court should grant the instant Motion.

## II. **Grounds for Relief**

The Amended Petition asserts two grounds for relief:

1) "[t]rial counsel was ineffective because he failed to request limiting instructions prohibiting jurors from considering the [s]tate's extensive 'profile' and [post-traumatic stress disorder ('PTSD')] expert testimony and evidence as substantive evidence [the victim] had, in fact, been sexually abused by [Petitioner] - at some point - while attending Lindley Elementary School" (Docket Entry 6 at 100 (bold font and block formatting omitted)); and

2) "[t]rial counsel was ineffective because he failed to object and move to strike or request a mistrial when Dr. Stacy Thomas, Bobbie Bingham, and Detective Nero repeatedly vouched for [the victim]'s credibility and truthfulness" (<u>id.</u> at 138 (bold font and block formatting omitted)).

4

### III. <u>Facts</u>

On direct appeal, the North Carolina Court of Appeals summarized the factual background of the case as follows:

> [Petitioner] was a teacher in the English as a Second Language (ESL) program at an elementary school. George[FN] was a Spanish-speaking student in [Petitioner]'s classes from kindergarten through the third grade. When George was in the first grade, [Petitioner] began sexually assaulting George in the bathroom while walking him and other students back to their classrooms. George reported this conduct continued throughout his second and third-grade years. When George was in third grade, he began claiming that he was sick and did not want to attend school. George told his mother and another teacher he was upset over his grandmother's recent death. George's mother did not believe him "[b]ecause he didn't even know her . . . [h]e didn't speak with her." Upon further questioning, George told his mother he did not want to attend school anymore because "he was scared of" [Petitioner] and that [Petitioner] "had hurt him a lot."
>
> [FN] A pseudonym is used to protect the identity of the minor victim.

<u>Clawson</u>, 2019 WL 438428, at *1.

### IV. <u>Habeas Standards</u>

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Further, "[b]efore [the] [C]ourt may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he

presents those claims to [this] [C]ourt in a habeas petition. The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").[2]

Additionally, this Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id.

Under Section 2254(d)'s deferential standard, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court

_____

[2] The Court may deny a claim on the merits despite a lack of exhaustion. See 28 U.S.C. § 2254(b)(2).

6

proceeding." 28 U.S.C. § 2254(d). To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also id. at 409-11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous").

### V. Ineffective Assistance of Counsel Standards

The Fourth Circuit has provided guidance in regards to the clearly established Federal law governing ineffective assistance claims:

> In order to establish an ineffective assistance of counsel claim . . ., [a petitioner must] establish that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," [Strickland v. Washington, 466 U.S. 668, 688 (1984)], and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "Unless a [petitioner] makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

7

In determining whether counsel's performance was deficient, "[i]t is all too tempting for a [petitioner] to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted).

Similarly, in evaluating whether [a petitioner] has shown actual prejudice from any such deficient performance, it is insufficient for the [petitioner] "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." Id. at 693. Rather, a "reasonable probability" that the result would have been different requires "a probability sufficient to undermine confidence in the outcome." Id. at 694.

Fisher v. Lee, 215 F.3d 438, 446-47 (4th Cir. 2000) (emphasis added) (parallel citations omitted).

Moreover, the United States Supreme Court has cautioned that "[s]urmounting *Strickland*'s high bar is never an easy task. . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." Harrington v. Richter, 562 U.S. 86, 105 (2011) (emphasis added) (internal quotation marks omitted). Further, "[w]here the issue is whether the state court has unreasonably applied *Strickland* standards to a claim of ineffective assistance of counsel, . . . double deference is required." Lavandera-Hernandez v. Terrell, No. 1:12CV553, 2013 WL 1314721, at *4 (M.D.N.C. Mar. 28, 2013) (unpublished)

8

(Schroeder, J.) (emphasis added) (internal quotation marks omitted), appeal dismissed, 539 F. App'x 159 (4th Cir. 2013); see also Harrington, 562 U.S. at 105 ("The standards created by Strickland and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." (emphasis added) (internal citations and quotation marks omitted)).

Accordingly, when the Court's examination of an ineffective assistance claim proceeds under Section 2254(d), "[t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 562 U.S. at 105; see also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (observing that Section 2254(d) imposes "a difficult to meet and highly deferential standard . . ., which demands that state-court decisions be given the benefit of the doubt . . . [and that a] petitioner carries the burden of proof" (internal citations and quotation marks omitted)). In other words, "under the dual, overlapping lenses of [Section 2254(d) ] and Strickland [the Court must] ask[ ] the following question: Was the [state habeas court]'s holding incorrect to a degree that its conclusion was so lacking in justification that it was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement?" Moore v. Hardee, 723 F.3d 488, 496 (4th Cir. 2013) (emphasis added) (internal brackets, ellipses, and quotation marks omitted).

9

## VI. Discussion

## A. De Novo Versus Section 2254(d) Standard of Review of Strickland's Deficient Performance Prong

Petitioner has advanced two threshold arguments that the Court should review his allegations regarding his trial counsel's deficient performance in Grounds One and Two under a de novo standard of review, rather than Section 2254(d)'s deferential standard: 1) the MAR court's refusal to grant Petitioner an evidentiary hearing resulted in a "[m]aterially incomplete state court record" (Docket Entry 6 at 95 (bold font omitted); see also id. at 128-29; Docket Entry 29 at 8-10); and 2) the MAR court's failure to expressly address Strickland's deficient performance prong in its decision denying the Amended MAR precludes the Court from applying Section 2254(d)'s deference to that prong (see Docket Entry 6 at 94-95, 124-28; see also Docket Entry 29 at 4-8.) The Court will address those arguments in turn.

## 1. Materially Incomplete State Court Record

Petitioner argues that he "repeatedly asked [the MAR court] for an evidentiary hearing so trial counsel could testify and explain his reasoning or lack thereof regarding why he didn't request . . . limiting instructions" (Docket Entry 6 at 128), but that the MAR court "repeatedly denied th[o]se requests" (id. at 129), resulting in a "materially incomplete" record (id. at 128 (citing Valentino v. Clarke, 972 F.3d 560, 577 (4th Cir. 2020), Gordon v. Braxton, 780 F.3d 196, 202 (4th Cir. 2015), Winston v.

10

_Pearson_, 683 F.3d 489, 496 (4th Cir. 2012) ("_Winston II_"), and _Winston v. Kelly_, 592 F.3d 535, 555 (4th Cir. 2010) ("_Winston I_"))). Thus, Petitioner maintains that he has rebutted the presumption under _Harrington_ that the MAR court adjudicated the merits of his allegations regarding trial counsel's deficient performance under _Strickland_, such that a de novo standard of review should guide the Court's analysis of deficient performance, rather than Section 2254(d)'s deferential standard. (See _id._)

Petitioner raised the substance of his instant claims of ineffective assistance on direct appeal to the North Carolina Court of Appeals, but that court "dismissed []his appeal without prejudice to [his] right to file a [MAR] in the [s]uperior [c]ourt," _Clawson_, 2019 WL 438428, at *2, reasoning as follows:

> After a thorough review of the cold record before us, [the court is] unable to determine whether trial counsel's performance fell below an objective standard of reasonableness. <u>Trial counsel's strategy is a question of fact that cannot be hypothesized, and the strategy of [Petitioner]'s counsel and the reasons therefore are not apparent from the cold record</u>. _See State v. Al-Bayyinah_, 359 N.C. 741, 753 (2005). Given the strong presumption that trial counsel acted within the standard of reasonableness, further investigation is needed in order to 'assess the allegations in light of all the circumstances known to counsel at the time of representation.' _See_ [_State_ v.] _Buckner_, 351 N.C. [401,] 412 [(2000)].

_Id._ (emphasis added) (parallel citations omitted).

Petitioner thereafter raised the substance of his instant ineffectiveness claims in his MAR (see Docket Entry 1-1 at 141, 165), and requested an evidentiary hearing to "allow him to

11

meaningfully and effectively develop and present his federal
constitutional claims to the post-conviction court[,] . . . namely
testimony from trial counsel explaining his trial decision-making"
(see id. at 168). The MAR court subsequently allowed Petitioner's
Motion for Post-Conviction Discovery (see Docket Entry 1-1 at 170-
75; see also Docket Entry 6 at 84),[3] after which Petitioner
submitted his Amended MAR (Docket Entry 1-1 at 196-352), which also
raised the substance of his instant ineffectiveness claims (see id.
at 201, 203), "supplemented . . . with numerous favorable facts
from the provided discovery" (Docket Entry 6 at 87 (emphasis
added)), and again requested an evidentiary hearing to elicit
"testimony from trial counsel explaining his trial decision-making"
(Docket Entry 1-1 at 351). The MAR court then denied Petitioner's
Amended MAR without holding an evidentiary hearing, ruling, in
pertinent part, as follows:

> [Petitioner] now alleges a violation of his rights, the
> contentions set forth in his [Amended MAR] that he
> received ineffective assistance of counsel and outline[d]
> above. The [c]ourt, having reviewed the established
> record and the proceedings in both trials. The [c]ourt
> finding those proceedings consistent with the
> documentation in the court file, has determined that
> there are no facts alleged in the [Amended MAR] that, if
> true, would indicate a reasonable probability that the
> result of the proceedings would have been different. The
> [c]ourt concludes that the allegations in support of the
> [Amended MAR] are wholly insufficient to indicate that

---

[3] The record does not contain an order from the MAR court granting
Petitioner's Motion for Post-Conviction Discovery.

any alleged deficient performance by counsel prejudiced [Petitioner's] defense.

(Id. at 410.)

Notably, Petitioner failed to argue in his petition for a writ of certiorari to the North Carolina Court of Appeals seeking review of his Amended MAR's denial that the MAR court erred by not granting Petitioner an evidentiary hearing. (See id. at 411-61.) That failure amounts to an abandonment of that argument. See State v. Brent, 367 N.C. 73, 76 (2013) (holding that the defendant "not only failed to preserve [an] issue through objection at trial but, had he preserved the issue, also would have abandoned the issue by failing to raise it in his brief before the [North Carolina] Court of Appeals" (emphasis added)); see also N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned." (emphasis added)).

Moreover, after abandoning that argument in the North Carolina Court of Appeals, Petitioner did not revive it in his pleadings in this matter. In his original petition, he generically requested an evidentiary hearing without specifying the reasons for which he sought the hearing (see Docket Entry 1 at 10 ("WHEREFORE, [Petitioner] respectfully requests the following relief: . . . 4. An order granting an evidentiary hearing.")) and, in the Amended Petition, he failed to request an evidentiary hearing at all (see Docket Entry 6 at 173 ("WHEREFORE, based on the forgoing facts, authorities, and arguments - [Petitioner] respectfully requests the

13

following relief: 1. An order granting him a writ of habeas corpus . . . . 2. Any other order the Court deems necessary to protect his right to fundamentally fair federal habeas proceedings.")). Even more significantly, Petitioner entirely failed to argue, in his original Petition, the Amended Petition, or his response in opposition to the instant summary judgment motion, that this Court could not adjudicate the deficient performance prong of his Strickland claims (or find against him on that prong) without holding an evidentiary hearing to elicit his trial counsel's reasons for not objecting to (or seeking to limit the jury's consideration of) the profile, PTSD, and vouching testimony at issue in this case. (See Docket Entries 1, 6, 29.) Accordingly, in light of Petitioner's abandonment of such argument, both in the North Carolina Court of Appeals and this Court, the Court should not further consider Petitioner's argument that the MAR court's failure to hold an evidentiary hearing resulted in a materially incomplete record. However, even if not abandoned, that argument also fails on its merits, as discussed in more detail below.

In that regard, in Winston I, after the state habeas court had denied relief without granting discovery or holding an evidentiary hearing, the petitioner produced for the first time in federal habeas proceedings an IQ score of 66, which would have disqualified him for the death penalty under Atkins v. Virginia, 536 U.S. 304

14

(2002), but the district court "refused to consider" the new IQ score "because it rendered [the petitioner's] claim unexhausted" and "concluded that the [state habeas c]ourt's determination was not objectively unreasonable" under Section 2254(d). Winston I, 592 F.3d at 548. The Fourth Circuit reversed, holding as follows:

> When . . . the petitioner offers, for the first time in federal habeas proceedings, new, material evidence that the state court could have considered had it permitted further development of the facts, an assessment under § 2254(d) may be inappropriate. . . . [W]hen a state court forecloses further development of the factual record, it passes up the opportunity that exhaustion ensures. If the record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d). New, material evidence, introduced for the first time during federal habeas proceedings, may therefore require a de novo review of [the] petitioner's claim.

Id. at 555-56 (emphasis added) (internal citations omitted).

After the United States Supreme Court issued Harrington and Pinholster in 2011, the Fourth Circuit revisited the continuing viability of Winston I's above-quoted holding in Winston II:

> Closely scrutinizing the import of Pinholster and [Harrington], we find nothing in those decisions that renders infirm our analytical framework in Winston I. Neither decision clarifies the "adjudicated on the merits" requirement of § 2254(d)(1) such that it compels disturbing our prior holding . . . that the state court's refusal to allow [the petitioner] to develop the record, combined with the material nature of the evidence that would have been produced in state court were appropriate

15

procedures followed, rendered its decision unbefitting of classification as an adjudication on the merits.

*Winston II*, 683 F.3d at 500-02 (emphasis added).[4]

Since its holding in *Winston II*, the Fourth Circuit found that a materially incomplete state court record precluded deferential review under Section 2254(d) where the state habeas court "unreasonably truncated further factual development on [the petitioner]'s contention that [his trial counsel] failed to file an appeal and said noting at all about [the petitioner]'s assertion that [his trial counsel] failed to consult with him" about an appeal. *Gordon*, 780 F.3d at 202. The court noted that "[t]he record . . . set[] up a <u>classic factual dispute</u>" on a dispositive

---

[4] Other federal appellate courts do not agree that <u>Winston I</u>'s materially incomplete record exception to a state court's adjudication on the merits of a habeas claim should survive <u>Harrington</u> and <u>Pinholster</u>. <u>See</u> <u>Sandoval Mendoza v. Lumpkin</u>, 81 F.4th 461, 472 (5th Cir. 2023) ("With respect for th[e Fourth C]ircuit, we have consistently held that 'a full and fair hearing is not a precondition to . . . applying § 2254(d)'s standards of review.'" (quoting <u>Boyer v. Vannoy</u>, 863 F.3d 428, 446 (5th Cir. 2017))), <u>cert. denied</u>, No. 23-1004, 145 S. Ct. 138 (mem) (Oct. 7, 2024); <u>Garuti v. Roden</u>, 733 F.3d 18, 23 (1st Cir. 2013) ("[The petitioner] urges us to follow cases similar to *Winston* [*I*,] . . . [but t]his court held that those cases on which [the petitioner] relies were essentially overruled by *Pinholster*."); <u>Bollinger v. Prelesnik</u>, 709 F.3d 558, 561-62 (6th Cir. 2013) ("In [the pre-*Harrington* decision in] *Brown* [*v. Smith*, 551 F.3d 424 (6th Cir. 2008)], we concluded that the state court had not issued a decision on the merits because highly relevant documents were absent from the trial court record. To the extent that *Brown* is inconsistent with *Harrington*'s definition of 'on the merits,' however, it is no longer the law. . . . It is now clear that a state-court adjudication, even when unaccompanied by an explanation, is presumed to be on the merits and is to be reviewed through the deferential lens of § 2254(d). While allowing a petitioner to supplement an otherwise sparse trial court record may be appealing, especially where he diligently sought to do so in state court, the plain language of *Pinholster* and *Harrington* precludes it." (citations omitted)).

16

question, but that the state habeas court failed to "resolve th[at] credibility contest." Id. at 203 (emphasis added).[5]

With the exception of Gordon, since Winston I and Winston II, the Fourth Circuit has issued a series of opinions emphasizing the extremely limited scope of its materially incomplete record exception to finding an adjudication on the merits. See Stanko v. Stirling, 109 F.4th 681, 690 (4th Cir. 2024) ("It is indeed well established in our circuit . . . that a claim is not adjudicated on the merits for purposes of § 2254(d) if it is decided on a materially incomplete record because a state [habeas] court has

---

[5] Other district courts in the Fourth Circuit, including members of this Court, have similarly found materially incomplete state court records precluding Section 2254(d) deference where the state habeas court refused to resolve a credibility or factual dispute. See, e.g., Smith v. Mirandy, No. 2:14CV18928, 2016 WL 1274592, at *14, 16 (S.D.W. Va. Mar. 31, 2016) (unpublished) ("[T]he [c]ourt finds that the state court did not adjudicate on the merits [the p]etitioner's claim related to the advice that he received concerning a plea offer. . . . The state court's adjudication of the claim was not an on-the-merits adjudication because the state court unreasonably refused to allow further factual development of the issue. . . . It was particularly important to hold an evidentiary hearing on [the p]etitioner's plea offer claim because that issue inherently requires a credibility determination[.]" (emphasis added)); Turner v. Young, No. 1:08CV884, 2013 WL 2403274, at *5-6 (M.D.N.C. May 31, 2013) (unpublished) (Beaty, J.) ("Petitioner presented to the MAR Court a copy of a North Carolina 'Transcript of Plea' form signed by both [the p]etitioner and [his trial counsel], . . . which . . . provi[ded] that [the p]etitioner would receive a single consolidated sentence . . . . [The p]etitioner also presented the altered 'Transcript of Plea' form . . ., which did not include the consolidated sentence provision and which [the p]etitioner argued was altered without his knowledge. . . . [The p]etitioner requested an evidentiary hearing in two separate places within his [MAR]. The MAR Court did not, however, grant an evidentiary hearing and . . . did not resolve the circumstances surrounding the alteration of the 'Transcript of Plea' form at issue . . . . [The] Court now finds that[,] despite [the p]etitioner's efforts to set forth and support his claims within his [MAR], the MAR Court failed to properly develop the factual record [as to the petitioner's] claims that his plea was not voluntary and knowing because it was based on an altered 'Transcript of Plea' form, or that he received ineffective assistance of counsel with respect to the alteration of the 'Transcript of Plea' form. . . . As such, the Court concludes that [those] claims . . . were not adjudicated on the merits in state court[, and] the Court will . . . review [those] claims . . . de novo . . . .").

17

unreasonably refused to permit _necessary_ factual development,
either by refusing to consider, without explanation, _critical_
_evidence_, or by unreasonably refusing to hold a hearing to resolve
a _critical factual dispute_.  But that is a _rare_ _scenario_[.]"
(emphasis added) (internal quotation marks, citations and dash
omitted)), _cert. denied_, ___ U.S. ___, No. 24-6420, 2025 WL 1287095
(May 5, 2025); _Burr v. Jackson_, 19 F.4th 395, 417 (4th Cir. 2021)
("*Winston* and related cases provide a _narrow exception_ to
*Pinholster* that we have held arises where the state court _shuns_ its
primary responsibility for righting wrongful convictions and
_refuses_ to consider claims of error." (emphasis added)); _Valentino_,
972 F.3d at 576, 578-79 ("[The petitioner] asserts the state court
failed to adjudicate his claim on the merits when it rejected his
petition without ordering forensic testing of his bloody
sock. . . .  A state court does not unreasonably truncate further
factual development when it declines to order discovery of a fact
that it finds _immaterial_. . . .  [T]he state court here determined
that the bloody-sock evidence was just not prejudicial." (emphasis
added)); _Burr v. Lassiter_, 513 F. App'x 327, 341 (4th Cir. 2013)
("The fact that [the petitioner]'s state post-conviction counsel
requested but was denied an evidentiary hearing simply does not,
without more, warrant de novo review of the state court's
decision.").

In contrast to those cases, Petitioner here does not proffer any new, material evidence the MAR court refused to consider, nor does he describe any credibility or factual dispute the MAR court failed to resolve. Instead, Petitioner merely speculates that the testimony of his trial counsel at an evidentiary hearing would support his claim of deficient performance, because "[t]rial counsel's failure to request a limiting instruction wasn't based on a legitimate strategic decision; it was based on inattention and/or ignorance of the law." (Docket Entry 6 at 126.) Petitioner's speculation about both the substance and impact of his trial counsel's testimony at an evidentiary hearing falls far short of the proffer necessary to establish a materially incomplete state court record. See Brizuela v. Clarke, 112 F. Supp. 3d 366, 375 (E.D. Va. 2015) ("Both *Winston I* and *Winston II* are inapposite to this case, as [the] petitioner has failed to identify a single piece of material evidence that the [state habeas court] failed to consider. Indeed, [the] petitioner's supplemental petition and response brief are devoid of the pieces of evidence that were missing from the record in the state habeas proceedings below, and how such evidence would have been material." (emphasis added)).

Furthermore, the mere fact that, on direct appeal, the North Carolina Court of Appeals declined to resolve Petitioner's ineffectiveness claims on the "cold record" before it, see Clawson, 2019 WL 438428, at *2, does not require this Court to rule that the

19

MAR court issued its ruling on a materially incomplete record. The MAR court granted Petitioner's Motion for Post-Conviction Discovery, and Petitioner supplemented his ineffectiveness claims with information he obtained in discovery that did not come before the North Carolina Court of Appeals on direct appeal. (See Docket Entry 6 at 87.) As documented previously, Petitioner thereafter abandoned any request for an evidentiary hearing when he sought review of the MAR court's ruling (see Docket Entry 1-1 at 411-61) and the North Carolina Court of Appeals refused any further review (see id. at 462). Likewise, Petitioner failed to request an evidentiary hearing in this Court for the purpose of soliciting testimony from his trial counsel and failed to argue that the absence of such testimony precluded a ruling against him on the performance prong of his ineffective assistance claims. (See Docket Entries 1, 6, 29.)

Moreover, many courts have rejected a petitioner's assertion of a materially incomplete state court record based on the state habeas court's refusal to hold an evidentiary hearing on ineffectiveness claims, where the state habeas record contained sufficient information to determine the objective reasonableness of trial counsel's actions under Strickland. See Morva v. Zook, 821 F.3d 517, 523, 528 (4th Cir. 2016) ("[The petitioner] moved repeatedly to supplement the record[,] and for discovery, the appointment of mental-health experts, and an evidentiary hearing.

20

The [state habeas] court denied [the petitioner]'s motions and dismissed the habeas petition, finding no ineffective assistance. . . . Although the [state habeas court] precluded some factual development as to counsel's investigative decisionmaking, th[at] court did not act unreasonably. The record was substantial and contained sufficient evidence to answer the <u>Strickland</u> inquiry."); <u>Blakes v. Clarke</u>, No. 1:18CV1257, 2019 WL 3502903, at *4-5 (E.D. Va. July 31, 2019) (unpublished) ("[The petitioner ] argues that the record upon which the [state habeas c]ourt [] denied [his] ineffective assistance claims was materially incomplete because the state court failed to order an evidentiary hearing to determine trial counsel's motivation for taking — or failing to take — certain actions during and before trial . . . . [T]he state court did not act unreasonably in failing to order an evidentiary hearing. [The p]etitioner repeatedly argues that an evidentiary hearing was necessary to determine trial counsel's <u>subjective</u> motivation for taking or not taking certain actions. [The petitioner] claims that this information is determinative as to whether counsel provided constitutionally sound assistance. [The p]etitioner is incorrect. '*Strickland* calls for an inquiry into the *objective* reasonableness of counsel's performance, not counsel's *subjective* state of mind.'" Where [the] petitioner failed adequately to allege grounds suggesting that counsel's behavior fell below <u>objectively</u>

21

reasonable standards, no factual development was necessary, and denying petitioner's request for an evidentiary hearing was not unreasonable. Contrary to [the] petitioner's claims, then, the state court did not render its decision on an incomplete factual record; its adjudication was 'on the merits' for the purposes of 28 U.S.C. § 2254(d)." (internal citations omitted) (emphasis added) (quoting Harrington, 562 U.S. at 110 (italics added by Blakes))); Noce v. Clarke, No. 1:18CV513, 2018 WL 7017992, at *4, 5 (E.D. Va. Oct. 30, 2018) (unpublished) ("[The p]etitioner's case is distinguishable from both *Winston I* and *Gordon*, where both state habeas courts failed to address the petitioner's claims. . . . Here, the [state habeas court] directly addressed [the] petitioner's argument for ineffective assistance of counsel. Moreover, the record is complete, and [the] petitioner has not identified any new admissible evidence or witness testimony that would warrant an evidentiary hearing . . . . [T]he [state habeas court] found that there were many objective reasons why trial counsel may not have chosen to present testimony on the issues of the victim's dissociative disorder and recovered memories, including 'that such testimony may well [have] emphasized the degree of trauma she suffered at the hands of her father's lengthy

22

abuse.'" (emphasis added)), <u>recommendation adopted</u>, 2018 WL 6634601

(E.D. Va. Dec. 18, 2018) (unpublished).[6]

Under such circumstances, Petitioner has not shown that a de
novo standard of review should apply to his deficient performance
arguments under <u>Strickland</u> due to alleged gaps in the state court
record.

2.  <u>Absence of MAR Court Ruling on Deficient Performance Prong of
    Strickland</u>

Petitioner next maintains that, because the MAR court
"rejected [his] <i>Strickland</i> claim by focusing solely on <i>Strickland</i>'s
prejudice element, Section 2254(d)'s deference [does not] apply to
<i>Strickland</i>'s deficient performance element."  (Docket Entry 6 at 94
(citing <u>Porter v. McCollum</u>, 558 U.S. 30, 39 (2009), and <u>Rompilla v.
Beard</u>, 545 U.S. 374, 390 (2005); <u>see also</u> <u>id.</u> at 94-95, 124-28;
Docket Entry 29 at 4-8 (additionally citing <u>Wiggins v. Smith</u>, 539
U.S. 510, 534 (2002)).)  Respondent does not challenge the notion
that the MAR court failed to address deficient performance (<u>see</u>

_____

[6] Indeed, because <u>Strickland</u> requires an <u>objective</u> inquiry into trial
counsel's reasonableness, courts routinely must hypothesize as to the strategic
reasons behind counsel's actions.  <u>See</u> <u>Evans v. Miller</u>, 850 F. App'x 515, 522
(9th Cir. 2021) (concurring in part and dissenting in part) ("[W]here the state
court never held a hearing or actually engaged with the merits of an ineffective
assistance claim, a federal court reviewing a habeas corpus petition may (or
must) attempt to hypothesize plausible strategic reasons why trial counsel acted
or failed to act."); <u>John v. United States</u>, No. CR-12-8082, 2023 WL 5366312, at
*5 (D. Ariz. Aug. 22, 2023) (unpublished) ("<i>Strickland</i> calls for an inquiry into
the <u>objective</u> reasonableness of counsel's performance, not counsel's <u>subjective</u>
state of mind. . . .  [E]ven admissions by trial counsel of ineffectiveness are
not dispositive of such claims because ineffectiveness is a question for the
courts, not counsel, to decide.  Here, trial counsel's claim that she was not
making a strategic decision does not change the [c]ourt's legal conclusion that
she made a strategic decision under <i>Strickland</i>." (emphasis added)
(ellipsis, brackets, internal parenthetical citations, and some internal
quotation marks omitted)).

23

Docket Entry 26 at 10-11 ("[I]t appears that [the MAR court rejected Petitioner's claims] only on a finding of no prejudice under *Strickland*'s second prong.")), but notes that "[i]t appears that this Court and the Fourth Circuit have not addressed this question" (id. at 12). Respondent further argues that "the *Wiggins* reasoning is contrary to the United States Supreme Court's later-in-time *Sexton* decision's treatment of unreasoned state court decisions, which provides deference to 'arguments or theories' that 'could have supported . . . the state court's decision.'" (Id. at 12 (quoting Sexton v. Beaudreaux, 585 U.S. 961, 964-65 (2018)).) Respondent's counter arguments fail for two reasons.

First, and most importantly, the Fourth Circuit has rejected the idea that later-in-time United States Supreme Court cases have undermined the relevant holdings in Porter, Rompilla, and Wiggins:

> The Commonwealth urges us to affirm the dismissal of [the petitioner]'s ineffective assistance claim on two alternative grounds. . . . Because the state court did not reach these questions, we consider them de novo. *See Brumfield*[ *v. Cain*], [576 U.S. 305, 323 (2015)] (where state trial court does not make finding on particular component of claim, there is "no determination on that point to which a federal court must defer" under § 2254(d)); *Wiggins*, 539 U.S. at 534 (no AEDPA deference in evaluating prong of *Strickland* analysis that state court has not reached) . . . .[8]
>
> [8] We do not understand the Commonwealth to argue against this application of *Brumfield* and *Wiggins*. Once it is established that the state-court decision we review under § 2254(d) is that of the [state habeas c]ourt, it follows that deference under § 2254(d) is owed only to the actual determinations of that court and not those that it hypothetically might have made . . . . *See Brumfield*, [576 U.S. at 323] (contrasting *Wiggins* and [*Harrington*]).

> And if there were any question as to whether _Wiggins_
> survives [_Harrington_], we think it was resolved by the
> Supreme Court's recent decision in _Brumfield_, applying
> _Wiggins_ to review de novo one component of a claim under
> _Atkins_[], because it was not addressed by the last
> reasoned state-court decision.

Grueninger v. Director, Virginia Dep't of Corr., 813 F.3d 517, 528 & n.8 (4th Cir. 2016) (emphasis added). A few years later, the Fourth Circuit re-confirmed in a published decision that _Porter_, _Rompilla_, and _Wiggins_ remained binding precedent and required de novo review of elements of claims the state habeas court did not address in its reasoned decision. See Bowman v. Stirling, 45 F.4th 740, 753 (4th Cir. 2022) ("[W]hen the state court did not decide one element of a properly presented federal claim; if the federal court must consider that element, it does so de novo." (citing _Porter_, 558 U.S. at 39, _Rompilla_, 545 U.S. at 390, and _Wiggins_, 539 U.S. at 534)). This Court must follow that binding precedent.

Second, Sexton merely quoted the well-established principle from Harrington that, "[w]hen . . . there is no reasoned state-court decision on the merits, the federal court 'must determine what arguments or theories . . . could have supported . . . the state court's decision,'" Sexton, 585 U.S. at 964–65 (quoting Harrington, 562 U.S. at 102), and did not even mention, much less call into question or overrule, _Porter_, _Rompilla_, and _Wiggins_, see id. Accordingly, Sexton provides no basis for this Court to disregard _Porter_, _Rompilla_, and _Wiggins_.

25

In light of the foregoing considerations, the Court should review Petitioner's deficient performance arguments in Grounds One and Two under a de novo standard of review.

**B.    Ground One**

Via Ground One, Petitioner contends that "[t]rial counsel was ineffective because he failed to request limiting instructions prohibiting jurors from considering the [s]tate's extensive 'profile' and PTSD expert testimony and evidence as substantive evidence [the victim] had, in fact, been sexually abused by [Petitioner] - at some point - while attending Lindley Elementary School." (Docket Entry 6 at 100 (bold font and block formatting omitted); see also Docket Entry 29 at 12-34.)  More specifically, Petitioner asserts that his trial counsel failed to request a limiting instruction from the trial court prohibiting the jurors from considering as substantive evidence 1) testimony from three of the state's expert witnesses, social worker Cindy Stewart, pediatrician Dr. Stacy Thomas, and licensed professional counselor Bobbie Bingham, that the victim displayed symptoms consistent with those exhibited by sexually abused children (see Docket Entry 6 at 100-04 (citing Docket Entry 39-7 (Trial Tr. Vol. IV-2) at 14-20 (Stewart), 69-82 (Thomas), and Docket Entry 39-8 (Trial Tr. Vol. V) at 65-70 (Bingham))), as well as 2) testimony from Bingham that she diagnosed the victim with PTSD based on his reports of sexual abuse by Petitioner (see id. at 104-05 (citing Docket Entry 39-8 at 70-

26

105)).  Petitioner maintains that, because his trial counsel failed to "request[] a limiting instruction for the extensive 'profile' and PTSD expert testimony and evidence" (id. at 125), Petitioner has demonstrated deficient performance by trial counsel under a de novo standard of review (see id. at 128).  Petitioner additionally asserts that the MAR court, in concluding that trial counsel's alleged deficient performance did not prejudice Petitioner, 1) "'unreasonably applied' *Strickland*'s prejudice standard to the facts in [Petitioner's] case" and 2) based that conclusion "on an unreasonable finding, *i.e.*, the [s]tate presented overwhelming evidence of [Petitioner]'s guilt regarding the first-grade and third-grade counts [against him]."  (Id. at 134.)  For the following reasons, the Court should deny relief on Ground One.

1.   Deficient Performance

Petitioner argues that, under North Carolina precedent, "if the trial court permits 'profile' testimony regarding the 'symptoms and characteristics of sexually abused children[,]' it must 'limit the permissible use' of the 'profile' evidence by jurors" to "corroborative purposes only" (id. at 108-09 (quoting State v. Hall, 330 N.C. 808, 817 (1992) (in turn citing and discussing State v. Kennedy, 320 N.C. 20 (1987)))) and that, "[b]efore admitting expert testimony that the [victim] suffers from PTSD, the 'trial court should balance the probative value of the [PTSD evidence] . . . against its prejudicial impact under [North

27

Carolina] Evidence Rule 403[,]' . . . 'determine whether admission of th[at] evidence would be helpful to the trier of fact under [North Carolina] Evidence Rule 702,' and . . . 'take pains to explain to the jurors the limited uses for which the evidence is admitted'" (id. at 110 (quoting Hall, 330 N.C. at 821)). Thus, Petitioner asserts, "[t]o vindicate th[at] critical limitation, . . . trial counsel must ask the trial court for a limiting instruction." (Id. at 109 (emphasis added).) According to Petitioner, his "[t]rial counsel's failure to request a limiting instruction [for the profile evidence] constitutes Strickland deficient performance[, because t]rial counsel didn't have a strategic reason for not requesting said limiting instruction." (Id.; see also id. at 111 (making same argument regarding PTSD evidence); id. at 126 (stating that trial counsel's failure to request limiting instruction "was based on inattention/ignorance of the law").) In Petitioner's view, "a limiting instruction would've tremendously benefitted [him] because the [s]tate's case hinged entirely on [the victim]'s credibility" (id. at 109), and "trial counsel should've known it was quite likely [Petitioner]'s jurors would find the extensive profile and PTSD expert testimony 'very impressive' - even more impressive than [the victim]'s own testimony" (id. at 112 (first internal quotation marks omitted) (quoting Ake v. Oklahoma, 470 U.S. 68, 81 n.7 (1985))).

28

**a. Profile Evidence**

i. <u>Stewart's Profile Evidence</u>

Stewart testified that she had worked "as a hospital social worker . . . in the pediatric clinic in Brenner Children's Hospital . . . [s]ince 1992." (Docket Entry 39-6 (Trial Tr. Vol. IV-1) at 9.) After a voir dire outside the presence of the jury (<u>see</u> <u>id.</u> at 14-17), the trial court admitted Stewart as an expert in "sexual abuse and interviewing children" (<u>id.</u> at 14; <u>see also</u> <u>id.</u> at 20 (trial court's ruling)) without objection by trial counsel (<u>see</u> <u>id.</u> at 20). Stewart then explained that she conducted the diagnostic interview portion of the child medical examination of the victim (<u>see</u> <u>id.</u> at 21-24; <u>see also</u> Docket Entry 39-7 at 5-14) and, as relevant to this case, provided the following testimony:

> [PROSECUTOR:] . . . [I]n your time and in your experience of conducting these types of interviews with children who allege some sort of sexual abuse, <u>are there any common symptoms that you would see</u> in a child, not necessarily [the victim], but in the common characteristics that pop out to you that are - that come <u>in children who allege some sort of sexual abuse</u>?
>
> [STEWART:] We actually do question the parents or the caregivers about physical symptoms and also emotional and behavioral indicators. And there are some of those that are specific to - generally specific to stress or some form of trauma and then there are some that are more specific to sexual abuse. . . . But the questions are about <u>any complaints about their bodies, any complaints about their genital area, their butt, constipation, recurring diarrhea, bedwetting, wetting during the day, soiling themselves with bowel movement</u>. And so there's a list of just general medical kinds of things that we talk about. Is there any <u>discharge, bleeding, complaints</u>

29

about itching, burning, those kinds of things. The
emotional and behavioral indicators include questions
about sleeping and any sudden changes in behaviors where
things have gone a certain way and then all of a sudden
they're totally different in a child's personality or
their way of handling things has completely changed. We
talked about the sleeping, crying easily, symptoms of
depression. We talk about unusual fears that a child may
have. And this may be specific to people, a certain
person, places. . . . [T]he unusual fears can
be . . . fear of bathrooms, fear of going to bed at
night. But those are sometimes kind of indicators of the
time frame of when something might have happened. We
continue with talking about behavioral things in terms of
increase in difficult to manage behaviors at home and
also behavioral changes at school where there may have
been behavior problems that have cropped up. We also
talk about changes in academic performance . . . . The
other questions that are very more specific to sexual
abuse are whether a child seems to know more about sexual
things than they should for their age, whether they are
exhibiting that through words or actions with other
children or adults. And whether they're doing things to
their own body, excessive masturbation, inserting objects
into their genital areas or their anal areas.

[PROSECUTOR:] When you mentioned the indicators and
characteristics for sexual abuse, does that include being
able to describe sexual acts?

[STEWART:] Yes. Definitely, especially in younger
children who usually, generally don't have the knowledge
of the mechanics of sexual acts.

[PROSECUTOR:] Now, when you were interviewing [the
victim], did you make any observations or do you recall
any observations, from your memory, as to his behavior?

[STEWART:] He was a very delightful child. He was shy
and talked about being shy, but he showed his shyness by
smiling a lot and kind of standing with his parents in
terms of being a little bit standoffish. . . . [I]t was
kind of choppy. He would give bits of information. He
was kind of reluctant to keep going and describing what
had happened to him, and so I would have to say, now,
what happened next. What happened after that. And then
he would provide another piece of information. He didn't
provide a whole chunk of narrative. At times he would

30

maybe give a couple of sentences. But according to the description of the first forensic interview that we had, he appeared, and I documented this in my documentation, he seemed more calm and more confident and comfortable than he seemed to have been when he was initially talking about this when it came out to begin with.

[PROSECUTOR:] Did that surprise you?

[STEWART:] Yes. It did surprise me. Because we had quite a bit of information about his school avoidance, his extreme anxiety, his sleep disturbance. He had delayed disclosure, which is not uncommon at all for victims of sexual abuse. He was exhibiting anger and changes in his behavior and lots of fear around certain places and things - and being out of his home and being away from his parents. So, you know, . . . I was surprised that he was as personable and as comfortable because he had been struggling with extreme anxiety.

[PROSECUTOR:] But he also mentioned his therapist at that time?

[STEWART:] Yes, he did.

[PROSECUTOR:] Is it possible that having started seeing a therapist may have helped him be more comfortable?

[STEWART:] Yes, ma'am.

[PROSECUTOR:] You mentioned the concept of delayed disclosure. If you could explain to the ladies and gentlemen of the jury what that is?

[STEWART:] Many times children do not tell immediately after something happens to them. It's due to a variety of pressures and it depends on whether the circumstances are inside the family unit or inside the extended family or whether it's outside the family unit. But those pressures can be a variety of things, threats from the alleged . . . perpetrator, thoughts in the child's head in terms of what could happen to me if I tell. What could happen to somebody else if I tell. How will my parents react or respond to my telling. So there's a lot of pressure on children to maintain the secret, to maintain silence about something that is unspeakable. It's unspeakable for them. And it's reinforced by the pressures of what happened to them, reinforced by the

31

perpetrator and reinforced by the dynamics of what happened, and the dynamics in the family.

[PROSECUTOR:] <u>Would frequent exposure to the alleged perpetrator contribute to that delayed disclosure</u>?

[STEWART:] <u>Yes</u>.

. . .

[PROSECUTOR:] Now, Mrs. Stewart, based on the information that was gathered and shared with you in your interview with [the victim], <u>do you have an opinion as to whether the behavior you observed by [the victim] . . . was consistent with symptoms of children who alleged that they have typically experienced some form of sexual abuse</u>?

[STEWART:] <u>The symptoms that were presented to us in [the victim]'s presentation in clinic, not just during the interview but from the beginning of the evaluation until the completion of the evaluation, those symptoms and indicators are characteristics that are consistent with sexual abuse</u>.

(Docket Entry 39-7 at 14-20 (emphasis added).)[7] As the above-quoted testimony shows, trial counsel did not request an instruction from the trial court limiting the jurors' consideration of Stewart's profile testimony to corroborative purposes only. (<u>See</u> <u>id.</u>)

ii. <u>Dr. Thomas' Profile Evidence</u>

Dr. Thomas testified that she had served as "a pediatrician at Wake Forest Baptist Medical Center" for "[t]welve years" (<u>id.</u> at 55), and had participated in "the Child Medical Examination Program

---

[7] In all instances where Petitioner has challenged certain testimony by witnesses, the undersigned has included the specific testimony to which Petitioner objects, as well as additional testimony as needed to provide proper context for analysis.

at [the University of North Carolina]" (id. at 56). The trial court admitted Dr. Thomas, without objection from trial counsel, "as an expert in the area of pediatric medicine with an emphasis on child abuse treatment." (Id. at 59-60.) Dr. Thomas thereafter discussed the child medical examination of the victim as follows:

[PROSECUTOR:] [ W]hat information did you gather from the parents and the information that you had as to why [the victim] was there [for the child medical examination]?

[DR. THOMAS:] . . . His parents talked to me about what led to the current concerns. And what they told me is that . . . he was really having problems getting to school. He was afraid of school. He was having headaches. He was vomiting. He was crying. He was having trouble sleeping. He needed his mom more often. . . . [H]is behavioral symptoms increased and got worse. The school avoidance got worse. . . . And then he said to his mom, I don't want to go to school. . . . He said, I am afraid of my teacher. . . . He identified [Petitioner] as the teacher he was afraid of[.] . . . [H]e said that the teacher he was afraid of had hurt him really badly. . . . He was afraid of men in the school. And he was afraid of bathrooms at school. He was showing increased aggressive behavior, rebellion and poor listening. He cowers in his bed in the corner in the morning . . . . The vomiting happens at all different times of the day. He has a decreased appetite and fears being alone.

. . .

[PROSECUTOR:] When [the victim] walked in[to the clinic], could you describe his behavior for our jury?

[DR. THOMAS:] Sure. He was cooperative and pleasant and very sweet. Most of the kids, and he was not an exception, looked nervous. Nobody really likes to see me coming. But he was cooperative with the exam in the beginning . . . up until I tried to do the genital and anal exams and then there was a dramatic change in his affect and behavior. He became very, very upset, crying, screaming, you know, holding legs together, resisting the examination. . . . [The victim's] Mom was in there and then I had a female pediatric resident and the nurse with me. And we sang songs and joked. And we have a light on the top of the ceiling that looks like it's a fish

33

tank.  And I did all the tricks and all the things I could do to make him comfortable and reassure him.  But <u>ultimately, I did not do that exam.  I was able to examine genitals briefly, but I did not do the anal exam, because in my mind, I felt like that would be more traumatic than information we would gather. . . .  [T]his is relatively rare.  Most children don't have this much trouble with this exam</u>.

. . .

[PROSECUTOR:] Dr. Thomas, during the course of your time as a child medical examiner, have you ever seen children who are alleging some form of sexual maltreatment have changes in their behavior?

[DR. THOMAS:] Yes.  I would say most do.  That's not 100 percent.  But that is one of the specific things we're asking about, those behavioral, emotional changes that can reflect trauma.

[PROSECUTOR:] . . .  What are some of the <u>general characteristics you see that children who allege sexual maltreatment have</u>?

[DR. THOMAS:] <u>The key to it is change</u>.  So what were they like before whatever time in question, and then what changed.  And <u>often it is symptoms of depression or anxiety.  So crying, seeming sad, staying in their room more often, or depending on the situation, not wanting to go in their room, whatever it is.  A change.  Not wanting to go to school or not wanting to go to . . . another place, daycare, a babysitter, et cetera, fears of specific people, unusual fears, like fears of a bathroom.  Sexualized behaviors that suggest they maybe know more about sex than you would expect for their age.  That's a tip off.  Also, grade performance can be very telling, and often grades will drop.  Physical symptoms, headaches, stomachaches.  Kids seem to feel things in their belly, maybe most of us do.  But vomiting, diarrhea, constipation, gastrointestinal symptoms are not uncommon.  And then I'm also about [sic] symptoms of sexual transmitted infections like discharge or rashes, blisters in the genital or anal areas</u>.

[PROSECUTOR:] And based upon that generalization that you gave us, <u>were some of those changes noted in [the victim]</u>?

[DR. THOMAS:] <u>The emotional and behavioral ones were</u>.  None of the physical -- for example, no rashes, blisters, penile discharge or nothing like that.  But the <u>fears of school,</u>

34

fears of men, fears of bathrooms, the not wanting to go to
school.  Pretty dramatic school avoidance . . .  [C]rying,
cowering in the corner, is what the[ victim's parents]
described. . . .  [The victim's] Dad went to school and stayed
in the - I can't remember if he sat in the chair in the
hallway or sat in the chair in the classroom, but . . . they
were trying so hard to get [the victim] to be able to go to
school.  And even . . . that wouldn't work[.]

. . .

[PROSECUTOR:] Dr. Thomas, do you have an opinion as to whether
the behavior and symptoms reported and displayed by [the
victim] was consistent with other children who allege some
sort of sexual maltreatment?

[DR. THOMAS:] Yes.  It's consistent with that.

[PROSECUTOR:] Did his reaction, when you tried to do that anal
exam, factor into that opinion?

[DR. THOMAS:] It did.

(Id. at 63-82 (emphasis added).)  Trial counsel did not request the

trial court to issue a limiting instruction regarding Dr. Thomas'

profile testimony.  (See id.)

iii. Bingham's Profile Evidence

Bingham testified that she had worked as "a licensed

professional counselor . . . [s]ince March of 2007," that she also

held the title of "certified clinical trauma professional" (Docket

Entry 39-8 at 24), and that "[her] practice area primarily focused

on children" (id. at 28).  The trial court admitted Bingham,

without objection from trial counsel, "as an expert . . . in the

area of license[d] professional counseling."  (Id. at 30.)

Following that admission, Bingham stated that "the Children's

Advocacy Center" referred the victim to her for counseling (id.),

35

and that she continued to render counseling services to the victim as of the date of her testimony (see id. at 34). After describing the victim's disclosures to her in counseling sessions (see id. at 37-50), the following testimony ensued:

[PROSECUTOR:] . . . [H]ow was [the victim]'s behavior at school when you first met him in February of 2014?

[BINGHAM:] [The victim] was <u>unable to go to school</u>.

[PROSECUTOR:] Can you explain the behavior that led you to say [the victim] was unable to go to school?

[BINGHAM:] . . . [H]e would say, I don't want to go. I'm scared. . . . <u>I'm scared [Petitioner] might hurt me. I'm scared [Petitioner]'s going to be there</u>. And despite our statements that [Petitioner] wasn't there, [the victim] still stated that he was afraid to go.

[PROSECUTOR:] . . . Were you still treating [the victim] in March of 2014?

[BINGHAM:] I was.

. . .

[PROSECUTOR:] So what symptoms did you make note of that he was still experiencing?

[BINGHAM:] That he . . . continued to present with <u>nightmares, agitation, somatic complaints, which include vomiting, headaches, stomachaches</u>.

[PROSECUTOR:] At that point was he able to go to school?

[BINGHAM:] He was not.

[PROSECUTOR:] Did he ever tell you why he couldn't go to school in March?

[BINGHAM:] He stated the same thing, that he was afraid. That <u>he was afraid [Petitioner] was going to come and get [the victim] . . . and his sister</u>.

. . .

36

[PROSECUTOR:] . . . [D]uring the course of your professional background and your practice as a counselor, can you describe for the jury any <u>common characteristics</u> <u>that a child who makes an allegation of sexual abuse</u> <u>displays</u>?

[TRIAL COUNSEL]: <u>Objection</u>.

T[RIAL] COURT: Ladies and gentlemen, I'm going to ask that you step back to the jury deliberation room for just a moment.

. . .

[TRIAL COUNSEL]: Your Honor, [] Bingham's been admitted as a counselor. I don't believe she's been admitted as a psychiatrist or someone who would be able to - or sexual abuse expert - to talk about this area.

T[RIAL] COURT: All right. Clearly, if the question was, has the alleged victim been sexually abused, that would be sustained. I've read those cases. It does appear in talking about profiles of allegedly abused children <u>it is</u> <u>appropriate for an expert witness to testify regarding</u> <u>the profiles that in the abstract sexually abused</u> <u>children have</u>. That's [<u>Hall</u>]. And then there are more recent cases. [<u>State v. Ware</u>, 188 N.C. App. 790 (2008)], and that was a clinical social worker. Here we have a witness who has been tendered and accepted as a licensed professional counselor with a license in trauma therapy. So the -- as to this question, the objection is overruled. <u>I am cognizant of, and have been cognizant of</u> <u>since we began, the cases, particularly those recent</u> <u>cases, wherein the [a]ppellate [c]ourt[s] have made clear</u> <u>to the [t]rial [c]ourt that the [t]rial [c]ourt should be</u> <u>vigilant about not allowing witnesses, expert or</u> <u>otherwise, to vouch for the credibility of an alleged</u> <u>victim, particularly in these circumstances. So I am</u> <u>cognizant of that and have been listening for that</u>. But I'll hear from you further, if you wish to be heard further, [trial counsel]. But it appears to me the objection should be overruled.

[TRIAL COUNSEL]: Your Honor, nothing further, just <u>maintain the objection</u>.

37

T[RIAL] COURT: All right. While we're outside the presence of the jury, are there going to be any other questions that we might need to go ahead and hear?

[PROSECUTOR]: Your Honor, as Your Honor seems to be well-versed on the case law that governs expert opinions about general characteristics in children who allege that they have experienced some form of child sexual assault, that that is a longstanding admissible question, the [s]tate's next question would be, have you seen any of that behavior -- those behavior characteristics in [the victim]. And depending on the answer, I would ask did she have an opinion as to whether the behavior that she noted and experienced with [the victim] was consistent with the general characteristics of other children who allege some sort of sexual abuse. Again, Your Honor, the [s]tate contends that that is a standard, longstanding opinion question that is done in sexual assault cases on a regular basis.

T[RIAL] COURT: Well, again, <u>the case law seems to allow that</u>. I will say, <u>I will give liberal opportunity to explore that area on cross-exam. So long as the witness is not vouching for the credibility of the [victim], or opining that the [victim] was sexually abused or otherwise assaulted, then the case law appears to support that</u>. But if you hear anything else, please feel free to object at any time, [trial counsel].

. . .

Sheriff, you may bring the jury in. Right on point is [<u>State v. Isenberg</u>,] 148 N.C. App. 29 [(2001)].

. . .

T[RIAL] COURT: <u>The objection's overruled</u>. You may proceed.

. . .

[PROSECUTOR:] . . . Can you describe for the jury any <u>generalized behavior or behavior or characteristics that a child who alleges that they have experienced sexual abuse would display</u>?

[BINGHAM:] Yes. Children who allege that they have been sexually abused present with a <u>myriad of psychological</u>

38

consequences and emotional disturbances in the form of
fear, anxiety, sometimes aggression, depression,
nightmares, sometimes children will present with
particular phobias and sometimes hysterical reactions,
sometimes suicidal behavior and substance abuse.

[PROSECUTOR:] Can you tell the ladies and gentlemen of
the jury, what kind of behavior [the victim] has
displayed during the course of your treatment of him?

[BINGHAM:] [The victim] displayed symptoms of somatic
complaints, headaches, vomiting. He displayed
significant fear and avoidance of going to school. He
had consistent nightmares. He also had some symptoms of
aggression in the home, being more defiant in the home,
not wanting to comply at certain times with his parents'
requests early on.

[PROSECUTOR:] Mrs. Bingham, based on your experience, is
the behavior that [the victim] displayed consistent with
the general symptoms and characteristics of other
children who allege that they have experienced some sort
of sexual abuse?

[TRIAL COUNSEL]: Renew my objection.

[BINGHAM]: Yes.

T[RIAL] COURT: Noted. Overruled.

. . .

[PROSECUTOR:] I'm sorry. What was the answer?

[BINGHAM:] My answer to your question is yes.

(Id. at 54-70 (emphasis added).) Although Petitioner's trial

counsel objected to Bingham's profile testimony (see id. at 65) and

renewed that objection (see id. at 70), his trial counsel did not

request a limiting instruction from the trial court regarding

Bingham's profile testimony (see id. at 54-70).

39

iv.  <u>North Carolina Law Governing Profile Evidence</u>

The Supreme Court of North Carolina previously has "f[ou]nd no error in the admission of [] testimony" from a psychologist and a pediatrician "concerning the symptoms and characteristics of sexually abused children and . . . that the symptoms exhibited by the victim were consistent with sexual or physical abuse." <u>Kennedy</u>, 320 N.C. at 31-32.  In so holding, the court noted that, "[t]he fact that this evidence may support the credibility of the victim does not alone render it inadmissible[, because m]ost testimony, expert or otherwise, tends to support the credibility of some witness." <u>Id.</u> at 32.

A few years later, the North Carolina Supreme Court noted that the "defendant . . . argue[d] that the statements of [a clinical social worker, a pediatrician, and a child psychiatrist] regarding conversion disorders and post-traumatic stress syndrome [we]re inadmissible." <u>Hall</u>, 330 N.C. at 816.  The court observed that "[the social worker] never discussed conversion disorders or post-traumatic stress syndrome during her testimony," <u>id.</u>, but proceeded to "discuss some difficulties [the court] perceive[d] to be present in the transcript," <u>id.</u>, despite acknowledging that such discussion "may well be outside the parameters of [the court's] order allowing discretionary review," <u>id.</u>  The court commented that "[the social worker]'s testimony was limited to a discussion of the typical symptoms and characteristics of sexually abused children," <u>id.</u>, and

40

the opinion "that [the victim]'s symptoms appeared to fit that 'profile' of a sexually abused child," id. The court "note[d] at the outset that the trial court [] did not limit the permissible uses of the 'profile' evidence as presented by [the social worker]." Id. at 817. However, the court then focused the remainder of its discussion regarding the social worker on its "concern[] that [the social worker] was never explicitly or implicitly qualified as an expert witness by the trial court," id. (emphasis added), because "[o]nly an expert in the field may testify on the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent with th[at] profile," id. at 818. The court in Hall neither held that a trial court must limit profile evidence to corroborative purposes only, nor elaborated on "the permissible uses of [] profile evidence." Id. at 817 (internal quotation marks omitted).

In Respondent's brief supporting the instant summary judgment motion, she contested the assertion that Hall requires a limiting instruction for profile evidence. (See Docket Entry 26 at 14-15.) According to Respondent, Petitioner's assertion that, under Hall, the trial court "'must "limit the permissible use" of the "profile" evidence by jurors'" (id. at 14 (quoting Docket Entry 6 at 108 (in turn quoting Hall, 330 N.C. at 817))) constitutes "a misreading of Hall" (id.). Respondent appears to suggest that the North Carolina Supreme Court's statement "'that the trial court [] did not limit

the permissible uses of the 'profile' evidence *as presented by* [*the social worker*]'" meant only that the trial court should have limited that testimony not because a trial court must limit <u>all</u> profile testimony but because a non-expert witness provided it. (<u>Id.</u> (quoting <u>Hall</u>, 330 N.C. at 817) (italics added by Respondent); <u>see also</u> <u>id.</u> at 15 ("The North Carolina Supreme Court did not create a bright-line rule that all profile testimony should be attended by a limiting instruction[;] . . . [i]nstead it took issue with the fact that a witness . . . provided profile testimony while not being qualified as an expert . . . .").)

Since the North Carolina Supreme Court decided <u>Hall</u>, the North Carolina Court of Appeals has offered differing opinions on whether <u>Hall</u> <u>requires</u> a trial court to issue a limiting instruction for profile evidence. In <u>State v. Hutchens</u>, 110 N.C. App. 455 (1993), the court held that "[e]vidence that a particular child's symptoms are consistent with those of children who have been sexually abused is admissible (1) only through the testimony of an expert in the field, and (2) only for the <u>limited purpose</u> of aiding the jury in assessing the complainant's credibility," and thus that "[t]he trial court is <u>required</u> to explain to the jury the permissible uses of [profile] evidence." <u>Hutchens</u>, 110 N.C. App. at 460 (citing <u>Hall</u>, 330 N.C. at 817) (emphasis added) (internal citation and parallel citation omitted). In 2001, in <u>Isenberg</u>, "[the d]efendant argue[d], based on . . . *Hall* . . . and *State v. Hensley*, 120 N.C.

42

App. 313 (1995), that [profile] evidence is admissible, if at all, only with a limiting instruction that it be considered for corroborative and not substantive purposes." <u>Isenberg</u>, 148 N.C. App. 39. The expert in question "was a licensed professional counselor . . . [with] six years of experience . . . counsel[ing] and treat[ing] children . . . who had been traumatized by sexual and physical abuse" and "was tendered as an expert in the counseling of and the behavior of sexually abused children." <u>Id.</u> at 33-34. "[<u>The expert] testified that [the minor victim's</u> <u>behavior was consistent with a child who had been sexually abused</u>." <u>Id.</u> at 34. "[The court] note[d] the decisions in both *Hall* and *Hensley* are limited to post-traumatic stress disorders and conversion disorders," that, "[i]n *State v. Richardson*, 112 N.C. App. 58 (1993), [the c]ourt distinguished the underlying facts from *Hall* because the expert in *Richardson* testified to 'basic characteristics of sexually abused children, reasons for children failing to report abuse to parents, and various events leading to disclosure[,]'" and "that[,] since no 'testimony as to an abuse "profile" or "syndrome" was given . . . the analysis set forth in *Hall* [wa]s inapplicable.'" <u>Isenberg</u>, 148 N.C. App. at 40 (quoting <u>Richardson</u>, 112 N.C. App. at 65). The court "dismiss[ed] th[e] assignment of error, because "[ the expert did not] testif[y] that the minor victim suffered from [PTSD, but] . . . testified as to the general characteristics of children who suffer from sexual

43

abuse." Id. Thus, as of the time of Petitioner's trial in March 2017, North Carolina appellate cases conflicted about whether Hall required the trial court to issue limiting instructions for profile evidence.[8]

v. Analysis of Deficient Performance Based on Profile Evidence

Where, at the time of Petitioner's trial, North Carolina law remained unclear whether the trial court must issue a limiting instruction for profile evidence (and thus also not clear that the trial court would have issued one if requested by trial counsel),[9] trial counsel's failure to request a limiting instruction does not qualify as objectively unreasonable under Strickland. See Smith v. Singletary, 170 F.3d 1051, 1053-54 (11th Cir. 1999) ("[The

_____

[8] Well after Petitioner's trial, the North Carolina Court of Appeals issued two decisions holding that, in light of Hall, trial courts "should generally" provide limiting instructions for profile evidence. State v. Kelton, No. COA24-513, ___ N.C. App. ___, 916 S.E.2d 296 (table), 2025 WL 1703957, at *7 (June 18, 2025) (unpublished) ("[E]xperts are permitted to testify as to the profiles of child sexual abuse victims. This type of 'profile' testimony 'should be limited to its permissible uses, and if admitted, the trial court should generally provide a limiting instruction.'" (quoting State v. Betts, 267 N.C. App. 272, 278 (2019)) (emphasis added) (citation omitted); Betts, 267 N.C. App. at 277-78 ("[E]xperts are permitted to testify about the profiles of victims of sexual abuse. This type of profile evidence should be limited to its 'permissible uses,' and if admitted, the trial court should generally provide a limiting instruction." (quoting Hall, 330 N.C. at 822) (emphasis added), aff'd as modified, 377 N.C. 519 (2021).

[9] Indeed, as quoted and emphasized above, the trial court discussed Hall in connection with the objection by Petitioner's trial counsel to Bingham's profile testimony and recognized the admissibility of profile evidence without mentioning any requirement for a limiting instruction. (See Docket Entry 39-8 at 66 ("It does appear in talking about profiles of allegedly abused children is it appropriate for an expert witness to testify regarding the profiles that in the abstract sexually abused children have. That's [Hall]. And then there are more recent cases. [Ware].")). Significantly, the trial court found Isenberg "[r]ight on point" (id.), and Isenberg expressly found that Hall did not require a limiting instruction for expert testimony deeming a victim's characteristics consistent with those of sexually abused children, see Isenberg, 148 N.C. App. at 40.

44

petitioner] contends that his counsel was ineffective for advising him that his out-of-state conviction could not be used to enhance his sentence. Even though [the court] accept[s] that [the petitioner]'s counsel gave him incorrect advice about Florida law, his claim still fails. . . . The . . . lack of clarity of Florida law about the use of an out-of-state conviction to enhance a defendant's sentence . . . is important in determining whether the advice given by [the petitioner]'s counsel was reasonable when it was given. . . . [A]s an acknowledgment that law is no exact science, the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized." (internal citations, quotation marks, and ellipsis omitted)); <u>Johnson v. Carroll</u>, 327 F. Supp. 2d 386, 398 (D. Del. 2004) ("Pursuant to *Strickland*, a court must assess an attorney's performance under the circumstances existing at the time of counsel's conduct. When [the p]etitioner went to trial . . ., there was a split of authority in the six federal Circuits that had addressed the issue of whether drug courier profile evidence could be admitted as substantive evidence of guilt. Although the Delaware courts had not yet addressed the issue, Delaware precedent did permit drug courier profile evidence to be considered as a component of probable cause for a search or seizure by law enforcement officers. Given the unsettled nature of this issue at the time of [the p]etitioner's trial, the [c]ourt concludes that

45

trial counsel's failure to object to the drug courier profile testimony was not deficient performance." (internal citations and footnote omitted)), aff'd, 157 F. App'x 472 (3d Cir. 2005); see also Fondren v. Commissioner, Ala. Dep't of Corr., 568 F. App'x 680, 686 (11th Cir. 2014) ("It is axiomatic that if an instruction was not warranted by the facts established at trial, then a failure to request such instruction or object to its absence cannot constitute ineffective assistance of counsel.").

Furthermore, courts assessing ineffective assistance claims have long recognized that trial counsel routinely pursue an objectively reasonable strategy of not requesting limiting instructions to avoid highlighting unfavorable evidence for the jury. See Thomas v. Vannoy, 651 F. App'x 298, 300, 303 (5th Cir. 2016) ("[The defendant]'s counsel did not request a cautionary instruction that [his co-defendants'] guilty pleas should not be used as evidence of [the defendant]'s guilt. . . . [The defendant] urges us to infer that counsel was simply too incompetent to ask for the instruction. But this conclusion flies in the face of Strickland. The [United States] Supreme Court has, time and again, 'specifically command[ed] that a court must indulge the strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment.' [] Pinholster, 563 U.S. [at] 196 [] (internal quotation marks and brackets omitted) (quoting Strickland, 466 U.S. at 689–90). The mere absence of the

46

instruction neither overcomes this presumption nor satisfies [the defendant]'s burden to show deficient performance. . . . [S]uch an instruction is double-edged: it effectively informs the jury, right before deliberations, about the most damning inference they could draw from [the co-defendants'] guilty pleas." (parallel citations omitted)); United States v. Harris, 14 F. App'x 144, 145-46 (4th Cir. 2001) ("[The petitioner] asserts that he received ineffective assistance of counsel when his attorney failed to request a curative instruction after firearms, that were not admitted into evidence, were shown to the jury. Although the district court initially stated that it would give the jury a limiting instruction, defense counsel did not object to the court's failure to actually do so. . . . [The petitioner's ]claim is [] meritless. . . . [A]s [the court] noted on appeal, it would have been a reasonable trial strategy to forego an instruction that would remind the jurors of the firearms."); United States v. Gregory, 74 F.3d 819, 823 (7th Cir. 1996) ("[T]he decision not to request a limiting instruction is solidly within the accepted range of strategic tactics employed by trial lawyers in the mitigation of damning evidence. If the lawyer cannot stop the evidence from being admitted, it is perfectly rational to decide not to draw further attention to it by requesting a . . . limiting instruction." (emphasis added)); United States v. Cartagena-Carrasquillo, 70 F.3d 706, 713 (1st Cir. 1995) ("Whether

47

an instruction will 'cure' a problem or exacerbate it by calling more attention to it than warranted is within the ken of counsel and part of litigation strategy and judgment."); United States v. Myers, 917 F.2d 1008, 1010–11 (7th Cir. 1990) ("You can't instruct 'Do not draw inference X' without informing the jurors that X is one possible conclusion from the evidence. To tell jurors not to do something is to ensure they will do it, at least for a while. . . . [R]easonable persons may differ about whether the good such an instruction does with a thoughtful juror will outweigh the harm it can do by fastening attention on a link that may have been overlooked or forgotten."); United States v. Childs, 598 F.2d 169, 176 (D.C. Cir. 1979) ("It is well known that, even when a limiting instruction is likely to aid the accused's cause, astute defense counsel may prefer tactically to forego it in the interest of avoiding its inevitable focus of the jury's attention on unfavorable evidence."); United States v. Barnes, 586 F.2d 1052, 1059 (5th Cir. 1978) ("Counsel may refrain from requesting an instruction in order not to emphasize potentially damaging evidence . . . ."); Wilson v. McFadden, No. 6:14CV4287, 2015 WL 5437164, at *22 (D.S.C. Sept. 15, 2015) (unpublished) ("[T]here are plausible reasons for not objecting to the absence of a curative instruction. The most obvious rationale for not requesting a limiting instruction, having lost on the question of admissibility, is for counsel to make a tactical decision to forego the instruction to

48

avoid further focus of the jury's attention on the unfavorable use that could be made of the evidence.").

Although the state court record does not elucidate trial counsel's reasons for refraining from requesting limiting instructions for the profile evidence, that fact should not alter the Court's conclusion that Petitioner has failed to establish deficient performance with respect to the profile evidence. See Bernardez v. United States, No. 1:09CR216, 2017 WL 3599641, at *11 (E.D. Va. Aug. 18, 2017) (unpublished) ("That [trial counsel] did not [] request a limiting instruction [regarding evidence of the petitioner's immigration status] does not render his conduct unreasonable — trial counsel may have felt that such a request . . . would draw more attention to [the p]etitioner's immigration status. Regardless of trial counsel's reasons for not requesting a limiting instruction, th[e c]ourt finds that trial counsel acted reasonably in his efforts to prevent unfair prejudice stemming from [the p]etitioner's immigration status." (emphasis added)).[10]

---

[10] Furthermore, as explained above, Petitioner not only abandoned any request for an evidentiary hearing to elicit his trial counsel's reasons for their handling of the profile evidence when he sought review of the MAR court's ruling in the North Carolina Court of Appeals (see Docket Entry 1-1 at 411-61), but also failed to resuscitate that argument here in this Court, i.e., Petitioner neither requested an evidentiary hearing for the purpose of questioning his trial counsel regarding their strategy with respect to the profile evidence, nor argued that this Court could not adjudicate deficient performance under Strickland (or rule against him on the performance prong) in the absence of such testimony (see Docket Entries 1, 6, 29).

Indeed, the Strickland standard tasks courts with assessing the objective reasonableness of counsel's performance, rather than their subjective motivation for acting.  See Harrington, 562 U.S. at 110 ("*Strickland* calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (emphasis added)).  Thus, even where the state court record shows that trial counsel could not recall their strategy or believed that they made errors in their defense strategy at trial, courts still find that counsel followed objectively reasonable strategy.  See Samples v. Ballard, No. 2:14CV15413, 2016 WL 1271508, at *9-10 (S.D.W. Va. Mar. 31, 2016) (unpublished) ("[The p]etitioner argues that his trial counsel provided ineffective assistance . . . when they failed to propose a limiting instruction for the judge to give the jury regarding the [petitioner's] prior conviction and parole status . . .  As to why no limiting instruction was requested, [one of the petitioner's trial counsel] could not recall why no limiting instruction was sought.  [The p]etitioner's [other] trial counsel [] testified at the habeas hearing that [counsel] probably should have requested a limiting instruction, but 'it's one of those errors that you make in the heat of battle.'  Notwithstanding this admission and the lack of a reasoned explanation for the failure to request a limiting instruction, the [c]ourt does not believe that counsel's performance was objectively unreasonable." (emphasis added)),

50

aff'd, 860 F.3d 266 (4th Cir. 2017); <u>Coates v. Green</u>, No. CV
13-1631, 2016 WL 1065805, at *6-7 (D. Md. Mar. 14, 2016)
(unpublished) ("Trial counsel testified at the post-conviction
hearing that she had a reason for not asking for th[e ] jury
instruction [at issue], but <u>could not recall what the reason might
have been</u>. During her testimony, counsel stated that she had been
practicing criminal defense law for approximately seventeen
years . . . and that she [w]as aware of the existence of the
pattern jury instruction which would have limited the jury's
consideration on the testimony about the second shooting. Indeed,
the trial judge asked defense counsel if she wanted the limiting
instruction and she indicated she did not want to request it. The
post-conviction court found that, in light of counsel's extensive
experience, the decision by trial counsel to forego the limiting
instruction was a legitimate trial strategy, <u>even though she could
not explain what that strategy had been</u>. Significantly, the
post-conviction court already had concluded that further emphasis
on [the petitioner]'s possible involvement in the second shooting
could have been detrimental to the defense. And, [the petitioner]
did not 'overcome the presumption that, under the circumstances,
[counsel's decision not to request the instruction] might be
considered sound trial strategy.'" (quoting <u>Strickland</u>, 466 U.S. at
689) (emphasis added) (internal citations and some quotation marks
omitted)).

Further underscoring trial counsel's lack of deficient performance with respect to the profile evidence, the record shows that trial counsel thoroughly attacked that evidence. Notably, trial counsel successfully objected when the state asked Robyn Miller Ward, admitted "as an expert in forensic interviewing" (Docket Entry 39-7 at 121), if "[she had] an opinion as to whether or not the behavior and characteristics that [she] observed when interviewing [the victim] were consistent with symptoms typically exhibited by children who allege some sort of sexual abuse" (id. at 174). As quoted above, trial counsel also objected to Bingham's profile evidence (see Docket Entry 39-8 at 65) and, after losing that objection (see id. at 67-69), renewed it to preserve the matter for appeal (see id. at 70).

Beyond those objections, trial counsel effectively cross-examined Stewart, Dr. Thomas, and Bingham, eliciting the following testimony helpful to Petitioner:

- Stewart agreed that the victim's allegations that a music teacher hit him in the first grade could cause trauma (see Docket Entry 39-7 at 29), and then admitted that she had not reviewed any records relating to the music teacher allegations because her job "is not to investigate" (id. at 30), raising the inferences that Stewart's evaluation lacked thoroughness and that an alternate cause of the victim's behavioral changes might have existed;

- Stewart admitted that she described what the victim had previously disclosed to Ward and then asked the victim about the truth of those statements (see id. at 33-34), raising the possibility of suggestibility because, as trial counsel emphasized, "nothing [existed] for [the victim] to

52

answer" and "all he c[ould] do is just agree or disagree" (id. at 34);

- Stewart agreed that she had encountered children who had not experienced sexual abuse but who knew more than a child of their age should know about sex because of exposure to pornography, explicit media, and older siblings (see id. at 42-43), raising the inference that the victim could have learned his sexual knowledge through means other than abuse by Petitioner;

- Dr. Thomas stated that the victim's parents told her that the victim's behavior problems started in January 2014, after Christmas break (see id. at 86), which coincided with an event, the death of the victim's grandmother, that the defense raised as a alternate cause of the victim's behavioral changes (see, e.g., Docket Entry 39-5 (Trial Tr. Vol. III) at 164-66);

- Dr. Thomas admitted that, although a detective can attend the diagnostic interview of the victim, representatives of the accused cannot do so, raising the inference of a one-sided and unfair process (see Docket Entry 39-7 at 89-91);

- Dr. Thomas agreed that her physical examination of the victim reflected normal findings (see id. at 93-95);

- Bingham admitted that she had not reviewed the victim's primary care records, and that such a review could have "help[ed her] to know if [the victim] ha[d] a history of fabrication," underscoring the point that Bingham did not base her opinions on investigative fact-finding (Docket Entry 39-8 at 108-09);

- Bingham admitted her job consisted of accepting information and rendering counseling and not investigating the underlying abuse allegations (see id. at 120-21); and

- Bingham agreed that the victim's illustration of a dream prompted his initial disclosure of anal penetration by Petitioner's finger (see id. at 121-23), and that the dream involved two males behind

53

the victim and did not indicate that Petitioner grabbed the victim (see id. at 123), raising an inference of suggestibility and the possibility of an alternate perpetrator.

Those admissions raised the possibility of a lack of thoroughness and suggestibility during the interviews and examinations of the victim, placed before the jury two alternate causes of the victim's behavioral changes (i.e., his grandmother's death and physical abuse by a first grade teacher), and suggested an alternate perpetrator as well as an alternate explanation for the victim's sexual knowledge, all of which countered the experts' testimony regarding the consistency of the victim's behavior with that seen in sexually abused children, as well as the state's ultimate burden to prove that Petitioner sexually abused the victim.

Under such circumstances, even under a de novo standard of review, the Court should find that Plaintiff's trial counsel did not provide constitutionally deficient performance under Strickland by not requesting a limiting instruction regarding the profile testimony at issue.

**b. PTSD Evidence**

i. Bingham's PTSD Testimony

Following Bingham's profile testimony, the state elicited the following testimony regarding Bingham's diagnosis of the victim with PTSD:

[PROSECUTOR:] Did you ever perform any type of diagnostic testing on [the victim]?

54

[BINGHAM:] I did.

[PROSECUTOR:] Is there a standard tool that mental health professionals use in order to make assessments and diagnoses?

[BINGHAM:] Yes.

[PROSECUTOR:] And what is that?

[BINGHAM:] That tool is the UCLA PTSD Reaction Index for children.

[PROSECUTOR:] Are there any other tools that are used?

[BINGHAM:] There are.

[PROSECUTOR:] Okay.  What is a DSM?

[BINGHAM:] It is the Diagnostic and Statistical Manual of [M]ental [H]ealth [D]isorders.

. . .

[PROSECUTOR:] . . . [A]re these tools widely used in the mental health field and in the psychological and psychiatrist fields?

[BINGHAM:] They are.

[PROSECUTOR:] Now, did you use . . . those tools with [the victim]?

[BINGHAM:] Yes, I did.

. . .

[PROSECUTOR:] And what is [PTSD]?

[BINGHAM:] [PTSD] is a set of criteria laid out in the DSM that's used to diagnose a mental health condition when people have been exposed to a significant trauma.

[PROSECUTOR:] Is there a specific list of criteria that a licensed mental health professional would use in order to assess that?

[BINGHAM:] Yes.

55

. . .

[PROSECUTOR:] <u>What is the first criteria that has to be met</u>?

[BINGHAM:] <u>You have to be exposed to a traumatic event</u>.

[PROSECUTOR:] <u>And what was your finding for that first criteria</u>?

. . .

[BINGHAM:] [<u>The victim] alleged that he had been the victim of a sexual assault</u>.

[PROSECUTOR:] <u>So was that criteria met</u>?

[BINGHAM:] <u>Yes</u>.

[PROSECUTOR:] And what is the second criteria that is required to be met?

[BINGHAM:] That the person re-experiences the event in the form of intrusive thoughts or memories, nightmares related to the event, flashbacks, feeling like the event is happening again, psychological and physical reactivity to reminders of the traumatic event.

[PROSECUTOR:] And did [the victim] have any of those criteria . . . during your diagnosis of him?

[BINGHAM:] Yes, he did.

[PROSECUTOR:] Which criteria did he meet?

[BINGHAM:] The nightmares related to the event, intrusive thoughts and memories, the -- in particular, the psychological and physical reactivity to reminders of the traumatic event, such as not being able to go to school.

. . .

[PROSECUTOR:] What about the third criteria?

[BINGHAM:] The third criteria is avoidant symptoms, avoiding thoughts. The person might avoid thoughts or feelings connected to the traumatic event, avoiding

56

people or situations connected to the event. And yes, [the victim] exhibited those symptoms.

[PROSECUTOR:] In what way?

[BINGHAM:] [The victim] did not want to go to school. He feared that [Petitioner] was still at the school. He initially did not want to talk about his thoughts or feelings about anything that allegedly happened to him.

[PROSECUTOR:] So that third criteria was met?

[BINGHAM:] Yes.

[PROSECUTOR:] And the fourth criteria, what is that?

[BINGHAM:] Negative alterations [in] mood or cognitions, memory problems that are exclusive to the event, negative thoughts or beliefs about oneself or the world, distorted sense of blame for oneself or others related to the event, severely reduced interest in pre-trauma activities or feeling detached or isolated, disconnected from other people.

[PROSECUTOR:] And how did [the victim] meet that criteria?

[BINGHAM:] [The victim] certainly had negative beliefs about himself and the world. He had . . . a distorted sense of blame in that he was very afraid that any disclosure was going to result in harm to his sister. He had severely reduced interest in activities prior to his disclosure of alleged events. . . . [A]s I recall, he didn't want to play soccer anymore. He didn't want to leave the house. He didn't want to engage in the activities he had before. He was very afraid to leave his house.

. . .

[PROSECUTOR:] And then is there a fifth criteria that had to be met?

[BINGHAM:] Yes. It's an increase in arousal symptoms, used to describe people who present as being on edge and having, for example, an exaggerated startled response, hypervigilance, irritability, increased anger.

57

> [PROSECUTOR:] And how did [the victim] meet that criteria?
>
> [BINGHAM:] As I stated earlier, [the victim] had an increase in what his parents had described to me as aggressive behavior in the home, not wanting to comply. It also included difficulty falling or staying asleep, hypervigilance, difficulty concentrating.
>
> [PROSECUTOR:] <u>So based upon that did he -- so he met all of the criteria for [PTSD]</u>?
>
> [BINGHAM:] <u>Yes, he did</u>.
>
> [PROSECUTOR:] <u>And is that your official diagnosis that you made back in 2014</u>?
>
> [BINGHAM:] <u>Yes, it is</u>.

(<u>Id.</u> at 70-75 (emphasis added).) At this point in Bingham's testimony, the state introduced a copy of the UCLA PTSD Index form Bingham administered to the victim and discussed both the victim's answers and Bingham's notations on the form. (<u>See</u> <u>id.</u> at 75-85.) Bingham later denied that, "[d]uring the three years that [she] ha[d] treated [the victim], [ her] diagnosis [had] ever changed" (<u>id.</u> at 102), as well as testified that "[the victim] still me[t] the criteria in the new DSM-V for [PTSD]" (<u>id.</u> at 103), and that she "st[oo]d by [her] diagnosis of [PTSD]" (<u>id.</u> at 104). Petitioner's trial counsel neither objected to the PTSD-related testimony nor requested a limiting instruction from the trial court. (<u>See</u> <u>id.</u> at 70-85, 102-04.)

ii. <u>North Carolina Law Governing PTSD Evidence</u>

The North Carolina Supreme Court previously addressed two expert witnesses' testimony that they had diagnosed a victim of

58

sexual assault with conversion disorder and post-traumatic stress syndrome, noting that, until that point, "th[e c]ourt had not finally resolved the extent of [such evidence's] permissible uses." Hall, 330 N.C. at 818. The court thereafter held as follows:

> [W]e remain concerned about the unlimited use of evidence that a prosecuting witness suffers from either [conversion disorder or post-traumatic stress syndrome], especially where, as here, the expert testimony is admitted as substantive evidence that a rape has in fact occurred. There are two, primary problems when such evidence is employed to show that a rape has occurred. First, the psychiatric procedures used in developing the diagnosis are designed for therapeutic purposes and are not reliable as fact-finding tools to determine whether a rape has in fact occurred. Second, the potential for prejudice looms large because the jury may accord too much weight to expert opinions stating medical conclusions which were drawn from diagnostic methods having limited merits as fact-finding devices. . . .
>
> Thus, on balance, evidence that a prosecuting witness is suffering from post-traumatic stress syndrome should not be admitted for the substantive purpose of proving that a rape has in fact occurred.
>
> Nonetheless, we will not exclude such evidence for all purposes and hold that it may be admitted for certain corroborative purposes. Although . . . evidence of post-traumatic stress syndrome does not alone prove that sexual abuse has in fact occurred, . . . this should not preclude its admission at trial where the relevance to certain disputed issues has been shown by the prosecution.
>
> . . .
>
> . . . Testimony that the complainant suffers from [PTSD] may [] cast light onto the victim's version of events and other, critical issues at trial. For example, testimony on post-traumatic stress syndrome may assist in corroborating the victim's story, or it may help to explain delays in reporting the crime or to refute the defense of consent.

59

This list of permissible uses is by no means exhaustive. <u>The trial court should balance the probative value of evidence of post-traumatic stress, or rape trauma, syndrome against its prejudicial impact under Evidence Rule 403. It should also determine whether admission of this evidence would be helpful to the trier of fact under Evidence Rule 702. If the trial court is satisfied that these criteria have been met on the facts of the particular case, then the evidence may be admitted for the purposes of corroboration. If admitted, the trial judge should take pains to explain to the jurors the limited uses for which the evidence is admitted. In no case may the evidence be admitted substantively for the sole purpose of proving that a rape or sexual assault has in fact occurred</u>. . . .

[E]vidence that a prosecuting witness has suffered a conversion reaction may be admitted for corroborative purposes to the same extent as evidence that she has suffered from post-traumatic stress syndrome.

<u>Id.</u> at 820-23 (emphasis added).

Respondent's materials in support of the instant Motion did not address Petitioner's contention that, in light of <u>Hall</u>, his trial counsel's failure to request a limiting instruction regarding Bingham's PTSD evidence amounted to ineffective assistance. (<u>See</u> Docket Entry 26 at 12-17; <u>see also</u> Docket Entry 33 at 2-11.) Accordingly, neither party contests that 1) <u>Hall</u> requires a limiting instruction for PTSD evidence, 2) Bingham testified that she diagnosed the victim with PTSD based upon his allegations of sexual abuse by Petitioner, 3) the trial court did not issue a limiting instruction for Bingham's PTSD evidence, and 4) trial counsel neither objected to nor requested a limiting instruction for the PTSD evidence.

60

iii. <u>Analysis of Deficient Performance Based on PTSD Evidence</u>

Although North Carolina law at the time of Petitioner's trial required the trial court to consider PTSD evidence under Rules 403 and 702 of the North Carolina Rules of Evidence before admitting such evidence, and to issue the jury an instruction limiting their consideration of such evidence to permissible, non-substantive purposes only, <u>see</u> <u>Hall</u>, 330 N.C. at 822, the Court confronts an entirely separate matter in determining whether trial counsel provided constitutionally deficient performance by not objecting and/or requesting a limiting instruction when the trial court failed to do so. Trial counsel reasonably could have concluded, given the trial court's earlier statements when overruling counsel's objection to Bingham's profile evidence (<u>see</u> Docket Entry 39-8 at 68 (reflecting trial court's remarks that, "[s]o long as the witness is not vouching for the credibility of the [victim], or opining that the [victim] was sexually abused or otherwise assaulted, then the case law appears to support th[e admission of profile evidence]" but advising trial counsel that trial court "w[ould] give <u>liberal opportunity to explore that area on cross-exam</u>" (emphasis added))), that pursuing a vigorous cross-examination of the PTSD evidence constituted a better strategy than further underscoring the importance of that evidence by requesting a limiting instruction, <u>see</u> <u>Thomas</u>, 651 F. App'x at 303; <u>Harris</u>, 14 F. App'x at 145-46; <u>Gregory</u>, 74 F.3d at 823; <u>Cartagena-</u>

61

Carrasquillo, 70 F.3d at 713; Childs, 598 F.2d at 176; Barnes, 586 F.2d at 1059; Wilson, 2015 WL 5437164, at *22.

As discussed above with regard to the profile evidence, the absence of statements from Petitioner's trial counsel in the state court record regarding the reasons for not requesting a limiting instruction for the PTSD evidence does not prevent the Court from finding that counsel pursued an objectively reasonable trial strategy in foregoing a request for a limiting instruction. See Harrington, 562 U.S. at 110 ("Strickland calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (emphasis added)); see also Bernardez, 2017 WL 3599641, at *11; Samples, 2016 WL 1271508, at *9-10; Coates, 2016 WL 1065805, at *6-7.[11]

Moreover, trial counsel cross-examined Bingham and elicited the following testimony undermining her PTSD evidence:

- Bingham agreed that the victim identified the traumatic event of "getting hit, punched or kicked very hard at home" on the UCLA PTSD Index form he completed with Bingham (Docket Entry 39-8 at 110), suggesting an alternate cause of the victim's PTSD;

- Bingham admitted that the accidental death of the victim's grandmother would also qualify as a traumatic event on the UCLA PTSD Index form (see

---

[11] As previously explained, Petitioner abandoned any request for an evidentiary hearing to ascertain his trial counsel's strategy concerning the PTSD evidence when he sought review of the MAR court's denial decision in the North Carolina Court of Appeals. (See Docket Entry 1-1 at 411-61.) That abandonment continued in this Court, where Petitioner neither sought an evidentiary hearing to question his trial counsel about their strategy with respect to the PTSD evidence, nor contended that this Court could not adjudicate Strickland's deficient performance prong (or rule against him on that prong) without such testimony (see Docket Entries 1, 6, 29).

id. at 110-12), and that the victim had "told his teacher that he was upset about his grandmother" (id. at 115), raising another alternate cause of the victim's PTSD; and

- Bingham admitted she had not completed a form similar to the UCLA PTSD Index to rule out a diagnosis of "separation anxiety disorder" (id. at 113), and that she did not think that diagnosis applied despite her recollection that the victim testified that he was concerned about his mother after his grandmother's death (see id. at 114-16).

Such admissions attacked the thoroughness and accuracy of Bingham's PTSD diagnosis of the victim and, in particular, her conclusion that alleged sexual abuse constituted the trauma that underlay that diagnosis.

In light of the foregoing analysis, the Court should find, even under a de novo standard of review, that Petitioner has not shown that his trial counsel rendered constitutionally deficient performance under Strickland.

2. Prejudice

Petitioner contends that, because his trial counsel did not "limit[] the extensive 'profile' and PTSD expert testimony and evidence[, ] jurors were free to rely on this expert evidence and testimony as substantive evidence of [Petitioner]'s guilt" (Docket Entry 6 at 114-15) and to conclude that "[the victim] must've been sexually abused by [Petitioner] - at some point - during [the victim's] time at Lindley [Elementary School]" (id. at 115 (emphasis supplied by Petitioner); see also Docket Entry 29 at 34-50). According to Petitioner, "[h]ad the extensive 'profile' and

63

PTSD expert testimony and evidence been properly limited as *Kennedy* and *Hall* required[,] . . . it's reasonably probable *at least one juror* would've harbored reasonable doubt regarding all the counts [against Petitioner] - not simply the second-grade counts [on which the jury acquitted Petitioner]."  (Docket Entry 6 at 120 (citing <u>Buck v. Davis</u>, 580 U.S. 100, 119-20 (2017)); <u>see also</u> Docket Entry 29 at 35-43.)  Petitioner thus argues that the MAR court "unreasonably applied *Strickland*'s prejudice standard to the facts in [Petitioner's] case," and based its "no prejudice conclusion . . . on an unreasonable finding, *i.e.*, the [s]tate presented overwhelming evidence of [Petitioner]'s guilt regarding the first-grade and third-grade counts [against Petitioner]." (Docket Entry 6 at 134 (internal quotation marks omitted); <u>see also</u> Docket Entry 29 at 43-50.)

As an initial matter, Respondent appears to contest Petitioner's argument that he can show prejudice by "demonstrat[ing a] reasonabl[e] probab[ility] that at least one [juror] harbored reasonable doubt as to Petitioner's guilt."  (Docket Entry 33 at 5 (citing Docket Entry 29 at 39-40).)  In Respondent's view, "[t]he Fourth Circuit has repeatedly set out the proper *Strickland* prejudice standard" as requiring a petitioner to "'demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,] . . . [a]nd, in cases where a conviction has been the

64

result of a trial, the [petitioner] must demonstrate that[,] but for counsel's errors, there is a reasonable probability that [the petitioner] would not have been convicted.'" (Id. (quoting Lee v. Clark, 781 F.3d 114, 122-25 (4th Cir. 2015)).) Respondent further points out "that the Fourth Circuit has not adopted the 'one juror' formulation of the *Strickland* prejudice test," but argues that "there is no need for this Court to determine whether there exists any daylight between the Fourth Circuit's 'reasonable probability that the outcome of the proceedings would have been different' test and other circuit[s'] 'reasonably probable that counsel's deficient performance impacted only one juror's verdict' test." (Id. at 6 (first quoting Lee and then quoting Massey v. Superintendent Coal Twp. SCI, No. 19-2808, 2021 WL 2910930, at *5 (3d Cir. 2021) (unpublished), and citing Sleeper v. Spencer, 510 F.3d 32, 39 (1st Cir. 2007)).)

Respondent's argument overlooks Hope v. Cartledge, 857 F.3d 518 (4th Cir. 2017), in which the Fourth Circuit held, in a non-capital case, that, "[i]n jurisdictions such as South Carolina, where a jury must return a unanimous verdict to convict, the prejudice prong of *Strickland* is met where 'there is a reasonable probability that at least one juror would have struck a different balance.'" Hope, 857 F.3d at 524 (emphasis added) (quoting Wiggins, 539 U.S. at 537); see also Mangal v. Warden, Perry Corr. Inst., No. 6:18CV106, 2019 WL 7461668, at *19, *23 (D.S.C. Dec. 18,

65

2019) (unpublished) ("[T]he [magistrate judge] recommends that the district court find that the petitioner has met the prejudice prong of *Strickland* because there is a reasonable probability that <u>at least one juror</u> would have struck a different balance had the jury not heard the improper bolstering testimony." (emphasis added) (internal parenthetical citation omitted)), <u>recommendation adopted</u>, 2020 WL 42859 (D.S.C. Jan. 3, 2020) (unpublished).[12]

Moreover, under either the Petitioner's or the Respondent's version of the <u>Strickland</u> prejudice test, the analysis remains the same. A "reasonable probability" of a different outcome in Petitioner's trial would include not just an acquittal, but also a mistrial brought about by a hung jury. Only one juror must have reasonable doubt and insist on a not guilty verdict in order to prevent a unanimous verdict of guilty and to cause a mistrial, i.e., a different outcome than occurred here. Thus, the Court's use of either version of the <u>Strickland</u> prejudice test should yield the same result.

The MAR court, in "determin[ing] that there [we]re no facts alleged in the [Amended MAR] that, if true, would indicate a reasonable probability that the result of the proceedings would have been different" and "conclud[ing] that the allegations in

---

[12] Under the North Carolina Constitution, "[n]o person shall be convicted of any crime but by the unanimous verdict of a jury in open court." N.C. Const. art. 1, § 24; <u>see also</u> N.C. Gen. Stat. § 15A-1237(b) ("The verdict must be unanimous[.]"). Thus, <u>Hope</u>'s one-juror holding applies equally to cases like Petitioner's arising in North Carolina.

66

support of the [Amended MAR] are wholly insufficient to indicate that any alleged deficient performance by counsel prejudiced [Petitioner's] defense" (Docket Entry 1-1 at 410), did not unreasonably apply Strickland's prejudice test to the facts in Petitioner's case. "In making th[e prejudice] determination [under Strickland], a court hearing an ineffectiveness claim must consider the totality of the evidence before the . . . jury." Strickland, 466 U.S. at 695. Here, a "consider[ation of] the totality of the evidence before the jury," id., makes clear that the MAR court did not unreasonably apply the Strickland prejudice standard to Petitioner's case.

Although Petitioner repeatedly characterizes the case against him as relying entirely on the credibility of the victim, such that the potential substantive use of the profile and PTSD evidence by the jury necessarily played a critical role in the jury's finding of Petitioner's guilt (see Docket Entry 6 at 9-10, 111, 116, 118), that position glosses over other significant trial evidence supporting the jury's guilty verdicts. Quite apart from the profile and PTSD evidence, the jury considered the following evidence corroborating the victim's testimony:

- Dr. Aaron Woody, the principal of Lindley Elementary School during the victim's time there (see Docket Entry 39-5 at 196-97), testified that, after the victim disclosed the sexual abuse by Petitioner, a team of people, including Woody, the victim's parents, his third grade teacher, Margaret Sisk, Bingham, and a school counselor (see id. at 218-19), "tried to set up multiple supports" (id.

67

at 218), such as allowing the victim to "carry[] a cell phone" (id.) and allowing his father and sister to accompany the victim into school and remain outside his classroom (see id.), but the victim "never wanted hi[s father] to leave" (id.) and, after one month, the team agreed that "homebound [school] would be the best [] alternative" for the victim (id. at 219);

• Sisk testified that "[the victim] started to have some absences or wanting to leave [school] early just before Christmastime [in 2013,]" and that, after Christmas break, the victim presented as "very upset[,] . . . would cry[,] and . . . had a very hard time being at school" (id. at 254), which "usually [happened] later in the day" because, "[u]sually[,] in the morning[,] he would come in okay" (id. at 256), as well as that the victim attended Petitioner's class from "about 1:20" to "2:00 or 2:05" (id.);

• Sisk verified that, despite the interventions of the team aimed at successfully returning the victim to Sisk's classroom, the victim would cry and become upset when his sister or father would leave the classroom area, as well as that, after three or four weeks, the victim changed to homebound instruction (see id. at 265-67);

• JCP, the victim's ESL classmate in the third grade (see id. at 274-75), testified that Petitioner required students to answer a question correctly to leave his class (id. at 276), that she was the second last to leave Petitioner's classroom (id. at 280), and that the victim was the last student to leave (id. at 278);

• Stewart testified that, during her diagnostic interview of the victim, he presented as "a little bit standoffish" and "reluctant to keep going[,]" and that he only gave her "bits of information[,]" and needed repeated prompts to continue (Docket Entry 39-7 at 17);

• Stewart explained that it did not surprise her that the victim "did[ not] give detailed statements about what happened in each grade" because, "when something has happened more than a couple of

68

times[,] children often will put what happened to them in those several times . . . into a composite of what usually happened" (id. at 19-20);

- Stewart stated that "[it is] very common" that, after a "diagnostic interview and forensic interview[,]" a victim "would then later on disclose more information" (id. at 21), because "[d]isclosure is a process" (id. at 21-22), and the disclosing victim faces "a variety of pressures" including "frequent exposure to the alleged perpetrator" (id. at 19) and "will often test the waters" by making partial disclosures (id. at 22);

- Stewart further testified that, "[i]f [abuse victims were] not ready to disclose [abuse] yet, [they] may need to help take care of themselves, [and] they would say some things that might not necessarily be true" (id. at 24-25);

- Dr. Thomas testified that, when she conducted the child medical examination of the victim, he appeared "nervous," but also "cooperative and pleasant and very sweet" (id. at 72), but that, when "[she] tried to do the genital and anal exams[,] . . . there was dramatic change in [the victim's] affect and behavior[,]" and "[h]e became very, very upset, crying, screaming, . . . holding his legs together, resisting the examination" (id. at 73), as well as that, despite trying "all the tricks and all the things [Dr. Thomas] could do to make [the victim] comfortable and reassure him, [] ultimately, [Dr. Thomas] did not do . . . the anal exam, because in [her] mind, . . . [the exam] would be more traumatic then information [she] would gather" (id. at 74);

- Dr. Thomas further testified that "[m]ost often children do[ not] have th[at] much trouble with th[e anal] exam" (id.);

- Dr. Thomas testified that "physical abnormalities of the genitals and anus are the exception in pediatric abuse [cases,]" and that she did not expect "touching" to cause "physical changes to those areas" (id. at 76);

69

- Officer Christopher Little with the Greensboro
  Police Department (see id. at 106) testified that,
  when the victim, his mother, and his older sister
  came to a police substation to report Petitioner's
  sexual abuse of the victim (see id. at 107-08), the
  victim appeared "[s]ubdued" and "nervous" (id. at
  112), and "hesitant to talk and reluctant to be
  forthcoming" (id. at 113), as well as that he
  "would not make eye contact" (id. at 112) and "was
  staring down at the table" (id. at 113);

- Ward also explained the concept of "delayed
  disclosure" (id. at 170), and indicated that
  "[b]arriers to disclosure" included "a high level
  of obedience to adults or authority figures" in the
  victim (id. at 171) (and pointed out that the
  student-teacher relationship entailed obedience
  (see id. at 172-73)), the perpetrator warning the
  victim "not to tell" or "threat[ening]" the victim
  (id. at 171-72), "shame" felt by the victim (id. at
  172), and "regular contact with an alleged
  perpetrator" (id. at 173);

- Ward testified that children "often" do not "tell
  [her] every detail of abuse" during her forensic
  interviews of them (id. at 174-75), that, "[a] lot
  of times[,] they will say just enough to make the
  abuse stop" (id. at 175), and that "it's not
  uncommon at all for when [child abuse victims] get
  into a therapeutic relationship with a therapist
  and they develop more of an ongoing relationship
  with that person, there's more trust there, and so
  they may provide more details to that therapist as
  it's ongoing" (id. at 176);

- Ward testified that "it's not abnormal at all for
  [her] to either not get the whole story or for some
  details to be a little foggy, particularly if the
  abuse has been ongoing over some amount of time or
  if it has happened multiple times[,]" likening the
  situation to trying to remember all the times a
  person has filled up his or her car with gas in the
  last two years - that he or she might remember a
  particular time if "something different" or
  "unusual" happened, "[b]ut [] might not be able to
  differentiate other details of individual times"
  (id. at 177);

70

- Bingham testified that, when she first met the victim for therapy, he appeared "very quiet[,]" "very withdrawn," and "nervous and scared[,]" and he displayed "closed body language" (Docket Entry 39-8 at 33);

- Bingham testified that, despite her therapeutic interventions "at least twice a week[,]" the victim's symptoms of school avoidance, fear of Petitioner, "nightmares, agitation, vomiting, headaches, [and] stomachaches" did not improve in February and March of 2014 (id. at 54-55);

- Bingham testified that she participated on the team of people trying to find accommodations for the victim to remain at Lindley Elementary School (see id. at 85), but that the victim remained in "significant distress[,]" that his father "had to [] almost carr[y the victim] into the school[,]" that "[the victim] grabb[ed] the frame of the door and h[eld] onto it[, ] crying and saying, no, I don't want to go[,] I don't want to go[,] I don't want to go[,] I'm scared[,] and "kept trying to run out of the classroom," which Bingham found "very disturbing" (id. at 86);

- Bingham further testified that homebound school "helped with the [victim's] anxiety about going to school[,]" but that "he continued to exhibit . . . nightmares[,]" "seeking more comfort from his mom[,]" fear of public bathrooms, withdrawal, loss of interest in activities such as soccer, and fear "of white things . . . because [Petitioner's] hair was white" (id. at 88), as well as that the victim later reported "frequent headaches" (id. at 89), "difficulty concentrating" (id. at 90), and "unhealthy beliefs that all white males in all schools were out to hurt him" (id.);

- Bingham explained that, when the victim eventually returned to in-person education at a different elementary school, despite a "safety plan" in place for the victim (id. at 91), his "walk-through of the school[,]" and a social worker "escort[ing the victim] to class" (id. at 92), "[he] began to reexperience some of the . . . alleged trauma, and it seemed to be triggered by his white male science teacher," such that the victim initially

71

"complet[ed] his science work in his homeroom class room . . ., and then eventually [re-attended the science teacher's class by] s[itting] in the back of the class with the door open and [the victim] could leave if he didn't feel comfortable" (<u>id.</u> at 93);

- Bingham recalled that she attended an after-hours visit to Lindley Elementary School with the victim, his mother, a photographer, a detective, and an assistant district attorney shortly before trial (<u>see</u> <u>id.</u> at 103), and that, "[w]hen [the victim] would go into the bathroom, he would come back out of the bathroom, and he wept . . . and held his mother" (<u>id.</u> at 104);

- The victim's mother testified that the victim started going to the school's infirmary and asking to be picked up early, but that, once at home, he did not seem sick, that he would often tell her in the morning before school that his stomach hurt or that he had a headache (<u>see</u> <u>id.</u> at 146-48), and that this behavior had started "before January [of 2014]" (<u>id.</u> at 151);

- The victim's mother stated that the victim told her that his grandmother's death caused his behavior, but that the mother did not believe the victim, because "he didn't even know h[is grandmother]" (<u>id.</u> at 151-52);

- The victim's mother testified that, when the victim first told her about Petitioner's sexual abuse one morning before school, "[h]e started to grab onto his head[, h]e was covering his ears[, and h]e started to jump and run as if this man was going to show up in our room" (<u>id.</u> at 161), as well as that, after [she] took [the victim] to the police department, . . . [his] behavior got worse" (<u>id.</u> at 162);

- The victim's mother testified that, after the victim's disclosure of abuse, "[h]e became depressed[,]" "isolated himself from [the family,]" did not sleep through the night, "had nightmares[,]" wanted to sleep next to his mother (<u>id.</u> at 164), and wanted all the doors, windows, and curtains in the house closed (<u>id.</u> at 165);

72

- The victim's mother recalled that the victim remained "quite fearful of . . . white male teachers" at his new elementary school, and that he remained, at the time of trial, fearful of "white men" and "public restrooms" (id. at 168);

- The victim's mother verified that the victim never identified any other men who did "inappropriate" things to him, that no pornography existed in her home, and that the victim did not "watch any movies with nudity or sex acts in [her] home" (id. at 169);

- Detective Nero testified that she observed Ward's forensic interview of the victim, that she saw the victim "rocking back and forth in his chair" and "[w]ringing his hands[,]" and that, when Ward asked the victim "a difficult question[,]" he checked the clock on the walls . . . to avoid answering the question or[ to] buy[] time" (Docket Entry 39-9 (Trial Tr. Vol. VI) at 19);

- Detective Nero further testified that, when she interviewed Petitioner "[a]t the family victims unit office" (id. at 24), she found him "matter of fact" when told of the victim's allegations against him, without "an emphatic declaration one way or the other" (id. at 29), and the jury viewed Nero's interview of Petitioner and could see for themselves Petitioner's non-emotional reaction to the allegations (id. at 33-35);

- Detective Nero additionally testified that, when she arrested Petitioner, his demeanor "was very similar to what [the jurors] viewed in the video [of her interview of Petitioner]" (id. at 37-38); and

- Karen Sexton, the victim's second grade teacher (see Docket Entry 39-10 (Trial Tr. Vol. VII) at 25), testified that she did not recall the victim ever "talk[ing] about sex" (id. at 48).

That evidence, none of which involved expert opinions that the

victim displayed behavior consistent with those of sexually abused

73

children or that sexual abuse caused him to suffer from PTSD, corroborated the victim's testimony that Petitioner sexually abused the victim, provided the jury with a reason, other than fabrication, why the victim delayed disclosing the abuse and why the victim's recollection of the details of such abuse changed over time, and countered the defense's theories that the victim's grandmother's death caused his behavioral changes and that exposure to sexual material explained his non-age-appropriate sexual knowledge. Moreover, the fact that such evidence qualifies as circumstantial rather than direct evidence of Petitioner's guilt does not alter the analysis, as the trial court instructed the jury that "[t]he law makes no distinction between the weight to be given either direct or circumstantial evidence," as well as that "a greater degree of certainty [is not] required of circumstantial evidence than of direct evidence" (id. at 77).

Notably, the evidence at trial also failed to establish a motive or reason for the victim to make unfounded allegations of sexual abuse by Petitioner. Witnesses described the victim as "shy," "very polite," and a person who "worked hard and never [had] a behavior issue" (Docket Entry 39-5 at 253 (Sisk)); "very delightful," "shy," and a person who "smil[ed] a lot" (Docket Entry 39-7 at 17 (Stewart)); and "cooperative and pleasant and very sweet" (id. at 72 (Dr. Thomas)). Moreover, the evidence did not establish any prior conflicts between the victim and Petitioner

74

which might have given the victim a motive to make false allegations against Petitioner. Detective Nero recalled that the victim's parents had told her that they thought "[Petitioner] was a good teacher" and had no "concerns" about him prior to the victim's allegations. (Docket Entry 39-9 at 16.) Significantly, Petitioner testified that "[the victim] was fairly bright," "very friendly," and that "[he] never had a problem with him." (Id. at 125 (emphasis added).) The absence of a reason for the victim to fabricate his allegations of sexual abuse by Petitioner significantly strengthened the state's case against Petitioner.

Importantly, the United States Supreme Court "ha[s] recognized that 'the more general the rule, the more leeway state courts have[,]'" and has thus held that, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Shinn v. Kayer, 592 U.S. 111, 118-19 (2020) (quoting Sexton, 585 U.S. at 968, and citing Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)) (emphasis added) (parallel citations omitted). Furthermore, the United States Supreme Court has emphasized that "[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous[,]" and "ha[s] held precisely the opposite: ' . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment

75

that the relevant state-court decision applied clearly established federal law <u>erroneously or incorrectly</u>[, but r]ather, that application must be <u>objectively unreasonable</u>.'" <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75–76 (2003) (quoting <u>Williams</u>, 529 U.S. at 409, 411) (emphasis added) (internal quotation marks and citations omitted).

Given that clearly established federal law governing the Court's analysis, and the evidence (detailed above) indicative of Petitioner's guilt beyond the profile and PTSD opinion evidence, the MAR court did not unreasonably apply <u>Strickland</u> in finding that Petitioner failed to establish that, absent his trial counsel's alleged errors with regard to the profile and PTSD opinion evidence, a reasonable probability of a different outcome existed in his case. <u>See</u> <u>Olguin v. Kibler</u>, No. 2:21CV368, 2021 WL 3737099, at *11 (E.D. Cal. Aug. 24, 2021) (unpublished) (holding that "there [wa]s no reasonable probability that, but for defense counsel's failure to object to the challenged [profile] evidence . . ., the result of the proceeding would have been different" because, even though the petitioner argued that "the victim was not a compelling witness because there was considerable evidence that she lied about at least some of the [] incidents" and "[she] disclosed additional details about the abuse in her forensic interview, and did not disclose [another] incident until later, [<u>an expert]'s</u> <u>properly-admitted testimony concerning delayed disclosure informed</u>

76

the jury this was not uncommon among children who have suffered sexual abuse[ and, i]n addition to the victim's testimony, her mother, the uncle she confided in on the way to school, the friend who prompted her to do so, her boyfriend, and [her school counselor] each testified to the emotion the victim displayed when talking about the abuse"), recommendation adopted 2021 WL 5330693 (E.D. Cal. Nov. 16, 2021) (unpublished), aff'd, No. 21-16953, 2024 WL 1209523 (9th Cir. Mar. 21, 2024) (unpublished); see also United States v. Becker, Civ. No. 02-3112, 2003 WL 21087960, at *2 (D. Kan. May 8, 2003) (unpublished) (holding that "defense counsel not objecting to the agent's testimony [about the characteristics of methamphetamine cooks, i.e., profile evidence] did not create a reasonable probability that the trial's outcome would have been different[, where] . . . the circumstantial evidence [wa]s more than sufficient for a jury to [convict the petitioner]").

Based on the foregoing analysis, Ground One fails as a matter of law.[13]

---

[13] Petitioner argues that the MAR court's "'no prejudice' conclusion is [] based on the (implicit) finding that the [s]tate presented overwhelming evidence of [Petitioner]'s guilt regarding the first-grade and third-grade counts [against Petitioner]." (Docket Entry 6 at 137; see also Docket Entry 29 at 46-50.) In Petitioner's view, "[t]h[at] 'overwhelming evidence' finding constitutes an 'unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding'" (Docket Entry 6 at 137 (quoting 28 U.S.C. § 2254(d)(2))), because "the state court record clearly and convincingly proves the [s]tate didn't present 'overwhelming' evidence regarding the first-grade and third-grade counts [against Petitioner]" (id.). Petitioner's argument fails, because the MAR court's finding of no prejudice under Strickland does not require this Court to find that the MAR court also implicitly found "overwhelming evidence" of guilt. Although the United States Supreme Court recognized in its discussion of prejudice in Strickland that "a verdict . . . only weakly supported by the record is more likely to have been affected by [trial counsel] errors than (continued...)

**C. Ground Two**

Petitioner's second and final ground for relief contends that his "[t]rial counsel was ineffective because he failed to object and move to strike or request a mistrial when Dr. [] Thomas, [] Bingham, and Detective Nero repeatedly vouched for [the victim]'s credibility and truthfulness." (Docket Entry 6 at 138 (bold font and block formatting omitted); see also Docket Entry 29 at 51-54.) In that regard, Petitioner argues that "[t]he 'jury is the lie detector in the courtroom and is the only proper entity to perform the ultimate function of every trial - determination of the truth.'" (Docket Entry 6 at 138 (quoting State v. Kim, 318 N.C. 614, 621 (1986)).) Petitioner further notes that, "[t]o protect the jury's truth- and credibility-determining provinces, witnesses can't vouch for an accuser's credibility" (id. (citing State v. Giddens, 199 N.C. App. 115, 121 (2009), aff'd, 363 N.C. 826

_____

[13] (...continued)
one with overwhelming record support," Strickland, 466 U.S. at 696, the court also acknowledged that the nature and degree of trial counsel's alleged error(s) impacts the prejudice analysis quite apart from the quantity of evidence of guilt:

> Some of the [jury's] factual findings will have been unaffected by [trial counsel's alleged] errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.

Strickland, 466 U.S. at 695-96 (emphasis added). Indeed, Petitioner has cited no United States Supreme Court cases holding that a finding of overwhelming evidence of guilt constitutes a condition precedent to a "no prejudice" finding under Strickland. (See Docket Entry 6 at 137-38; see also Docket Entry 29 at 46-50.) Thus, no clearly established federal law supports Petitioner's instant argument, and this Court can find that the MAR court reasonably applied the Strickland prejudice standard without also finding that the state court record demonstrated "overwhelming evidence" of Petitioner's guilt.

(2010))), and "[t]h[at] rule applies to experts" (id. (citing State v. Aguallo, 322 N.C. 818, 822 (1988), and State v. Dixon, 150 N.C. App. 46, 52, aff'd, 356 N.C. 428 (2002))).  Petitioner points out that, in North Carolina, "[i]f . . . no physical evidence corroborat[es] the child's sexual abuse allegations, the [s]tate can't introduce an expert who tells jurors . . . she still believes the child's sexual abuse allegations, and grounds her belief/determination on nothing more than the child's statements to her or other people regarding [the] allegations[.]"  (Id. at 139 (citing State v. Towe, 366 N.C. 56, 61-64 (2012), State v. Stancil, 355 N.C. 266, 266-67 (2002), State v. Trent, 320 N.C. 610 (1987), State v. Grover, 142 N.C. App. 411, aff'd per curiam, 354 N.C. 354 (2001), State v. Bates, 140 N.C. App. 743 (2000), and State v. Parker, 111 N.C. App. 359 (1993)); see also id. at 139 n.76 (citing additional North Carolina appellate cases).)  According to Petitioner, his trial counsel's failure to object to the alleged vouching testimony constituted deficient performance (see id. at 151-52) under a de novo standard of review (see id. at 159-64), and the MAR court unreasonably applied Strickland in finding no prejudice resulted from Petitioner's trial counsel's allegedly deficient performance (see id. at 165-72).  Those arguments lack merit and thus the Court should deny relief on Ground Two.

79

1.  Deficient Performance

a.  **Dr. Thomas' Alleged Vouching Testimony**

Petitioner first contends that the following testimony, as emphasized below, constituted impermissible vouching by Dr. Thomas that should have prompted Petitioner's trial counsel to object (see Docket Entry 6 at 140-41):

> [PROSECUTOR:] When [the victim] walked in[to the clinic], could you describe his behavior for our jury?
>
> [DR. THOMAS:] Sure. He was cooperative and pleasant and very sweet. Most of the kids, and he was not an exception, looked nervous. Nobody really likes to see me coming. But he was cooperative with the exam in the beginning . . . up until I tried to do the genital and anal exams and then there was a dramatic change in his affect and behavior. He became very, very upset, crying, screaming, you know, holding legs together, resisting the examination. So my clinic is a little tricky. You know, I'm dealing with children who have possibly had an extremely traumatic experience. . . . In [the victim's] case[,] . . . Mom was in there and then I had a female pediatric resident and the nurse with me. And we sang songs and joked. And we have a light on the top of the ceiling that looks like it's a fish tank. And I did all the tricks and all the things I could do to make him comfortable and reassure him. But ultimately, I did not do that exam. I was able to examine genitals briefly, but I did not do the anal exam, because in my mind, I felt like that would be more traumatic than information we would gather.
>
> . . .
>
> [PROSECUTOR:] Dr. Thomas, do you have an opinion as to whether the behavior and symptoms reported and displayed by [the victim] was consistent with other children who allege some sort of sexual maltreatment?
>
> [DR. THOMAS:] Yes. It's consistent with that.
>
> [PROSECUTOR:] Did his reaction, when you tried to do that anal exam, factor into that opinion?

80

> [DR. THOMAS:] It did. That's not all that
> typical. . . <u>[T]he only time I really see that is in
> very convincing, concerning cases</u>. Most of the time I
> can . . . reassure them it's not going to hurt. Have
> whoever they need to have, have a stuffed animal, have
> whatever it takes to get an exam. . . . <u>I really can
> only think of about five or six times in the four to five
> years I've been doing that, that it's happened this way</u>.

(Docket Entry 39-7 at 72-83 (emphasis added).)

The Court should find that the challenged testimony did not
amount to impermissible vouching. As an initial matter, before the
testimony in question, and as quoted above, Dr. Thomas noted that
she "deal[t] with children who have <u>possibly</u> had an extremely
traumatic experience" (<u>id.</u> at 73 (emphasis added)), thereby
signaling to the jury her recognition that, when conducting child
medical examinations, she dealt with <u>allegations</u> of sexual abuse.
Furthermore, Dr. Thomas, whom the trial court admitted "as an
expert in pediatric medicine with an emphasis on child abuse
treatment" (<u>id.</u> at 59-60), and who testified that she had conducted
approximately 500 child medical examinations (<u>see id.</u> at 83), would
have a better understanding than the jury that strong resistance to
anal exams such as that displayed by the victim in this case did
not happen often and that such reactions tend to occur in
"convincing, concerning cases" (<u>id.</u>).

An opinion from the North Carolina Court of Appeals supports
the view that the trial court would not have sustained an objection

81

from trial counsel regarding the testimony of Dr. Thomas in question, under the following reasoning:

[An expert pediatrician] testified that children don't make up stories about sexual abuse and that the younger the child, the more believable the story. He did not testify to the credibility of the victim but to the general credibility of children who report sexual abuse. Since such testimony was [the expert pediatrician]'s interpretation of facts within his expertise, and not his opinion upon the credibility of the specific victim, it is not excluded by Rule 405 [of the North Carolina Rules of Evidence]. The proper test of its admissibility is whether he was in a better position to have an opinion than the jury. In other words, was [the expert pediatrician]'s opinion helpful to the jury? [The court] determine[s] that it was.

The nature of the sexual abuse of children . . . places lay jurors at a disadvantage. Common experience generally does not provide a background for understanding the special traits of these witnesses. Such an understanding is relevant as it would help the jury determine the credibility of a child who complains of sexual abuse. The young child . . . subjected to sexual abuse may be unaware or uncertain of the criminality of the abuser's conduct. Thus, the child may delay reporting the abuse. In addition, the child may delay reporting the abuse because of confusion, guilt, fear or shame. The victim may also recant the story or, particularly because of youth . . ., be unable to remember the chronology of the abuse or be unable to relate it consistently.

. . . [The expert pediatrician] testified he had been a member of the Child Medical Examiners Program for child abuse from its beginning in the early 1970's and since that time had interviewed approximately one to two children each month who had allegedly been sexually abused. [He] testified he had devoted a portion of his practice to the examination of children involved in sexual abuse and that he had kept abreast of information in that area through professional journals. [The court] find[s] that [the expert pediatrician] was in a better position than the trier of fact to have an opinion on the credibility of children in general who report sexual

82

<u>abuse</u>.  His opinion is therefore admissible under Rule 702 [of the North Carolina Rules of Evidence].

<u>State v. Oliver</u>, 85 N.C. App. 1, 11 (emphasis added) (internal citations omitted), <u>disc. rev. denied</u>, 320 N.C. 174 (1987).

Moreover, Dr. Thomas did not take that testimony an impermissible step further and testify that, because of the victim's reaction to the anal examination, she believed that <u>he</u> had, in fact, suffered from sexual abuse, or that she believed <u>Petitioner</u> had perpetrated the abuse on the victim.  (<u>See</u> Docket Entry 39-7 at 83.)  Thus, this testimony helped the jury understand the significance of the victim's reaction to the anal examination and did not invade the ultimate province of the jury to determine the credibility of the victim.

Another case from the North Carolina Court of Appeals, <u>State v. Wiggins</u>, No. COA15-1385, 253 N.C. App. 841, 800 S.E.2d 135 (table), 2017 WL 2436970 (June 6, 2017) (unpublished), illustrates the difference between an expert making observations about a victim's demeanor or behavior during an examination or interview and opining on the <u>general</u> significance of such demeanor or behavior, and usurping the jury's role by opining that such demeanor or behavior led the expert to believe <u>the victim</u> or to conclude that abuse, in fact, occurred.  In that case, an expert

clinical social worker and child abuse evaluation specialist
provided the following testimony:

> [PROSECUTOR:] What sort of details did [the victim] give
> in your interview with him that gave . . . context or
> sensory information?
>
> [EXPERT:] [The victim] was able to tell detailed,
> eventually, sequentially, about what's occurred and with
> <u>some internal consistencies</u>.
>
> [PROSECUTOR:] What do you mean by internal consistency?
>
> [EXPERT:] . . . [The victim] would in more than one way
> share the same details. An example would be saying I was
> crying, but also saying I was wiping my face about the
> same incident or saying that [his] pants were off and
> then later saying what he did next was put his pants back
> on. <u>So that shows internal consistency</u>.
>
> . . .
>
> [PROSECUTOR:] And there was a delay of approximately two
> years [between the alleged abuse and the disclosure], how
> did that delay factor into your interview with [the
> victim]?
>
> [EXPERT:] . . . [W]hat's important in the interview
> protocol, why it differentiates between a one time
> incident and more than one time incident is because if
> something's happened multiple times, then you might form
> a script, is the term we use, related to memory, a script
> of what's occurred. So something happens similar, an
> event that happened more than one time, it's a similar
> event, then your memory is going to form on top of the
> prior memory. So this happens for trauma or
> non-traumatic events, like an analogy is that if . . .
> you go to the dentist every six months, that you're
> likely to be able to tell well about what happened
> usually at the dentist, but it's a little harder to talk
> about the specific timing to the dentist, because it
> happens in the same way. <u>*So, but overall, the scripted*</u>
> <u>*memory can be pretty reliable. And so [the victim] used*</u>
> <u>*a little bit of that*</u>, he talked about there's some parts
> of the four different incidents that were similar. And
> so he didn't tell as much detail about those parts, but
> when something's unique, the worst last time, he was able

to tell more detail about it and despite being two years
later.

Wiggins, 2017 WL 2436970, at *8-9 (underscoring added) (italics in

original).

Based on that testimony, "[the d]efendant argue[d] the trial

court committed plain error by allowing [the expert] to vouch for

[the victim]'s credibility and to categorize [the victim]'s

memories as internally-consistent and reliable[,]" but "[the court]

h[e]ld that [the expert] did not impermissibly vouch for [the

victim]'s credibility[,]" id. at *9, reasoning as follows:

> [The expert]'s testimony that "scripted memory *can* be
> pretty reliable" and that "[the victim] used *a little bit*
> of that" was not tantamount to an opinion that the child
> was credible.  [The court] acknowledge[s] that [the
> expert]'s testimony *could* give rise to an inference
> that[,] because [the victim] used scripted memory, his
> memory was reliable.  However, [the expert]'s testimony
> did not impermissibly make that inference for the jury.
> Indeed, the province of the jury was left undisturbed.

Id. (underscoring added) (italics in original) (internal citations

omitted)).  Similarly, Dr. Thomas' testimony could give rise to an

inference that, because the victim strongly resisted the anal

examination, and such reactions happen in "convincing, concerning

cases" (Docket Entry 39-7 at 83), then the victim's case qualified

as "convincing" and "concerning" (id.), but Dr. Thomas "did not

impermissibly make that inference for the jury," Wiggins, 2017 WL

2436970, at *9.

In contrast, the North Carolina Court of Appeals found in

State v. Crabtree, 249 N.C. App. 395 (2016), aff'd, 370 N.C. 156

85

(2017), that an expert pediatrician's testimony amounted to impermissible vouching based on the following reasoning:

> [The expert's] statement that "[w]e have sort of five categories all the way from, you know, we're really sure [sexual abuse] didn't happen to yes, <u>we're really sure that [sexual abuse] happened</u>" and her <u>reference to the latter category as "clear disclosure" or "clear indication" of abuse</u>, in conjunction with <u>her identification of that category as the one assigned to [the victim]'s . . . interview</u>, crosses the line from a general description of the abuse investigation process into impermissible vouching. Likewise, [the expert]'s testimony that her team's "<u>final conclusion [was] that [the victim] had given a very clear disclosure of what had happened to her and who had done this to her</u>" was an inadmissible comment on [the victim]'s credibility.

<u>Id.</u> at 403 (emphasis added). Thus, in <u>Crabtree</u>, the expert testified that she specifically found <u>the victim</u>'s disclosure a "'clear indication' of abuse," <u>id.</u>, rather than testifying, like Dr. Thomas, that a particular behavior occurs in convincing cases, without opining as to the truthfulness of the victim's reports, or identifying Petitioner as the perpetrator.

Given the state of the law on impermissible vouching in North Carolina, substantial doubt existed that the trial court would have sustained an objection to the testimony of Dr. Thomas in question and, by objecting, trial counsel would have risked drawing the jury's attention even further to that unfavorable testimony. Accordingly, the Court should find that trial counsel pursued an objectively reasonable trial strategy in not objecting to that testimony, such that Petitioner failed to establish constitutionally deficient performance.

86

Next, Petitioner maintains that the following testimony by Dr. Thomas, underscored below, constitutes impermissible vouching, to which Petitioner's trial counsel failed to object (<u>see</u> Docket Entry 6 at 141):

> [PROSECUTOR:] Now, did you make any recommendations for [the victim]?
>
> [DR. THOMAS:] I did. I wanted him to have therapy. And I was happy that he was in therapy. And he had expressed to [] Stewart that the therapy was helping and I was glad for that. He was having homebound school when we saw him. And that had actually been helpful. And I was in support of not having him go back to a place where this had allegedly happened. I feel like that was a good . . . choice. <u>But at the same time the whole goal . . . with abused children is to get them back to their potential and their life and what should be normal for them and what's normal for most kids is going to a school.</u> So it was my hope and my recommendation that he could return to some traditional school setting when it was emotionally healthy do so. I agreed that he should not go back to that school.

(Docket Entry 39-7 at 84-85 (emphasis added).) According to Petitioner, through this testimony, "Dr. Thomas told jurors [the victim] was, in fact, an 'abused child.'" (Docket Entry 6 at 141.)

The testimony in question does not amount to improper vouching under North Carolina law. To begin, immediately preceding that testimony, Dr. Thomas stated that she supported the decision to not send the victim back to Lindley Elementary School, a "place where th[e abuse] had <u>allegedly</u> happened" (Docket Entry 39-7 at 85 (emphasis added)), again making clear to the jury that Dr. Thomas's examination involved <u>allegations</u> of sexual abuse. Moreover, Dr. Thomas's testimony explained the basis for her recommendation that

87

the victim should eventually return to a "traditional school setting" (id.), but neither described the victim as an "abused child[,]" nor identified Petitioner as the perpetrator (id.).  Such testimony does not qualify as improper vouching for the victim.  See State v. McKoy, No. COA17-1025, 261 N.C. App. 539, 817 S.E.2d 921 (table), 2018 WL 4441143, at *4 (Sept. 18, 2018) (unpublished) ("At trial, in explaining her credentials and specializations, [the expert] testified that cognitive behavioral therapy is 'the best kind of treatment for children that's been abused or trauma [sic].'  She also testified that '[t]he last 13 years [of her work] ha[d] been specific to sexually abused children.'  [The d]efendant argues that [the expert]'s testimony regarding her area of practice and use of cognitive behavioral therapy was improper because it implied that [the victim] had been abused.  However, an expert's description of her therapeutic approach is not akin to an opinion on the truthfulness of a patient.  Indeed, at the time [the expert] made the statements that [the d]efendant now challenges, she was not testifying about [the victim] at all, but merely summarizing her methods and credentials.  Thus, we hold that [the expert]'s testimony explaining her credentials did not vouch for [the victim]'s credibility." (emphasis added)); State v. Harris, 243 N.C. App. 728, 738-39 (2015) ("[The] defendant argues that the trial court committed plain error by admitting [an expert]'s testimony regarding [the

88

victim]'s placement in [trauma-focused cognitive behavioral therapy ('TFCBT')] and the therapy process in general. [The d]efendant claims that this portion of [the expert]'s testimony constituted impermissible vouching for [the victim]'s credibility. . . . [The expert] explained how TFCBT is used to help treat victims in cases of sexual abuse and described therapeutic techniques that she employs in her treatment. . . . The mere fact that [the expert]'s testimony supports [the victim]'s credibility does not render it inadmissible." (emphasis added)); State v. Bratton, No. COA09-1627, 206 N.C. App. 597, 698 S.E.2d 768 (table), 2010 WL 3221869, at *5 (Aug. 17, 2010) (unpublished) ("[The d]efendant argues that [a licensed clinical social worker's] testimony improperly bolstered [the victim]'s credibility. . . . [T]he [licensed clinical social worker ] expressed no opinion that [the victim] was probably sexually abused, or that [the d]efendant was likely the perpetrator. It is true that [the licensed clinical social worker] testified to her treatment goals for [the victim], which included 'addressing issues related to her victimization.' This testimony does not constitute the sort of opinion on another witness's credibility that is prohibited by our precedent." (emphasis added) (brackets omitted)).

In addition to the above-cited cases, in a particularly instructive case, the North Carolina Court of Appeals emphasized the importance of the testimony's context in determining whether

expert testimony discussing treatment processes and recommendations crosses the line into improper vouching. In <u>State v. Dobbs</u>, No. COA09-1478, 209 N.C. App. 755, 710 S.E.2d 709 (table), 2011 WL 704759 (Mar. 1, 2011) (unpublished), the North Carolina Court of Appeals addressed, as relevant here, four arguments that expert testimony "amount[ed] to testimony that the sexual abuse in fact occurred." <u>Dobbs</u>, 2011 WL 704759, at *5. "[The defendant] first contend[ed] that [the expert] was improperly allowed to testify that, during her forensic evaluation of [the victim], '[i]t was important for [the expert] to help [the victim] feel comfortable during the interview, and be able to trust [the expert] to talk about *the things that really happened to* [*the victim*].'" <u>Id.</u> (italics in original). The court rejected that argument, reasoning as follows:

> <u>This argument, however, requires taking the statement out of context.</u> <u>This part of [the expert]'s testimony occurred during the course of [her] description of what she did during a forensic evaluation and the reason for her approach.</u> . . . <u>In context, it is apparent that [the expert] was not testifying that [the victim]'s allegations 'really happened,' but rather that [the expert] was following an evaluation process designed to encourage the child to be truthful.</u> In other words, [the expert] was explaining why she proceeded the way she did and what she was doing to enhance the <u>reliability of her process</u>. The focus was on the <u>credibility of the process</u> and evaluation rather than on the credibility of [the victim]. . . . [The court] hold[s] that [the expert]'s testimony [] was directed towards helping the jury <u>understand her investigative process</u> and did not amount to an impermissible opinion on [the victim]'s credibility."

<u>Id.</u> at *5-6 (emphasis added).

90

"[The d]efendant next point[ed] to the following testimony by [the expert] and argue[d] that the italicized portion amounted to testimony that the sexual abuse in fact occurred," <u>id.</u> at *6:

> I also stated that [the victim] stated [sic] feeling afraid of [the defendant] and felt threatened that he would hurt her or her mother. [The victim] *had shown signs of how the abuse negatively affected her functioning, particularly in school, leading to failing her grade. . . .*

<u>Id.</u> (italics in <u>Dobbs</u>). The court held that, "[w]hile it is preferable for the witness to refer to 'alleged abuse,' we do not believe that [the expert]'s testimony amounts to a statement that the abuse in fact occurred, but rather, when the answer is read as a whole, simply reports pertinent behaviors of [the victim], testimony that the c]ourt has previously determined to be relevant." <u>Id.</u> (emphasis added).

"The defendant also challenge[d the expert]'s testimony that '[a] child forensic evaluation is requested from the department of social services in cases where there is child physical, sexual or emotional abuse.'" <u>Id.</u> at *7 (emphasis added). The court again found no vouching had occurred:

> Again, when this testimony is read in context, it is apparent that [the expert] was not testifying that sexual abuse in fact occurred in this case. When [the expert] was first called to testify, she was asked, "What is a child forensic evaluation?" She responded:
>
> > It's an evaluation that goes through contact time with interviewing the child, all of the people that are part of the investigation or evaluation, working with the department of social services and reviewing records, medical

91

records, the department of social services' records in order to pull that information together *to come up with an evaluation of whether or not the child experienced sexual abuse*.

Later, in her testimony, the trial court asked her: "And just to refresh our memory, what is a forensic evaluation?" [The expert] responded to that question with the testimony challenged by defendant, which was a shorthand version of the original testimony that made it clear that a child forensic evaluation is essentially an investigation of allegations of sexual abuse to determine their validity. <u>Although the testimony could have been more precise, we do not believe that the jury would have understood [the expert] to have been testifying that the existence of a report established that sexual abuse had in fact occurred</u>.

<u>Id.</u> (emphasis added) (ellipsis, footnote, and parenthetical material omitted).

"Finally, [the d]efendant challenge[d] testimony by . . . a[n expert] pediatric nurse practitioner . . . that she did not ask [the victim] about the allegations of sexual abuse because 'it wasn't in her best interests to be questioned again about <u>the events that had happened</u>.'" <u>Id.</u> at *8 (emphasis added). "[The d]efendant contend[ed] that the reference to 'events that had happened' was a 'bald conclusory opinion that the child had been sexually abused.'" <u>Id.</u> Once again, the court did not find merit to the defendant's argument, finding that "[the nurse practitioner] was . . . <u>simply answering the State's question about why she did not interview [the victim, and ] did not specifically reference sexual abuse or any of the events [the victim] had said occurred</u> . . . . This testimony is not comparable to that

92

considered to be a conclusion that sexual abuse occurred." Id. (emphasis added).

Given the remote possibility, in light of the above-quoted cases, that the trial court would have sustained an objection to Dr. Thomas' testimony about her recommendations for "abused children" (Docket Entry 39-7 at 85), the Court should find (A) that trial counsel pursued an objectively reasonable strategy of not objecting to that testimony, which would have risked further emphasizing that testimony in the jurors' minds and, thus, (B) that trial counsel did not perform deficiently under Strickland.

Petitioner further highlights the following testimony as another instance of improper vouching by Dr. Thomas that should have drawn Petitioner's trial counsel's objection (see Docket Entry 6 at 141-42):

> [TRIAL COUNSEL:] Are any representatives of the accused allowed to go to [ diagnostic] interviews [of the victims]?
>
> [DR. THOMAS:] At our hospital?
>
> [TRIAL COUNSEL:] Yes.
>
> [DR. THOMAS:] No. Absolutely not. And the reason is . . . what [Stewart] said, I think, was the alleged perpetrator being in the clinic would make a child feel unsafe.
>
> [TRIAL COUNSEL:] I was asking about a representative, like an attorney who just wants information.
>
> [DR. THOMAS:] No. Because there is no attorney at this point. . . . We wouldn't have access to that person to be there.

93

[TRIAL COUNSEL:] Well, would it surprise you that
[Petitioner] had already been charged by the time [the
victim] was in your clinic?

[DR. THOMAS:] No.  I can tell you that generally --

[TRIAL COUNSEL:] Attorneys aren't allowed there?

[DR. THOMAS:] Not allowed. . . .  They just aren't -- I
mean, I've never had anybody come or -- that just isn't
part of what happens, I guess.

[TRIAL COUNSEL:] But detectives are allowed?

[DR. THOMAS:] Well, they are the one that referred
often. . . .  [E]ither [] law enforcement, [the
Department of Social Services,] or a therapist has
arranged this because they want to make sure a child is
medically okay, which is important and I think quite
valid.  So you guys aren't generally the ones that are
referring to our office.  And I'm not going to go and
call people and let them know a child is being seen.
That's protected health information. . . .  [I]t is not
a court of law where both sides need to be represented.
It is a medical clinic and that child has protections.
According to [the Health Insurance Portability and
Accountability Act ("HIPAA")], I cannot call you and tell
you that this child has a medical exam scheduled.  That
would be inappropriate and . . . not okay.

. . .

I'm just trying to express that . . . this is like going
to the pediatrician, basically.

[TRIAL COUNSEL:] I would think that most children don't
take detectives with them to the pediatrician.

[DR. THOMAS:] Our office is a pediatric office.  And most
children aren't referred by detectives.  But when they've
been sexually abused and there's a case, then they are
because they deserve medical care and medical treatment
and that's what he's there for and nothing else.

(Docket Entry 39-7 at 90-92 (emphasis added).)

94

Once again, the Court should find that Dr. Thomas' testimony does not amount to impermissible vouching. The <u>context</u> of her testimony makes clear that Dr. Thomas merely answered trial counsel's questions regarding why detectives attend child medical examinations, and did not opine that <u>the victim</u> had suffered sexual abuse or that <u>Petitioner</u> had committed the abuse. <u>See McKoy</u>, 2018 WL 4441143, at *4; <u>Harris</u>, 243 N.C. App. at 738-39; <u>Dobbs</u>, 2011 WL 704759, at *5-8; <u>Bratton</u>, 2010 WL 3221869, at *5. Because the trial court likely would not have sustained an objection to that testimony, trial counsel adopted an objectively reasonable trial strategy by choosing not to object and did not perform deficiently under <u>Strickland</u>.

In short, even under a de novo standard of review, Petitioner has not shown deficient performance under <u>Strickland</u> by trial counsel with respect to Dr. Thomas' alleged vouching testimony.

**b. Bingham's Alleged Vouching Testimony**

Next, Petitioner points to the following testimony from Bingham, emphasized below, as improper vouching for the victim, to which trial counsel failed to object (<u>see</u> Docket Entry 6 at 143-46):

> [TRIAL COUNSEL:] . . . You're familiar with the term co[-]morbidity in the DSM[,] are you not?
>
> [BINGHAM:] I am.
>
> [TRIAL COUNSEL:] And that essentially means that there is the simultaneous presence of more than one diagnosis[,] isn't that correct?

95

[BINGHAM:] That is correct.

[TRIAL COUNSEL:] And that's because sometimes mental health issues don't fit cleanly into one box, do they?

[BINGHAM:] Not always.

[TRIAL COUNSEL:] But another way, it's possible that a co[-]morbid diagnosis could be mistaken for another diagnosis[,] isn't that correct?

[BINGHAM:] That is correct. But I don't believe that to be the case with [the victim].

[TRIAL COUNSEL:] Not even if the underlying information you're being given is false or incorrect? It would be possible then, wouldn't it?

[BINGHAM:] Based on the information gathered in my assessment, I don't believe that to be the case. I did have a diagnosis of insomnia as it was related to the PTSD, and that would have been a co-morbid condition.

[TRIAL COUNSEL:] So if all the information you received is false, or a significant part of it, that wouldn't change your opinion at all

[BINGHAM:] The information that I received was based on the UCLA PTSD Reaction Index, which is a frequently used measure with reliability and validity measures. And the information that I received was based over the course of more than 30 days of assessing [the victim].

[TRIAL COUNSEL:] Would you answer my question now, which was, if you received false information wouldn't that possibly change the outcome of your diagnosis?

[PROSECUTOR:]: Your Honor, if we may approach just for one minute, please?

T[RIAL] COURT: You may.

BENCH CONFERENCE

. . .

[TRIAL COUNSEL:] . . . [Y]our diagnosis is based off of the information given to you by the patient, correct?

[BINGHAM:] It's based off the - yes. Based off the information given by the [victim], based off of the information that the [victim] had provided to both the police officer, as well as the forensic interviewer.

[TRIAL COUNSEL:] And it's not your job to investigate the claims being made to you, is it?

[BINGHAM:] That is correct. It is not.

[TRIAL COUNSEL:] Your job is to accept the information and to render counseling in response to that?

[BINGHAM:] Yes.

[TRIAL COUNSEL:] <u>And if the underlying information you're given is incorrect, that could affect your diagnosis, could it not</u>?

[BINGHAM:] [The victim] was consistent in his physiological presentation, as well as his psychological presentation, as well as his verbal behavior over a period of five weeks. <u>I had no reason to believe that any of that was false. It was consistent over time, and that's one of the measures in why we use 30 days to conduct an assessment</u>.

(Docket Entry 39-8 at 118-21 (emphasis added).) In Petitioner's view, that testimony constitutes improper vouching because "Bingham felt compelled to tell jurors she 'had no reason to believe' [the victim]'s <u>sexual allegations</u> were false, meaning she told jurors she believed [the victim]'s <u>sexual abuse allegations</u>, meaning she vouched for [the victim]'s credibility and the credibility of his <u>sexual abuse allegations</u>." (Docket Entry 6 at 145 (emphasis added).)

As Respondent argues, "[t]his exchange is not as far reaching as Petitioner contends" (Docket Entry 26 at 31), because "Bingham's

97

statement that she 'had no reason to believe that any of that was false' was referring to the items in her preceding sentence - [the victim]'s physiological and psychological presentation and his 'verbal behavior' during her assessments with him over a five-week period" (id. at 32 (quoting Docket Entry 39-8 at 121)). As well-argued by Respondent:

> In context, it is clear that Bingham was not stating she had no reason to believe [the victim]'s allegations [of sexual abuse by Petitioner] were false, but only that she had no reason to believe that [the victim]'s physiological and psychological presentation, along with his verbal behavior during her assessments was false. If the jury took anything from this exchange, it is almost certainly not the sweeping proposition that Petitioner does, but rather [that] Bingham had no reason to question her evaluation of [the victim]'s presentation and behavior, given that it was consistent during [Bingham's] five-week assessment.

(Id.)  In other words, Bingham did not vouch for the credibility of the victim's allegations of sexual abuse by Petitioner but, rather, defended the validity of Bingham's PTSD diagnosis of the victim, by stating that his physiological, psychological, and verbal behavior remained consistent over a period of five weeks, which satisfied the UCLA PTSD Reaction Index's "reliability and validity measures" (Docket Entry 39-8 at 120).

North Carolina appellate courts have long held that expert testimony characterizing a victim's allegations of sexual abuse as truthful, credible, or believable amounts to improper vouching. See Kim, 318 N.C. at 620-21 (ruling that expert's testimony that "'[the victim had] never been untruthful with [the expert] about

98

Case 1:23-cv-00937-TDS-LPA   Document 46   Filed 08/08/25   Page 98 of 131

[the victim's allegations of sexual abuse]'" and that "'[e]verything [the victim] had to say to [the expert] somehow [the expert would] find out later that [the victim] was <u>telling the truth</u>' . . . must have been construed by the jury as expert opinion testimony that the victim's accusations against the defendant as related to [the expert] were true[,]" that "[the expert]'s answer amounted to an expert opinion that the defendant was guilty of the rapes for which he stood charged[,]" and that "[t]he admission of such evidence clearly was error" (emphasis added)); <u>State v. Heath</u>, 316 N.C. 337, 340-42 (1986) (deeming expert's answer to question, "'do you have an opinion satisfactory to yourself as to whether or not [the victim] was suffering from . . . a mental condition which . . . might have caused her to <u>make up a story</u> about <u>the sexual assault[,]</u>'" that "'[t]here [wa]s nothing in the record or current behavior that indicate[d] that [the victim] ha[d] a <u>record of lying</u>' . . . not admissible since it related to the likelihood of whether [the victim] was telling the truth about the alleged sexual assault and thereby to the likelihood that [the] defendant committed the rape and sexual offenses of which he was accused" (emphasis added)); <u>State v. Carroll</u>, No. COA14-14, 235 N.C. App. 218, 763 S.E.2d 339 (table), 2014 WL 3510891, at *5-6 (July 15, 2014) (unpublished) ("[The expert] testified as follows: '[The victim is] one of the clients that I've had that was <u>so consistent with her story from day one</u>. She told me what happened and her

story stayed consistent throughout the time that I worked with her. . . . [I]f something is so traumatic to you that your story stays consistent, then . . . that's very telling; . . . it's hard to keep a lie going, you know?  And [] in my in my line of business, when . . . kids are having behavior problems, . . . that's one thing that we can always count on, that, . . . if it's a lie, we're gonna find out sooner or later . . . .  So for [the victim] to be consistent, . . . that tells me something.'  At a later point in the trial, [the expert] further testified that: '. . . I don't have a truth detector in my office, but []I have a pretty good gut, and I never . . . felt like there was any kind of manipulation.  I felt like [the victim] showed up and told her story and she stayed consistent throughout that time.' . . .  [B]ecause these statements vouched for the credibility of [the victim]'s account of abuse, [the court] conclude[s] that they were admitted erroneously." (emphasis added)); State v. Ryan, 223 N.C. App. 325, 334 (2012) ("[The court] conclude[s the expert]'s testimony that she was not concerned that the [victim] was 'giving a fictitious story' is tantamount to [the expert's] opinion that the [victim] was not lying about the sexual abuse." (emphasis added)), writ denied, review denied, 366 N.C. 433 (2013); State v. Horton, 200 N.C. App. 74, 78 (2009) (finding that expert's testimony, regarding victim's ability to detail moment when the defendant "said he was sorry when he noticed he was hurting the [victim]" that, "[i]n all of my

100

training and experience, when children provide those types of specific details it enhances their credibility" was "an impermissible opinion regarding the victim's credibility" (emphasis added) (internal quotation marks and brackets omitted)); State v. O'Connor, 150 N.C. App. 710, 711–12, (2002) (finding that expert's testimony that "'it was her impression that [the victim's] disclosure [of sexual abuse] was credible' . . . constitute[d] impermissible expert testimony on the credibility of [the victim]'s testimony" (emphasis added)); State v. Hannon, 118 N.C. App. 448, 449–50 (1995) ("[The expert] testified that the victim [wa]s telling the truth about having sex with [the] defendant, and this [wa]s how [the expert] kn[e]w [the victim was] telling the truth. . . . [I]t was error to admit [that testimony] at trial." (emphasis added)); State v. Teeter, 85 N.C. App. 624, 631–32 (1987) (holding that trial court's admission of expert's testimony that she "'believed'" the victim because, "'[e]very time [the expert] went to [the victim] to go back to the story, her story was always consistent no matter how [the expert] tried to take [the victim] off-track'" and "'[c]onsistently, when [the expert] took her back to the story, [the victim] always told the story of what had happened to her consistently, never changing the basic facts of what had been occurring to her' . . . was error" (emphasis added)), writ denied, 358 S.E.2d 66 (N.C. 1987); State v. Jenkins, 83 N.C. App. 616, 623–24 (1986) (finding expert's testimony that, "if [the

101

victim] has said that he has been <u>sexually abused</u>, he is <u>not making that up</u>" and that "it is my opinion that [another victim] is <u>very very unlikely to be making those things up</u> . . . clearly [constituted] expert testimony as to the credibility of the two [victims] to which [the expert] referred" (emphasis added)); <u>State v. Holloway</u>, 82 N.C. App. 586, 587 (1986) (holding that two experts' "testimony that[,] in their opinion[,] the [victim] had testified <u>*truthfully*</u> . . . did not meet the requirements for expert testimony as it concerned the credibility of a witness, a field in which jurors are supreme and require no assistance" (underscoring added) (italics in original)).

Critically, however, the North Carolina appellate courts have also repeatedly held that an expert's testimony as to the victim's demeanor and the reliability of the testing and procedures the expert used in treating and/or diagnosing the victim do not constitute impermissible vouching. <u>See</u> <u>State v. Wise</u>, 326 N.C. 421, 424-28 (1990) ("When asked to 'describe [ the victim] emotionally' while she was telling her story during the counseling sessions, the [expert] responded, '<u>Genuine.'</u>  <u>The witness was testifying that the emotions of the victim during the counseling session were genuine emotions. . . .  The [expert counselor] was not testifying that she believed what the victim told her was true, nor did she give her opinion as to the victim's character for truthfulness in general.  She merely described her personal</u>

observations concerning the emotions of the victim during the counseling sessions. Such a response is proper under th[e North Carolina Supreme] Court's decision in []*Kennedy*[ .]" (emphasis added)); Kennedy, 320 N.C. at 30–31 ("[The court] do[es] not consider the testimony of th[e expert psychologist] that the victim answered the test questions in an 'honest fashion' to be an expert opinion as to [the victim's] character or credibility. It was merely a statement of opinion by a trained professional based upon personal knowledge and professional expertise that the test results were reliable because the victim seemed to respond to the questions in an honest fashion: her patient did not attempt to give false responses on a psychological test, thereby skewing the test results and rendering the results unreliable. By this answer[, the psychologist] was not saying that she believed the victim to be truthful, but rather that she gave truthful answers to the test questions. The psychologist's testimony went not to the credibility of the victim but to the reliability of the test itself." (emphasis added)); Wiggins, 2017 WL 2436970, at *8-9 (holding that expert's testimony that victim's statements "'show[ed] internal consistency,'" that "'scripted memory can be pretty reliable,'" and that "'[the victim] used a little bit of [scripted memory]' . . . was not tantamount to an opinion that the child was credible" (emphasis added)); State v. Spellman, No. COA09-1636, 206 N.C. App. 765, 699 S.E.2d 140 (table), 2010 WL

3467141, at *8-9 (Sept. 7, 2010) (unpublished) ("The expert pediatrician]'s statement that [the victim] 'appeared to be <u>very candid</u> in explaining all the different injuries' that were evidenced by the numerous scars on her body relates to [the expert pediatrician]'s assessment of [the victim]'s <u>demeanor during her physical examination</u>. . . . [The court] conclude[s] that [the expert pediatrician]'s aforementioned testimony is permissible evidence relating to the <u>diagnosis and treatment</u> of sexual abuse of [the victim] based on [the expert pediatrician]'s thorough assessment and examination of [the victim]." (emphasis added)); <u>State v. Helms</u>, 93 N.C. App. 394, 402-03, 378 S.E.2d 237, 242 (1989) ("On redirect, [the] defendant asked [the defense expert] if he had conducted <u>physiological tests</u> also. When [the defense expert] answered that he had, [the] defendant asked, '[W]ere [those tests] done in such a way as to <u>determine the accuracy of the responses</u> that were given by [the defendant]?" The State objected to this question, and the judge sustained the objection. The judge's ruling ran counter to [the North Carolina S]upreme [C]ourt's holding in [] *Kennedy* . . . . The question asked of [the defense expert] addressed the <u>reliability of the test results</u> even more clearly than did the testimony in *Kennedy*. The question was, therefore, a proper one for [the] defendant to have asked." (emphasis added)); <u>State v. Bailey</u>, 89 N.C. App. 212, 219 (1988) ("[T]he testimony of an expert to the effect that a prosecuting

104

witness is believable, credible, or telling the truth is inadmissible evidence. . . . However, those <u>cases in which the disputed testimony concerns the credibility of a witness's accusation of a defendant must be distinguished from cases in which the expert's testimony relates to a diagnosis based on the expert's examination of the witness</u>." (emphasis added)).

The North Carolina Court of Appeals, in <u>State v. Marine</u>, 135 N.C. App. 279 (1999), confronted expert testimony that went much further than Bingham's challenged testimony; specifically, the expert - who had diagnosed the victim with PTSD, <u>see</u> <u>id.</u> at 284 - testified as follows:

> [PROSECUTOR]: The signs that you've just described that you observed and looked for to indicate deceptiveness, what did you observe about [the victim] in that light?
>
> [ Objection; overruled.]
>
> [EXPERT]: [<u>The victim]'s behavior was . . . guarded but straight forward</u>. Children who are making this stuff up want people to know so they talk about it. . . . <u>I wasn't convinced that [the victim] had enough sexual education</u> from adults or even from what she learned from kids around her to have been able <u>to describe what she had described to the police</u>. Those were both <u>clear indicators</u> to me that [the victim] was being <u>very honest</u> . . . .

<u>Id.</u> at 281 (emphasis added).

In addressing the "defendant['s] conten[tion] that the [foregoing] testimony . . . amounted to commenting on [the victim]'s credibility," <u>id.</u>, the court stated:

> [T]he [North Carolina] Rules of Evidence [] prohibit an expert witness from commenting on the credibility of

105

another witness.  On the other side of the coin, however, Rule 702 permits expert witnesses to explain the bases of their opinions.  Thus, "a witness who renders an expert opinion may also testify as to the <u>reliability of the information upon which he based his opinion</u>." *State v. Jones*, 339 N.C. 114, 146 (1994)[].  Furthermore, the <u>mental and emotional state of the victim before, during, and after a rape or sexual assault is relevant</u> testimony that can help assist the trier of fact in understanding the basis of that expert's opinion. . . .

Admittedly, <u>the line between proper and improper questioning can be quite narrow, especially in the context of sexual assault and rape cases</u>.  Th[e c]ourt, for example, recently struggled over an expert's testimony, "I believed that [the victim] was a reliable informant."  *State v. Bright*, 131 N.C. App. 57, 60 (1998).  One judge concluded this was proper to explain why the expert could rely on the victim's information.  *Id.* at 60-61.  The remaining two judges concurred in the result but concluded that the expert's response [improperly commented on the victim's credibility].  *Id.* at 62 (Greene, J., concurring).  Although *Bright* illustrates how narrow the line can be, we do not feel [the expert's] testimony crossed that line here into commenting on [the victim]'s credibility.

<u>[The expert's] opinion was that [the victim] suffered from post traumatic stress syndrome disorder ("PTSSD"). Under Rule 702, [the expert] could explain how she concluded that [the victim] suffered from PTSSD, including testifying as to [the victim]'s mental and emotional state and as to the reliability of the information used to formulate her opinion</u>.  In formulating her opinion, [the expert] explained that one of the indicators of PTSSD is that the victim has experienced actual or threatened serious injury or threat to her physical integrity.  The testimony complained of here simply seeks to explain why [the expert] felt [the victim] had experienced a traumatic event: <u>[the victim]'s behavior and lack of sexual education convinced [the expert] that the information she was using to formulate her opinion was reliable.  In short then, [the expert's] testimony went to the reliability of her diagnosis, not to [the victim]'s credibility</u>.  Accordingly, this was a permissive use of expert testimony under Rule 702.

106

Marine, 135 N.C. App. at 281-84 (emphasis added) (internal parenthetical citation, some internal quotation marks, and parallel citations omitted).

As shown by the above-quoted appellate case law, Bingham's statements in question did not amount to testimony that "[she] had no reason to believe" the victim's allegations of sexual abuse by Petitioner "w[ere] false" (Docket Entry 39-8 at 121), but, rather, that "[she] had no reason to believe" the victim's physiological, psychological, and verbal behavior during examination "was false" (id.), which Bingham believed satisfied the UCLA PTSD Reaction Index's "reliability and validity measures" (id. at 120) and thus supported her diagnosis of the victim with PTSD (see id. at 75). Because the trial court likely would not have sustained an objection to that testimony, trial counsel's decision not to object constituted an objectively reasonable trial strategy. Moreover, by allowing Bingham to repeatedly avoid directly answering questions about the impact on a diagnosis, in general, of false allegations, Petitioner's trial counsel strengthened his strategic efforts to paint Bingham's testimony as infected by "confirmation bias," about which he cross-examined her (id. at 125). For all of these reasons, Petitioner has not shown deficient performance by his trial counsel under Strickland with respect to Bingham's testimony at issue.

107

Petitioner also maintains that the following statements by Bingham amount to impermissible vouching that should have caused his trial counsel to object (see Docket Entry 6 at 145-46):

> [TRIAL COUNSEL:] . . . [D]o you have any training from the National Children's Advocacy Center [('NCAC')]?
>
> [BINGHAM:] I don't recall that I do.  No.
>
> [TRIAL COUNSEL:] Do you have any training on weeding out false allegations?
>
> [BINGHAM:] . . . I attended a three-day training in forensic interviewing.
>
> [TRIAL COUNSEL:] So do you agree or disagree the [sic] position of the [NCAC] that false allegations may derive from three main things: [s]ubmitting to suggestion by authority figures, from pseudomemories, or be the product of a child evading honest answers?
>
> [BINGHAM:] I would not disagree with that.
>
> . . .
>
> REDIRECT EXAMINATION
>
> . . .
>
> [PROSECUTOR:] You just mentioned that you would not disagree with that statement about the [NCAC], <u>does that premise apply in this case</u>?
>
> [BINGHAM:] <u>In my opinion, no.  It does not apply</u>.

(Docket Entry 39-8 at 129-30 (emphasis added).)  In Petitioner's view, that testimony "constituted impermissible vouching[,]" because "Bingham told jurors the NCAC's statement regarding false allegations didn't 'apply' to [the victim]'s case[, and] . . . therefore, told jurors the NCAC's statement didn't

'apply' because [the victim]'s sexual abuse allegations were truthful and credible." (Docket Entry 6 at 146.)

Again, Respondent well-explains why Bingham's statements in question do not amount to impermissible vouching:

> While the above-quoted exchange is confusing, Bingham did not make the sweeping statement Petitioner attributes to her . . . . It appears that Bingham testified that, in her opinion, the [NCAC]'s 'premise' did not apply to this case, presumably because she believed that [the victim] was not submitting to suggestion by authority figures, was not experiencing pseudomemories, and was not evading honest answers.
>
> While Bingham "did not disagree" with the NCAC's position that "false allegations may derive from three main things," Bingham did not testify that the three situations listed by [the] NCAC were the only situations in which false allegations [of sexual abuse] could derive. Therefore, Bingham did not testify that [the victim] was being truthful or that his allegation that Petitioner sexually abused him was true, only that the NCAC's statement did not apply to his case. If the jury took anything away from this exchange at all, it was likely not that Bingham believed [the victim] was telling the truth, but that she simply believed that the specific scenarios mentioned by the NCAC and noted by Petitioner's [trial] counsel did not apply to his case.

(Docket Entry 26 at 34 (emphasis added).) As discussed above, North Carolina appellate case law permits an expert to "testify as to the reliability of the information upon which [s]he based h[er] opinion[,]" Jones, 339 N.C. at 146, as well as "to the reliability of her diagnosis," Marine, 135 N.C. App. at 284; see also Bailey, 89 N.C. App. at 219. Bingham's testimony in question did not cross the line into improper vouching, and, thus, trial counsel pursued

an objectively reasonable trial strategy under <u>Striokland</u> in opting not to object to that testimony.

In sum, Petitioner has not demonstrated, even under a de novo standard of review, constitutionally deficient performance under <u>Strickland</u> with regards to Bingham's testimony at issue.

**c.  Detective Nero's Alleged Vouching Statements**

Lastly, Petitioner faults his trial counsel for failing to "object to the trial court's [limiting] instruction[s] or the trial court's refusal to strike [Detective] Nero's impermissible vouching" during her recorded interview of Petitioner at the police station prior to his arrest, which the prosecution played for the jury.  (Docket Entry 6 at 151 (citing Docket Entry 39-9 at 30-35).) In particular, Petitioner contends that the trial court's limiting instruction, which admonished the jury that "'[it] may only consider the statements made by Detective Nero for one purpose, and that is for what [it] find[s Petitioner]'s reaction or response to these statements to be'" (<u>id.</u> at 149 (quoting Docket Entry 39-9 at 34)), required the "jurors . . . to assume the truth of the matter asserted in Detective Nero's statements vouching for [the victim]'s credibility" (<u>id.</u> at 150).   According to Petitioner, "trial counsel's failure to object on due process, impermissible vouching, relevancy, or [North Carolina Rule of Evidence] 403 grounds constitutes *Strickland* deficient performance."  (<u>Id.</u> at 151.)

Prior to trial, Petitioner's trial counsel filed a "Motion in Limine to Redact Portions of [Petitioner]'s Recorded Statement" (Docket Entry 1-1 at 30), "seek[ing] to exclude . . . [n]arratives by [ D]etective [Nero] of the [s]tate's case and the comments regarding the credibility of the [victim] made without posing a question to [Petitioner, s]tatements regarding [Petitioner]'s sexuality made by [ D]etective [Nero, Petitioner]'s request to speak to his attorney[, and t]he dialogue between [Petitioner]'s civil attorney and [ D]etective [Nero]." (Id. (numbers omitted).)

The trial court addressed Petitioner' Motion in Limine as follows:

> I have reviewed all of the segments identified in
> [Petitioner]'s [M]otion [in Limine]. And I have been
> able to carefully consider each of the objections raised
> and the concerns identified in the written [M]otion.
> Now, I can tell you that with some degree of confidence
> I was able to resolve the issues with respect to each of
> the passages, except I do want to hear the parties
> relative to the third passage, . . . [a]nd we'll return
> to that in a moment. First of all, let me tell you all
> how I have resolved the evidentiary issues, to include
> engaging in the 403 balancing test with respect to
> several of the passages. And then I will give each of
> you an opportunity to argue to me, additionally, if you
> would like.
>
> . . . The first passage begins at 3:40[:40] . . . and
> end[s] at 3:44[:15 and] involves a narrative essentially
> wherein Detective Nero lays out the allegations from
> her . . . perspective. Now, I appreciate the concerns
> that [Petitioner] has expressed, because in this
> narrative[,] Detective Nero states certain
> opinions, . . . and of great import to me[] is her
> opinion about the believability or the veracity of the
> alleged victim. So that is a concern. And also, of
> course, the allegations are characterized in a manner
> that is, one could say, in the light most favorable to

111

the [s]tate. In other words, of course, naturally
[ D]etective [Nero] states the allegations in the manner
that is least beneficial to [Petitioner].

Now, this passage is nonetheless important because
[Petitioner]'s reaction to the allegations, however
stated, is a relevant and valuable piece of information
for the jury. Not only his verbal reaction, but also his
nonverbal reaction, facial expressions or lack thereof,
whatever the case may be. All of that is competent and
valuable and admissible evidence for the jury in
determining credibility, believability, and in assessing
the strength or weakness of the [s]tate's case. So there
has to be some protection to allow the competent part of
the interview and protect against what would ordinarily
be incompetent parts, such as, incompetent opinions that
[ D]etective [Nero] renders that would not be competent
for a jury. [ N]o one is allowed to vouch for the
credibility of any witness, particularly the alleged
victim . . . .

[T]he way that I believe it best to address those issues
to allow for the relevant evidentiary value and protect
against the risk of unfair prejudice is with a limiting
instruction. That was my initial intuition and thought
yesterday and it is borne out after hearing and viewing
the statement.

(Docket Entry 39-8 at 5-8 (emphasis added).)

The trial court thereafter read a limiting instruction it
proposed to give the jury prior to publishing Detective Nero's
recorded interview of Petitioner (see id. at 9), and advised the
parties: "I'll hear from you all, . . . but [] I am comfortable in
my discretion in evaluating the probative value of the interview[]
and/or interrogation, and [Petitioner]'s response, both verbally
and otherwise to the allegations which, of course, is at the center
of any criminal investigation, while protecting against undue
prejudice that may result from incompetent opinions and

112

embellishments, exaggerations and so forth in the investigative context" (id. at 10 (emphasis added)). Petitioner's trial counsel stated that, "with regard to the first passage[,] I think that limiting instruction the [trial c]ourt proposes to give certainly addresses our concerns." (Id.) The trial court subsequently "allow[ed] the [M]otion in [L]imine" with respect to the passages regarding Petitioner's sexuality under "the [Rule] 403 balancing test" (id. at 11; see also id. at 12), the passage involving Petitioner's request to speak with his civil attorney (see id. at 13-14), and the passage containing dialogue between the civil attorney and Detective Nero (see id. at 15).

At that point, the trial court read a second limiting instruction it proposed to give the jury regarding Detective Nero's recorded interview of Petitioner:

> [TRIAL COURT:] Ladies and gentlemen, you may see that portions of this video exhibit may not be played. You should understand that neither party or attorney is trying to inappropriately hide anything from you. Portions of the videotape may be about matters irrelevant to your consideration or simply contain information that is not appropriate for your consideration. You should not wonder what these passages are or speculate about what may have been in those passages, because remember that you will hear and see all of the competent and admissible evidence.

(Id. at 16.) Trial counsel did not object to that proposed limiting instruction. (See id.)

When the prosecutor reached the point during her direct examination of Detective Nero to introduce Detective Nero's

113

recorded interview of Petitioner to the jury, the trial court

issued the following two limiting instructions to the jury:

> T[RIAL] COURT: All right. Ladies and gentlemen, . . . I do have two important instructions that each of you must abide by relative to this exhibit, [Detective Nero's recorded interview of Petitioner]. First of all, you will see that during the videotape <u>Detective Nero will make a number of statements to [Petitioner] during his interview. You may not consider these statements as proof of the truth of what [ D]etective [Nero] says for several reasons[.] Number one, the statements were not made under oath at this trial, which I have instructed you about previously. Number two, law enforcement officers are permitted to use a number of investigative techniques for purposes of interrogation. These techniques may include exaggeration, embellishment and deception. Number three, these statements may include opinions about the veracity or the truthfulness of one party or witness or another which have no evidentiary value in this context and which are not appropriate for you to consider in terms of the opinions. You may only consider the statements made by Detective Nero for one purpose, and that is for what you find [Petitioner]'s reaction or response to these statements to be.</u>
>
> Furthermore, you may see or notice that portions of this video exhibit will not be played for you. Now, you should understand that neither party or attorney is trying to inappropriately hide anything from you. That is not the case. Portions of the exhibit may be irrelevant to your consideration. . . . And furthermore, portions of the exhibit may contain information that is simply not appropriate for your consideration. So you should not wonder or speculate, gosh, what . . . is it that I'm not getting to hear, what is it that I'm not getting to see. Remember, you will see and hear all of the admissible evidence.
>
> All right, you may publish or play [Detective Nero's recorded interview of Petitioner].

(Docket Entry 39-9 at 33-35 (emphasis added).) Petitioner's trial

counsel did not object. (<u>See</u> <u>id.</u> at 32 ("[TRIAL COUNSEL]: No

objection to the video pursuant to the [trial] court's ruling on the redactions.").)

Although Petitioner did not identify which statements by Detective Nero during her interview of Petitioner that he believes constitute impermissible vouching, the undersigned viewed the video and sets forth the following portions, emphasized below, as involving potential vouching by Detective Nero:

[DETECTIVE NERO:] Has [your civil attorney] explained to you what . . . the exact allegations are?

[PETITIONER:] Inappropriate touching, whatever that means.

[DETECTIVE NERO:] Okay. The allegations are for the last month [the victim] has been showing distress at school . . . to the point that his primary classroom teacher [Sisk] had noted that things just weren't right. . . . I asked about [the victim's] grandmother, and apparently that grandmother lives in Mexico [and] the victim's never even met her, so it's not like she's an integral part of his life. But anyway, when [the victim] was putting up more and more of a fight about going to school, he eventually told his mother that someone had been bothering him at school. She thought maybe it was just kind of a bullying situation. And then when she'd finally get [the victim] to agree to go to school, she said he would go but he would want to get picked up early and he'd miss the last 35-40 minutes of his day. Finally, after, you know, . . . a couple more days of these shenanigans of him refusing to go to school, and him having a headache and having a stomachache, the mom asked him okay who's bothering you. He said [you are]. And [] he said that [you] took him to the bathroom, put him in a stall, and made him touch your crotch with your penis exposed. And [] the thing is, you know, he came forward and he told his mother and then he was forensically interviewed . . . .

[He] made the same disclosure to the forensic interviewer as he made to his mother. And he had a lot of sensory details that, if a child was making it up, wouldn't've

115

been able to provide.  He was able to describe the route that he would take from your room to his classroom, which is coincidentally the same route that you described, even though you said there's often two ways to go, right?

[PETITIONER:] [Nods].

[DETECTIVE NERO:] And the other thing is, you know, you've got [the victim] who's a good kid.  You know, I talked to his teacher.  She described him the same way you did - well-behaved, bright kid.  He does struggle a little bit academically, but he does his homework and has never been in big trouble.  So, I mean, how do we get from a kid who's done well in school and has worked with you for years, to last month, he's been showing [] anxiety issues both at home and in the classroom and he's making these allegations?  You know, you put all that together and it looks like there's merit to these allegations.

. . .

Things are more problematic for you than they are for [the victim].  .  .  .   Everything that he disclosed happened in a sense can be corroborated, you know, with the consistent disclosures to his Mom, which is consistent with what he said in the forensic interview. And then you also put together his behaviors that he's exhibiting.  He said the first time with you - he said it happened multiple times - and the first time was right after Christmas, so that's the beginning of January, up until the last week in January, which is coincidentally the last time he went to school [inaudible].

[PETITIONER:] I didn't see [the victim] in the last week in January, and I didn't see him but five or ten minutes the week before the last week in January.

[DETECTIVE NERO:] Okay.  So in those ten minutes, how did that go?

[PETITIONER:] I mean, they came down to the room and we did the lesson.

[DETECTIVE NERO:] Okay.  So how come that was only for ten minutes when typically you would have them for 30 to 45 minutes?

116

[PETITIONER:] Oh, well [the victim's] mother came to pick him up early.

[DETECTIVE NERO:} [The victim's] Mom came to pick him up early?

[PETITIONER:] [Nods.]

[DETECTIVE NERO:] Any reason why? Was there a doctor's appointment?

[PETITIONER:] No, . . . the teacher just came by and said [the victim]'s mother is here to pick him up.

[DETECTIVE NERO:] You didn't question that?

[PETITIONER:] No, it happens to them.

[DETECTIVE NERO:] So that kind of gives a little more credence to what the parents are saying. You know he will fight you about going to school, and then when he finally agrees, it was, "I'll go but please pick me up early."

[PETITIONER:] I know how it looks.

[DETECTIVE NERO:] Okay. And how does that look, [Petitioner]?

[PETITIONER:] Like I'm screwed.

[DETECTIVE NERO:] Yeah.

. . .

It is basically looking like you're screwed: because of [the victim]'s statement, because of all the other, additional information from the parents, from the classroom teacher . . . who has nothing to gain over this at this point, if anything, she would be in your corner because she wouldn't want her school to be raked across the coals. And, you know, then on top of that, [the victim] is already seeing a trauma-based therapist, because [he] does not sleep through the night anymore,

117

<u>and he has chronic headaches, which his parents take him</u>
<u>to the doctor for him to get anxiety treatment</u>.

(Docket Entry 39-12 at 3:40:26-3:52:00 (emphasis added).)[14]

As the above-described circumstances make abundantly clear, Petitioner has not shown deficient performance under <u>Strickland</u> with respect to his trial counsel's handling of Detective Nero's statements in that recorded interview. Petitioner's trial counsel successfully moved in limine to 1) exclude from the jurors' consideration numerous portions of the video, and 2) have the trial court give the jurors an appropriate limiting instruction that they must not consider Detective Nero's statements for "proof of the truth of what [ D]etective [Nero] says," but must only consider them "for one purpose, and that is for what [they] find [Petitioner]'s reaction or response to these statements to be" (Docket Entry 39-9 at 34). Such successful efforts to limit the jury's consideration of unfavorable evidence defeat a showing of deficient performance. <u>See</u> <u>Benkahla v. United States</u>, No. 1:06CR9, 2010 WL 2721384, at *5 (E.D. Va. July 8, 2010) (unpublished) ("[The petitioner] next argues that [his trial counsel]'s failure to object to the playing of [a] video [relating to the terrorist bombing of the USS Cole] and failure to move for mistrial or a limiting instruction constituted ineffective assistance of counsel.

---

[14] The state filed the DVD containing Detective Nero's recorded interview of Petitioner under seal, because the video contains references to the minor victim's name. (<u>See</u> Docket Entry 39-12 (documenting filing of said exhibit under seal).)

An attorney's decision to object or not to object to certain items in the course of a jury trial is a classic example of a strategic trial judgment, 'the type of act for which *Strickland* requires that judicial scrutiny be highly deferential.' *Green*[ *v. Lynaugh*], 868 F.2d [176,] 178 [(5th Cir. 1989)]. With regards to the USS Cole video, [trial counsel] in fact objected twice after the video began . . . . Both times the [c]ourt sustained the objections. After the second objection, the Government ended the playing of the video. It was a short video played during the course of a four-day trial, and [trial counsel] objected to the video when he found it objectionable and was sustained. [Trial counsel] was an attentive attorney and clearly did not hesitate to object where he felt it was warranted. He objected to and moved to exclude numerous exhibits during the trial. A defendant 'is entitled to a fair trial, but not a perfect one, for there are no perfect trials.' *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984). [The p]etitioner cannot now show that [trial counsel] provided ineffective assistance . . . based on his failure to object to a piece of evidence, when he objected to parts of the evidence twice and ultimately succeeded in efforts to halt its presentation. [Trial counsel]'s conduct with regard to the USS Cole video was objectively reasonable[.]").

Petitioner's contention that the trial court's instruction to the jurors that "'[they] may only consider the statements made by

119

Detective Nero for one purpose, and that is for what [they] find [Petitioner]'s reaction or response to these statements to be'" (Docket Entry 6 at 149 (quoting Docket Entry 39-9 at 34)), required the "jurors . . . to assume the truth of the matter asserted in Detective Nero's statements vouching for [the victim]'s credibility" (id. at 150) also lacks merit. As well-contended by Respondent:

> Petitioner's reaction to Detective Nero's statements w[as] of course not vouching, and w[as] broadly relevant to a question at issue - whether Petitioner committed the crimes Detective Nero was interrogating him about. Petitioner's reaction to Detective Nero's statements - whether his reaction was frightful, indignant, angry, resigned, tearful, or something else entirely - was proper for the jury to consider. Given that the jury was aware Detective Nero's statements, in and of themselves, had "no evidentiary value" and were "not appropriate for [the jury] to consider," any vouching statements by Detective Nero in the interrogation were subject to a proper limiting instruction[.]

(Docket Entry 26 at 38 (quoting Docket Entry 39-9 at 34).) Indeed, the North Carolina Court of Appeals has recognized that trial courts can properly admit hearsay statements when not offered for the truth of the matter asserted but for their effect on the listener. See State v. Baldwin, No. COA06-649, 183 N.C. App. 156, 643 S.E.2d 677 (table), 2007 WL 1246418, at *4 (May 1, 2007) (unpublished) ("[T]he Confrontation Clause does not bar the use of testimonial statements offered for the non-hearsay purpose[] of . . . showing the effect of the statement on the listener").

Petitioner's assertion that "trial counsel's failure to object [to Detective Nero's statements} on due process, impermissible vouching, relevancy, or [North Carolina Rule of Evidence] 403 grounds constitutes *Strickland* deficient performance" (Docket Entry 6 at 151) fares no better. As quoted and emphasized above, the trial court clearly found that, with the additional provision of the limiting instructions, the relevance of that evidence outweighed any prejudice to Petitioner under Rule 403 of the North Carolina Rules of Evidence (<u>see</u> Docket Entry 39-8 at 5-8), and Petitioner entirely fails to explain how an objection on "due process" grounds would have succeeded (<u>see</u> Docket Entry 6 at 151). Such failure precludes relief on that front. <u>See</u> <u>Belk, Inc. v. Meyer Corp., U.S.</u>, 679 F.3d 146, 152 n.4 (4th Cir. 2012) (deeming issue "waived because [the plaintiff] fail[ed] to develop [an] argument to any extent in its brief"); <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)).

Put simply, Petitioner has failed to demonstrate that his trial counsel provided constitutionally ineffective assistance under <u>Strickland</u> by not objecting to the alleged vouching statements by Dr. Thomas, Bingham, and Detective Nero.[15]

---

[15] Again, as emphasized multiple times in the preceding discussion, Petitioner abandoned his pursuit of an evidentiary hearing to identify his trial counsel's strategy respecting the alleged vouching testimony in question by
(continued...)

121

2.   <u>Prejudice</u>

Petitioner argues that "[t]rial counsel's ineffectiveness [with respect to the alleged vouching] prejudiced [Petitioner,]" because "the [s]tate premised its case solely on [the victim]'s credibility [and] it didn't introduce physical evidence or lay witnesses to corroborate any aspect of [the victim]'s ever-evolving sexual abuse allegations." (Docket Entry 6 at 153-54.)  Petitioner further contends that, "[b]ased on the deference jurors afford experts, it's reasonably probable jurors relied on [vouching] opinions/statements [from Dr. Thomas and Bingham] when they returned their verdicts for the first-grade and third-grade counts [against Petitioner]" (<u>id.</u> at 154), and that "the trial [court]'s limiting instruction regarding [Detective Nero's recorded interview of Petitioner] didn't prevent jurors from considering [Detective] Nero's impermissible vouching when assessing [the victim]'s credibility and [Petitioner]'s guilt." (<u>Id.</u> at 155.)  Petitioner also contends that "it's reasonably probable jurors commingled th[e] impermissible vouching testimony with the substantive - yet impermissible - inferences they drew from the extensive 'profile' and PTSD expert testimony and evidence that trial counsel failed to

<hr>

[15]  (...continued)
failing to raise that argument in his petition for review of the MAR court's ruling in the North Carolina Court of Appeals.  (See Docket Entry 1-1 at 411-61.)  Significantly, Petitioner opted not to revive that argument in his instant federal proceedings, neither seeking an evidentiary hearing to ask his trial counsel about such matters, nor asserting that this Court <u>could not</u> make a <u>Strickland</u> deficient performance determination (particularly not against Petitioner) on a record lacking his trial counsel's testimony.  (See Docket Entries 1, 6, 29.)

limit under *Kennedy* and *Hall*" (id.), and thus insists that, "if the *Kennedy*/*Hall* errors don't produce *Strickland* prejudice, the cumulative impact of the *Kennedy*/*Hall* errors and the improper vouching does" (id. at 156). Petitioner thus argues that the MAR court "unreasonably applied *Strickland*'s prejudice standard to the facts in [Petitioner's] case," and based its "no prejudice conclusion . . . on an unreasonable finding, *i.e.*, the [s]tate presented overwhelming evidence of [Petitioner]'s guilt regarding the first-grade and third-grade counts [against Petitioner]." (Id. at 167 (internal quotation marks omitted); see also Docket Entry 29 at 52-61.) For the following reasons, those arguments fall short.

The MAR court, in "determin[ing] that there [we]re no facts alleged in the [Amended MAR] that, if true, would indicate a reasonable probability that the result of the proceedings would have been different" and "conclud[ing] that the allegations in support of the [Amended MAR] are wholly insufficient to indicate that any alleged deficient performance by counsel prejudiced [Petitioner's] defense" (Docket Entry 1-1 at 410), did not unreasonably apply *Strickland*'s prejudice test to the facts in Petitioner's case. "In making th[e prejudice] determination [under *Strickland*], a court hearing an ineffectiveness claim must consider the totality of the evidence before the . . . jury." *Strickland*, 466 U.S. at 695. Here, a "consider[ation of] the totality of the evidence before the jury," id., makes clear that the MAR court did

123

not unreasonably apply the <u>Strickland</u> prejudice standard to Petitioner's case.

Although Petitioner maintains that "the [s]tate premised its case <u>solely</u> on [the victim]'s credibility because it didn't introduce physical evidence or <u>lay witnesses</u> to corroborate any aspect of [the victim]'s ever-evolving sexual abuse allegations" (Docket Entry 6 at 153-54 (emphasis added)), he entirely overlooks other significant trial evidence that supported the jury's guilty verdicts. Quite apart from the alleged vouching by experts Dr. Thomas and Bingham, the jury considered the following <u>lay evidence</u> and <u>expert testimony from Ward that Petitioner did not contend amounted to vouching</u>, all of which corroborated the victim's testimony:

- Woody testified that, after the victim disclosed the sexual abuse by Petitioner, a team of people, including Woody, the victim's parents, Sisk, Bingham, and a school counselor (<u>see</u> Docket Entry 39-5 at 218-19), "tried to set up multiple supports" (<u>id.</u> at 218), such as allowing the victim to "carry[] a cell phone" (<u>id.</u>) and allowing his father and sister to accompany the victim into school and remain outside his classroom (<u>see id.</u>), but the victim "never wanted hi[s father] to leave" (<u>id.</u>) and, after one month, the team agreed that "homebound [school] would be the best [] alternative" for the victim (<u>id.</u> at 219);

- Sisk testified that "[the victim] started to have some absences or wanting to leave [school] early just before Christmastime [in 2013,]" and that, after Christmas break, the victim presented as "very upset[,] . . . would cry[,] and . . . had a very hard time being at school" (<u>id.</u> at 254), which "usually [happened] later in the day" because, "[u]sually[,] in the morning[,] he would come in

124

okay" (id. at 256), as well as that the victim attended Petitioner's class from "about 1:20" to "2:00 or 2:05" (id.);

- Sisk verified that, despite the interventions of the team aimed at successfully returning the victim to Sisk's classroom, the victim would cry and become upset when his sister or father would leave the classroom area, as well as that, after three or four weeks, the victim changed to homebound instruction (see id. at 265-67);

- JCP testified that Petitioner required students to answer a question correctly to leave his class (id. at 276), that she was the second last to leave Petitioner's classroom (id. at 280), and that the victim was the last student to leave (id. at 278);

- Officer Little testified that, when the victim, his mother, and his older sister came to a police substation to report Petitioner's sexual abuse of the victim (see Docket Entry 39-7 at 107-08), the victim appeared "[s]ubdued" and "nervous" (id. at 112), and "hesitant to talk and reluctant to be forthcoming" (id. at 113), as well as that he "would not make eye contact" (id. at 112) and "was staring down at the table" (id. at 113);

- Ward explained the concept of "delayed disclosure" (id. at 170), and indicated that "[b]arriers to disclosure" included "a high level of obedience to adults or authority figures" in the victim (id. at 171) (and pointed out that the student-teacher relationship entailed obedience (see id. at 172-73)), the perpetrator warning the victim "not to tell" or "threat[ening]" the victim (id. at 171-72), "shame" felt by the victim (id. at 172), and "regular contact with an alleged perpetrator" (id. at 173);

- Ward testified that children "often" do not "tell [her] every detail of abuse" during her forensic interviews of them (id. at 174-75), that, "[a] lot of times[,] they will say just enough to make the abuse stop" (id. at 175), and that "it's not uncommon at all for when [child abuse victims] get into a therapeutic relationship with a therapist and they develop more of an ongoing relationship

125

with that person, there's more trust there, and so they may provide more details to that therapist as it's ongoing" (id. at 176);

- Ward testified that "it's not abnormal at all for [her] to either not get the whole story or for some details to be a little foggy, particularly if the abuse has been ongoing over some amount of time or if it has happened multiple times[,]" likening the situation to trying to remember all the times a person has filled up his or her car with gas in the last two years - that he or she might remember a particular time if "something different" or "unusual" happened, "[b]ut [] might not be able to differentiate other details of individual times" (id. at 177);

- The victim's mother testified that the victim started going to the school's infirmary and asking to be picked up early, but that, once at home, he did not seem sick, that he would often tell her in the morning before school that his stomach hurt or that he had a headache (see Docket Entry 39-8 at 146-48), and that this behavior had started "before January [of 2014]" (id. at 151);

- The victim's mother stated that the victim told her that his grandmother's death caused his behavior, but that the mother did not believe the victim, because "he didn't even know h[is grandmother]" (id. at 151-52);

- The victim's mother testified that, when the victim first told her about Petitioner's sexual abuse one morning before school, "[h]e started to grab onto his head[, h]e was covering his ears[, and h]e started to jump and run as if this man was going to show up in our room" (id. at 161), as well as that, after [she] took [the victim] to the police department, . . . [his] behavior got worse" (id. at 162);

- The victim's mother testified that, after the victim's disclosure of abuse, "[h]e became depressed[,]" "isolated himself from [the family,]" did not sleep through the night, "had nightmares[,]" wanted to sleep next to his mother

126

(id. at 164), and wanted all the doors, windows, and curtains in the house closed (id. at 165);

- The victim's mother recalled that the victim remained "quite fearful of . . . white male teachers" at his new elementary school, and that he remained, at the time of trial, fearful of "white men" and "public restrooms" (id. at 168);

- The victim's mother verified that the victim never identified any other men who did "inappropriate" things to him, that no pornography existed in her home, and that the victim did not "watch any movies with nudity or sex acts in [her] home" (id. at 169);

- Detective Nero testified that she observed Ward's forensic interview of the victim, that she saw the victim "rocking back and forth in his chair" and "[w]ringing his hands[,]" and that, when Ward asked the victim "a difficult question[,]" he checked the clock on the walls . . . to avoid answering the question or[ to] buy[] time" (Docket Entry 39-9 at 19);

- Detective Nero further testified that, when she interviewed Petitioner "[a]t the family victims unit office" (id. at 24), she found him "matter of fact" when told of the victim's allegations against him, without "an emphatic declaration one way or the other" (id. at 29); and

- Sexton testified that she did not recall the victim ever "talk[ing] about sex" (Docket Entry 39-10 at 48).

That evidence, none of which involved testimony from Dr. Thomas, Bingham, or Detective Nero that Petitioner alleges amounts to improper vouching, corroborated the victim's testimony that Petitioner sexually abused the victim, provided the jury with a reason, other than fabrication, why the victim delayed disclosing the abuse and why the victim's recollection of the details of such

127

abuse changed over time, and countered the defense's theories that the victim's grandmother's death caused his behavioral changes and that exposure to sexual material explained his non-age-appropriate sexual knowledge. Significantly, as detailed above in the discussion of Ground One, the trial evidence additionally did not elucidate a motive for the victim to make false claims of sexual abuse by Petitioner, such as prior conflicts between the victim and Petitioner. The lack of a reason for the victim to fabricate his allegations of sexual abuse by Petitioner strengthened the state's case against Petitioner.

Petitioner's contentions that "it's reasonably probable jurors relied on [vouching] opinions/statements [from Dr. Thomas and Bingham] when they returned their verdicts" (Docket Entry 6 at 154), and that "the trial [court]'s limiting instruction regarding [Detective Nero's recorded interview of Petitioner] didn't prevent jurors from considering [Detective] Nero's impermissible vouching when assessing [the victim]'s credibility and [Petitioner]'s guilt" (id. at 155) fare no better. As discussed above, the testimony in question from Dr. Thomas and Bingham did not amount to vouching, and the limiting instruction from the trial court emphasized that jurors must not consider Detective Nero's statements as "proof of the truth of what [ D]etective [Nero] sa[id]" (Docket Entry 39-9 at 33). Petitioner's conclusory argument simply does not overcome the "presum[ption] that jurors pay close attention to the particular

128

language of the judge's instructions in a criminal case and that they undertake to understand, comprehend, and follow the instructions as given." State v. Nicholson, 355 N.C. 1, 60 (2002) (quotation marks omitted).

Lastly, Petitioner asserts that "it's reasonably probable jurors commingled th[e] impermissible vouching testimony with the substantive - yet impermissible - inferences they drew from the extensive 'profile' and PTSD expert testimony and evidence that trial counsel failed to limit under *Kennedy* and *Hall*" (Docket Entry 6 at 155), and that "the cumulative impact of the *Kennedy/Hall* errors and the improper vouching [produced *Strickland* prejudice]" (id. at 156 (emphasis added)). Well-settled Fourth Circuit law forecloses that argument, which Petitioner concedes by noting that, "while th[is ] Court can't overrule the Fourth Circuit's decision in *Fisher*[ *v. Angelone*, 163 F.3d 835 (4th Cir. 1998)], [Petitioner] must still present this argument to preserve it for appeal" (Docket Entry 29 at 60). See Fisher, 163 F.3d at 852 ("Having just determined that none of counsel's actions could be considered constitutional error, it would be odd, to say the least, to conclude that those same actions, when considered collectively, deprived [the defendant] of a fair trial. . . . [I]t has long been the practice of th[e c]ourt individually to assess claims under *Strickland* . . . . To the extent th[e c]ourt has not specifically stated that ineffective assistance of counsel claims . . . must be

129

reviewed individually, rather than collectively, [the court] do[es] so now."); see also Frizzell v. Dotson, No. 21-7491, 2024 WL 5135606, at *10 (4th Cir. Dec. 17, 2024) (unpublished) (citing Fisher and holding that "no cumulative [prejudice] analysis would have been possible under this binding precedent"); Mueller v. Angelone, 181 F.3d 557, 586 (4th Cir. 1999) ("[The p]etitioner also urges us to consider the cumulative effect of his ineffective assistance of counsel claims rather than whether each claim, considered alone, establishes a constitutional violation. This argument is squarely foreclosed by our [] decision in Fisher . . . .").

Petitioner's contentions regarding deficient performance by trial counsel and prejudice under Strickland arising out of trial counsel's failure to object to the alleged vouching statements by Dr. Thomas, Bingham, and Nero miss the mark and, as a result, the Court should deny relief on Ground Two.[16]

---

[16] Per the discussion of Ground One, the MAR court did not implicitly find that the record contained overwhelming evidence of Petitioner's guilt and thus, contrary to Petitioner's allegations, the MAR court did not base its "no prejudice conclusion . . . on an unreasonable finding, i.e., the [s]tate presented overwhelming evidence of [Petitioner]'s guilt regarding the first-grade and third-grade counts [against Petitioner]" (Docket Entry 6 at 167 (internal quotation marks omitted)).

130

## VII. <u>Conclusion</u>

Petitioner has not established entitlement to collateral relief.

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 25) be granted, and that the Amended Petition (Docket Entry 6) be denied.

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**

August 8, 2025

131