# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| RANDY CLAWSON | ) | |
| | ) | |
| Petitioner-Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-cv-937 |
| | ) | |
| SUPERINTENDENT, | ) | |
| EASTERN CORRECTIONAL | ) | |
| INSTIUTTE et al. | ) | |
| | ) | |
| | ) | |
| Defendant-Respondent. | ) | |
| | ) | |

### Objections to Report & Recommendation

Craig M. Cooley
**COOLEY LAW OFFICE**
5000 Centre Greenway, Ste. 500
412-607-9346 (cell)
craig.m.cooley@gmail.com
**Counsel for Randy Clawson**

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................i

OBJECTIONS .........................................................................................1

    A. Standard of review ...........................................................1

    B. The significant factual omissions in Magistrate Auld's Report & Recommendation...............................................................................1

        1. The failure to mention how the jury acquitted Randy of all seven second-grade counts .......................................................1

        2. The failure to mention EVC's admitted lies – and the inconsistencies in his narrative between the first and second trial ......................................................................................6

        3. The failure to mention how Karen Sexton's testimony unequivocally proved EVC's second-grade allegations were false and fabricated.................................................................15

    C. Claim One .....................................................................17

        1. Deficient performance: not requesting a limiting instruction regarding the profile expert testimony ................17

            a. North Carolina's case law prohibited the State from introducing the extensive "profile" expert testimony as substantive evidence that EVC had, in fact, been sexually abused by Randy – at some point – while attending Lindley Elementary School ...........................17

            b. Magistrate Auld's interpretation of the North Carolina case law .........................................................28

            c. How Magistrate Auld's interpretation of the North Carolina case law impacted his *de novo* deficient performance determination............................................30

Case 1:23-cv-00937-TDS-LPA     Document 49     Filed 09/12/25     Page 2 of 89

(1). By 2017, North Carolina law had clearly established prosecutors can't introduce profile expert testimony as substantive evidence the accuser was, in fact, sexually abused by the defendant ......................................................... 30

(2). *Strickland's* objective reasonableness standard required Magistrate Auld to conduct a holistic assessment – which he didn't do ......... 32

(3). That trial counsel supposedly "thoroughly attacked" the profile expert testimony – only supports Randy's claim trial counsel should've requested a limiting instruction ...................... 37

2. Deficient performance: not requesting a limiting instruction regarding the PTSD expert testimony ............ 40

a. The trial court's overruling of trial counsel's "qualifications" objection regarding Bobbie Bingham's profile expert testimony, had nothing to do with trial counsel's failure to request a mandatory *Hall* limiting instruction regarding Bobbie Binghman's extensive PTSD expert testimony ............................................ 41

b. Magistrate Auld's "thoroughly attacked" finding doesn't work for the same reason it didn't regarding trial counsel's failure to request a limiting instruction for the extensive profile expert testimony................ 47

3. Prejudice.................................................................. 49

a. Standard of review................................................ 49

b. *Strickland* prejudice standard .............................. 49

c. Magistrate Auld's no prejudice determination..... 50

(1). The jury's seven second-grade acquittals prove the incorrectness of Magistrate Auld's – "there's significant trial evidence supporting the jury's guilty verdicts" – finding ............................51

(2). The testimony and evidence underpinning Magistrate Auld's – "significant evidence" – determination shows just how flimsy the State's case was against Randy ........................................52

D. Claim Two ..............................................................................67

    1. Dr. Stacy Thomas...............................................................67

        a. The impermissible vouching .....................................67

        b. Magistrate Auld's no vouching determination..........69

    2. Bobbie Bingham.................................................................78

        a. The impermissible vouching .....................................78

        b. Magistrate Auld's no vouching determination..........80

    3. Prejudice............................................................................81

REQUEST FOR CERTIFICATE OF APPEALABILITY............................82

CONCLUSION................................................................................ 85

## OBJECTIONS

### A. Standard of review

The Court reviews *de novo* the portions of the Magistrate Judge's *Report & Recommendation* ("R&R") specifically objected to by the petitioner. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

### B. The significant factual omissions in Magistrate Auld's *Report & Recommendation*

#### 1. The failure to mention how the jury acquitted Randy of all seven second-grade counts

Randy objects to numerous relevant facts omitted from Magistrate Auld's R&R.

As the Court will see when it reviews the R&R – Magistrate Auld scoured the record looking for any evidence to support his "no deficient performance" and "no prejudice" determinations and conclusions regarding Randy's *Strickland* claims.

While Magistrate Auld scoured the record to find allegedly incriminating evidence or evidence supposedly proving trial counsel's effectiveness – Magistrate Auld never once mentioned the most remarkable and exculpatory fact concerning Randy's case: how jurors acquitted Randy of all seven second-grade counts.

1

Magistrate Auld never once mentioned or explained how the State charged Randy.  According to EVC, Randy sexually abused him in <u>first-grade</u> (2011-2012), <u>second-grade</u> (2012-2013), and <u>third-grade</u> (2013-2014).  Thus, when the State charged Randy – it separated the charges by grade:

### First-grade charges

1. <u>14 CRS 68712</u>: First-degree kidnapping.  The "date of the offense" is listed as sometime between August 1, 2011 to June 30, 2012.

2. <u>14 CRS 68714</u>: Indecent liberties with a child ("ILWC").  The "date of the offense" is listed as sometime between August 1, 2011 to June 30, 2012.

### Second-grade charges

1. <u>14 CRS 68715</u>: First-degree sexual offense with a child <u>and</u> felony sexual act with a student by a teacher.  The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

2. <u>14 CRS 68716</u>: ILWC.  The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

3. <u>16 CRS 24492</u>: ILWC.  The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

4. <u>16 CRS 24494</u>: First-degree sexual offense with a child <u>and</u> felony sexual act with a child by a teacher.  The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

5. <u>16 CRS 24495</u>: First-degree kidnapping.  The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

### Third-grade

1. <u>16 CRS 24493</u>: First-degree sexual offense with a child <u>and</u> felony sexual act with a student by a teacher.  The "date of the offense" is listed as sometime between August 1, 2013 and January 31, 2014.

2. <u>16 CRS 24496</u>: First-degree kidnapping.  The "date of the offense" is listed as sometime between August 1, 2013 and January 31, 2014.

3. <u>16 CRS 24497</u>: ILWC.  The "date of the offense" is listed as sometime between August 1, 2013 and January 31, 2014.

Magistrate Auld <u>never once mentioned</u> how jurors <u>acquitted</u> Randy of <u>all seven second-grade counts</u>, *i.e.*, those alleged offenses that supposedly occurred between August 1, 2012 and June 30, 2013:

1. <u>14 CRS 68715 – not guilty</u>: First-degree sexual offense with a child <u>and</u> felony sexual act with a student by a teacher.  The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

2. <u>14 CRS 68716 – not guilty</u>: ILWC.  The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

3. <u>16 CRS 24492 – not guilty</u>: ILWC.  The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

4. <u>16 CRS 24494 – not guilty</u>: First-degree sexual offense with a child <u>and</u> felony sexual act with a child by a teacher. The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

5. <u>16 CRS 24495 – not guilty</u>: First-degree kidnapping. The "date of the offense" is listed as sometime between August 1, 2012 and June 30, 2013.

Although jurors harbored reasonable doubt regarding EVC's second-grade allegations, they somehow found his first-grade and third-grade allegations credible because they convicted Randy of all first-grade and third-grade counts:

1. <u>14 CRS 68712 - guilty</u>: First-degree kidnapping. The "date of the offense" is listed as sometime between August 1, 2011 to June 30, 2012 (first-grade)

2. <u>14 CRS 68714 – guilty</u>: ILWC. The "date of the offense" is listed as sometime between August 1, 2011 to June 30, 2012 (first-grade).

3. <u>16 CRS 24493 – guilty</u>: First-degree sexual offense with a child <u>and</u> felony sexual act with a student by a teacher. The "date of the offense" is listed as sometime between August 1, 2013 and January 31, 2014 (third-grade).

4. <u>16 CRS 24496 – guilty</u>: First-degree kidnapping. The "date of the offense" is listed as sometime between August 1, 2013 and January 31, 2014 (third-grade).

4

5. <u>16 CRS 24497 – guilty</u>: ILWC.  The "date of the offense" is listed as sometime between August 1, 2013 and January 31, 2014 (third-grade).

Not mentioning the seven second-grade acquittals is inexcusable – because Randy relies significantly on the second-grade acquittals when explaining how trial counsel's ineffectiveness prejudiced him.  Thus, omitting any mention of the second-grade acquittals automatically calls into question the correctness – and objectivity – of Magistrate Auld's determinations and conclusions regarding Randy's two *Strickland* claims.

The significance of the seven second-grade acquittals can't be understated.  Counsel specializes in child sexual abuse cases – and has done so for the last decade.  Counsel has never seen a case like Randy's – where jurors determined an <u>entire year's worth of sexual abuse allegations</u> weren't credible.  However, despite making this year-long incredibility determination regarding EVC's second-grade allegations – jurors somehow determined EVC's first-grade and third-grade allegations were credible.

Consequently, the fundamental question in Randy's case is why did the reasonable doubt jurors harbored for the second-grade counts not carry over to the first-grade and third-grade counts?  Put differently, if jurors didn't believe EVC's second-grade sexual abuse allegations – what evidence did they rely on to find his first-grade and third-grade sexual abuse allegations credible enough to return guilty verdicts?

5

From Randy's perspective – the answer is plain from the record. It's reasonably probable the following occurred: (1) because trial counsel didn't move to limit the permissible uses of the extensive profile and PTSD expert testimony or move to strike the multiple instances of improper vouching, jurors were free to <u>improperly</u> consider this extensive expert testimony as <u>substantive evidence</u> that Randy, in fact, sexually abused EVC – <u>at some point</u> – while EVC attended Lindley Elementary School; and (2) because trial counsel didn't object to the significant improper vouching testimony, the improper vouching impacted how jurors assessed EVC's credibility – to Randy's detriment.

### 2. The failure to mention EVC's admitted lies – and the inconsistencies in his narrative between the first and second trial

During Randy's second trial, EVC admitted multiple prior statements were untrue, including his (1) February 3, 2014 statements, (2) February 6, 2014 forensic interview, and (3) March 17, 2014 interview with Cindy Stewart.[1] Magistrate Auld didn't mention and/or consider EVC's admitted lies – even when addressing the prejudice component of Randy's *Strickland* claims.

Likewise, Randy highlighted the countless inconsistencies between EVC's testimony at Randy's first trial – and his testimony at Randy's second trial.[2]

---

[1] E.C.F. #6, p. 60 (citing T2pp. 207-210, 227-228, 252, 256-257, 264).
[2] E.C.F. #6, pp. 71-73.

| EVC's prior inconsistent testimony | | |
|---|---|---|
| **First-grade** | | |
| **Topic** | **First trial** | **Second trial** |
| 1. Randy's ESL classroom? | -EVC claimed Randy's ESL classroom was in the main floor library in the secondary (three-floor) building. (T1pp. 166-167, 169) | -EVC claimed Randy's ESL classroom was on the bottom floor of the secondary building. (T2pp. 105-106) |
| 2. What boy's bathroom did the alleged abuse occur in? | -EVC claimed Randy abused him in the boy's bathroom on the main floor of the secondary (three-floor) building near the principal's office. (T1p. 183) | -EVC claimed Randy abused him in the boy's bathroom on the bottom floor of the secondary (three-floor) building next to the gym. (T2p. 110-112, 114) |
| 3. What bathroom stall did Randy make EVC enter once inside the boy's bathroom? | -EVC never mentioned Randy forcing him into any bathroom stall, let alone the handicap stall. | -EVC claimed, once inside the boy's bathroom, Randy forced him into the handicap stall. (T2p. 112-114, 120, 121) |
| 4. The wooden door to the boy's bathroom? | -EVC claimed, once he and Randy entered the boy's bathroom, Randy always closed *and* locked the wooden door from inside the boy's bathroom. (T1p. 179) | -EVC claimed, once he and Randy entered the boy's bathroom, Randy always *closed* the wooden door, but Randy didn't lock the wooden door from the inside because the wooden door didn't have a locking mechanism on the inside. (T2pp. 126, 239) |
| 5. Did Randy digitally penetrate EVC's anus | -EVC claimed Randy touched his (EVC's) penis *and* digitally penetrated his (EVC's) | -EVC claimed Randy only touched his (EVC's) penis in first-grade, meaning Randy *didn't* digitally penetrate his (EVC's) anus |

7

| | | |
|---|---|---|
| | anus in first-grade. (T1pp. 193-194) | in first-grade. (T2pp. 117-118, 169) |
| **6. Did EVC attempt to run the first time Randy allegedly abused him in first-grade?** | -When describing the first time Randy allegedly abused him in first-grade, EVC *never mentioned* trying to run from Randy or Randy "grabbing" him when he tried to run. | -When describing the first time Randy allegedly abused him in first-grade, EVC claimed he tried to run, but didn't get far because Randy not only "grabbed" him, but also threatened him that if he (EVC) tried to run again, he'd (Randy) abuse his little sister too. (T2pp. 116-117) |
| **7. Did Randy force EVC to touch his (Randy's) penis in first-grade?** | -During the alleged first-grade incidents, EVC claimed Randy touched his (EVC's) penis and digitally penetrated his (EVC's) anus. (T1pp. 180-182, 193-194)<br>-EVC, however, mentioned nothing about Randy forcing him (EVC) to touch his (Randy's) penis. | - During these alleged first-grade incidents, EVC claimed Randy only touched his (EVC's) penis. EVC claimed Randy *didn't* digitally penetrated his (EVC's) anus in first-grade. (T2pp. 117-118, 169)<br>-EVC, however, claimed Randy also forced him (EVC) to "grab" his (Randy's) penis. (T2pp. 119, 121) |
| **8. Did Randy abuse EVC in front of the bathroom sinks in the boy's bathroom?** | -In describing Randy's alleged abuse in first-grade, EVC didn't mention Randy abusing him in front of the bathroom sinks. | -In describing Randy's alleged abuse in first-grade, EVC claimed Randy abused him in either the handicap stall or in front of the bathroom sinks. (T2pp. 125-126) |

8

| 9. Did Randy's abuse stop in first-grade? If so, why? | -EVC claimed Randy abused him more than once in first-grade, but never mentioned Randy stopping his abuse once he (EVC) complained about his music teacher. (T1p. 184) | -EVC claimed Randy abused him more than once in first-grade, but claimed Randy stopped the abuse once he (EVC) complained about his music teacher. (T2pp. 140-142) |
|---|---|---|
| **Second-Grade** | | |
| **Topic** | **First trial** | **Second trial** |
| 1. How often did EVC go to Randy's ESL class in second-grade, and over what period of time did Randy allegedly abuse EVC in second-grade? | -EVC claimed he walked to Randy's ESL class thrice a week throughout the entirety of second-grade. EVC mentioned nothing about Randy attending Karen Sexton's class and helping Sexton team-teach her "guided reading" curriculum to her ESL students, including himself. (T1pp. 186-187) <br> -EVC, moreover, claimed Randy's abuse occurred throughout the entirety of second-grade, but stopped briefly when Randy "took a vacation." (T1pp. 186-187, 196-197, 199) | -EVC now recalled Randy came to Karen Sexton's class and helped Sexton team-teach "guided reading" curriculum to Sexton's ESL students, including himself. EVC also now claimed Randy didn't abuse him on those days Randy came to Sexton's classroom. (T2p. 143-144) <br> -Instead, EVC now claimed Randy's second-grade abuse was limited to those few days he took his ESL exams in Randy's ESL classroom. (T2pp. 144-146) |

| | | |
|---|---|---|
| **2. What boy's bathroom did the alleged abuse occur in?** | -In first-grade, EVC claimed Randy abused him in the boy's bathroom on the main floor in the secondary building. However, EVC claimed Randy used a "different" boy's bathroom in second-grade, but he didn't identify which boy's bathroom. (T1pp. 183, 190) | -EVC claimed the second-grade abuse occurred in the boy's bathroom on the main floor in the secondary building. (T2pp. 146-147) |
| **3. The wooden entrance door to the boy's bathroom?** | -EVC claimed, once he and Randy entered the boy's bathroom, Randy always closed *and* locked the wooden door from inside the boy's bathroom. (T1pp. 191-192) | -EVC claimed, once he and Randy entered the boy's bathroom, Randy always *closed* the wooden door, but Randy *didn't lock* the wooden door from the inside because the wooden door didn't have a locking mechanism on the inside. (T2pp. 155-156, 239) |
| **4. Once in the boy's bathroom, where did the alleged abuse occur?** | -EVC claimed Randy abused him in a boy's bathroom, but never mentioned the abuse occurring in the handicap stall or in front of the bathroom sinks. | -EVC not only claimed Randy abused him in the boy's bathroom on the main floor of the secondary building, but he also claimed the abuse occurred in either the handicap stall or in front of the bathroom sinks. (T2pp. 151-152)<br>-EVC, moreover, now claimed if Randy forced him into the handicap stall, Randy always |

10

| | | "locked" the stall door. (T2pp. 156, 172-173, 175) |
|---|---|---|
| **Third-grade** | | |
| **Topic** | **First trial** | **Second trial** |
| **1. The wooden entrance door to the boy's bathroom?** | -EVC claimed, once he and Randy entered the boy's bathroom, Randy always closed *and* locked the wooden door from inside the boy's bathroom. (T1pp. 210-211) | -In describing Randy's alleged abuse in third-grade, EVC merely claimed, once Randy entered the boy's bathroom, "[He] touch[ed]… both of my private parts." (T2pp. 185, 186-187)<br>-EVC never mentioned Randy closing or locking the wooden door during the alleged third-grade incidents. |
| **2. Who touched who in third-grade?** | -EVC claimed Randy touched his (EVC's) penis and digitally penetrated his (EVC's) anus. (T1pp. 210-211)<br>-EVC also claimed Randy forced him (EVC) to touch his (Randy's) penis and digitally penetrate his (Randy's) anus. (T1p. 211) | -EVC claimed only that Randy touched his (EVC's) penis and digitally penetrated his (EVC's) anus. (T2pp. 185, 186-187)<br>-EVC didn't testify that Randy forced him (EVC) to touch his (Randy's) penis or to digitally penetrate his (Randy's) anus. |

Magistrate Auld didn't mention and/or consider EVC's numerous inconsistencies – even when addressing the prejudice component of Randy's *Strickland* claims.

11

EVC's admitted lies and the indisputable inconsistencies in his trial testimony represent critical facts supporting Randy's trial defense and his *Strickland* claims – as these facts lay a strong foundation for Randy's primary defense and *Strickland* claims: EVC fabricated his sexual abuse allegations against him, and he did so because of his grandmother's January 3, 2014 passing.

Moreover, the evolution of EVC's allegations supports this position.

EVC's grandmother died on January 3, 2014. Before EVC's grandmother's passing, EVC never complained about Randy or his teaching method(s) – nor did EVC ever accuse Randy of sexually abusing him.

When EVC returned to Lindley in January 2014 – after the holiday break, his third-grade teacher, Margaret Sisk, noticed he appeared sad. Sisk spoke with CC – EVC's mother – and CC mentioned the grandmother's passing. CC said EVC was sad because she (CC) was devastated and heartbroken about her mother's passing. EVC's melancholy demeanor continued throughout January 2014.

Randy missed the first week of classes in January 2014 because he was visiting family in Alaska. Moreover, based on in-service days, snow days, and MLK day – Randy only taught EVC <u>thrice</u> in January 2014: <u>January 13th</u>, <u>January 15th</u>, and <u>January 21st</u>.

On February 3, 2014, EVC claimed to his family that Randy had sexually abused him <u>throughout</u> the month of January (2014).  Moreover, EVC cabined his sexual abuse allegations to January 2014.  EVC didn't accuse Randy of sexually abusing him in first-grade, second-grade, or anytime before the 2013 Christmas/New Year holiday in third-grade.

When EVC spoke to the Greensboro Police Department ("GPD") that day (February 3rd) – he gave the same narrative: Randy began abusing him in January 2014, the abuse consisted of Randy forcing him (EVC) to touch his (Randy's) penis, and the abuse occurred in a Lindley boy's bathroom.

On February 6, 2014, EVC underwent a forensic interview – where he repeated this narrative.  EVC, however, claimed the last time Randy had abused him was the last week of January 2014 – <u>a week Randy didn't teach EVC</u>.

On February 11, 2014, Detective Nero questioned Randy – who denied all allegations.

On February 14, 2014, Randy consented to have his desktop, laptop, and iPad searched for incriminating evidence – including child pornography.  Randy also consented to have his home and vehicle searched.  These searches produced no incriminating evidence whatsoever.

In mid-February 2014, EVC began therapy with Bobbie Bingham – where his sexual abuse allegations against Randy grew exponentially.

During his February 18, 2014 session, EVC claimed he didn't tell the GPD everything:  Besides him touching Randy's penis, Randy also touched his (EVC's) penis.  EVC claimed the abuse happened "a lot" – prompting Bingham to speculate Randy may've abused EVC before third-grade.  On February 20, 2014, Bingham called Detective Nero and reported EVC's new allegations – and her suspicions the abuse may've occurred before third-grade.

On February 25, 2014, Bingham called Detective Nero again.  Before this phone call, EVC had never claimed being anally sodomized by Randy.  During this phone call, however, both speculated Randy may've anally sodomized EVC based on EVC's anxiety level.  Detective Nero, consequently, contacted Cindy Stewart at Baptist Hospital and scheduled a child medical exam ("CME").

On February 27, 2014, Bingham met with EVC, where – remarkably – he claimed he'd had a dream where Randy anally sodomized him with his (Randy's) finger.  Bingham called Detective Nero again – and reported EVC's anal sodomy dream.  Bingham construed EVC's dream – and a drawing of said dream – as truthful disclosures.

During his March 14, 2014 session, EVC – for the first time – claimed Randy had sexually abused him in first-grade – and the abuse always occurred in a Lindley boy's bathroom.

14

Consequently, that Magistrate Auld mentioned and considered none of these facts – especially when conducting his *Strickland* prejudice analyses, makes plain his – "no prejudice" – determinations are incorrect.

### 3. The failure to mention how Karen Sexton's testimony unequivocally proved EVC's second-grade allegations were false and fabricated

Before and during Randy's first trial, EVC repeatedly claimed Randy came to his second-grade teacher, Karen Sexton's, classroom multiple times a week and escorted him and other ESL students to his ESL classroom. EVC claimed Randy repeatedly forced him to be the last student to leave his ESL classroom – for the purpose of taking him into the boy's bathroom and sexually assaulting him.

Karen Sexton's testimony, however, unequivocally proved EVC's second-grade narrative was false – and manufactured out of whole cloth. Sexton – who testified at both trials – told jurors EVC's second-grade narrative was false because Randy didn't escort her ESL students to his ESL classroom that year. Instead, Randy came to Sexton's classroom multiple times a week – and helped her team teach her English lessons to her ESL students.

15

In other words, Sexton's testimony debunked an entire year's worth of false sexual abuse allegations – but Magistrate Auld didn't mention this fact once in his 131-page R&R. As noted above, Sexton's exculpatory testimony – and the seven second-grade acquittals – represent critical pillars supporting Randy's prejudice argument.

As mentioned, the central question in Randy's case is why did the reasonable doubt jurors harbored for the second-grade counts not carry over to the first-grade and third-grade counts? In other words, if jurors didn't believe EVC's second-grade sexual abuse allegations – what evidence did they rely on to find his first-grade and third-grade sexual abuse allegations credible enough to return guilty verdicts?

Consequently, because Magistrate Auld never considered – let alone mentioned – Karen Sexton's exculpatory testimony, or the fact it destroyed EVC's second-grade sexual abuse allegations, this represents strong evidence Magistrate Auld's prejudice analysis is incorrect.

16

## C. Claim One

In Claim One, Randy raised the following *Strickland* claim:

> Trial counsel was ineffective because he failed to request limiting instructions prohibiting jurors from considering the State's extensive "profile" and PTSD expert testimony and evidence as substantive evidence EVC had, in fact, been sexually abused by Randy Clawson – at some point – while attending Lindley Elementary School.[3]

### 1. Deficient performance for not requesting a limiting instruction regarding the extensive profile expert testimony

Magistrate Auld correctly concluded this Court "should review" the deficient performance prong of this *Strickland* claim *de novo*.[4]

### a. North Carolina's case law prohibited the State from introducing the extensive profile expert testimony as substantive evidence that EVC had, in fact, been sexually abused by Randy – at some point – while attending Lindley Elementary School

In his amended 2254 petition, Randy argued North Carolina law prohibited the State from introducing its extensive profile expert testimony as substantive evidence that EVC had, in fact, been sexually abused by Randy – at some point – while attending Lindley Elementary School.[5] Consequently,

---

[3] E.C.F. #6, p. 100. Note – when counsel cites to E.C.F. pleadings, he uses the E.C.F. page numbers – not the pages numbers incorporated via Word.

[4] E.C.F. #46, p. 26.

[5] E.C.F. #6, p. 108 (citing *State v. Kennedy*, 357 S.E.2d 359 (N.C. 1987) and *State v. Hall*, 412 S.E.2d 883, 887 (N.C. 1992)).

17

"if the trial court permits 'profile' testimony regarding the 'symptoms and characteristics of sexually abused children' – it must 'limit the permissible use' of the 'profile' evidence by jurors."[6]

In *State v. Kennedy*, 357 S.E.2d 359 (N.C. 1987), the North Carolina Supreme Court said "expert testimony on the symptoms and characteristics of sexually abused children is admissible to assist the jury in understanding the behavior patterns of sexually abused children." *State v. Hall*, 412 S.E.2d 883, 887 (N.C. 1992) (citing and discussing *Kennedy*).

Importantly, while *Kennedy* "allowed evidence that a particular child's symptoms were consistent with those of sexual or physical abuse victims" – this holding was limited to assessing "the complainant's credibility." *Id.* Consequently, if the trial court permits "profile" testimony regarding the "symptoms and characteristics of sexually abused children" – it must "limit the permissible use" of the "profile evidence" by jurors. *Id.*

*Kennedy*, therefore, made profile expert testimony admissible for corroborative purposes only. It couldn't, therefore, be admitted for the *substantive* purpose of allowing jurors to infer EVC had, in fact, been sexually abused by Randy *at some point* during his time at Lindley.

*Hall* clearly-established this point.

---

[6] E.C.F. #6, p. 108.

18

In *Hall*, the defendant was charged and convicted of second-degree rape (N.C.G.S. § 14-27.3) and sexual activity by a substitute parent (N.C.G.S. § 14-27.7). The trial court admitted evidence that the accuser, *i.e.*, the defendant's fifteen-year-old step-daughter ("MM"), suffered a conversion reaction and PTSD following an alleged rape by the defendant, *i.e.*, her stepfather. *Id.* at 884.

The State presented three experts: (1) Judy Stadler, a clinical social worker; (2) Dr. Sarah Sinal, a pediatrician; and (3) Dr. Roy Haberkern, a child psychiatrist. The State "presented no physical evidence nor any other medical evidence that a rape had in fact occurred." Instead, "[i]t relied heavily" on Stadler's, Dr. Sinal's, and Dr. Haberkern's expert testimony – as well as MM's testimony. *Id.* at 885-886.

Stadler testified that she examined MM in 1985 and 1988 – and on both occasions MM had been referred to her due to sexual abuse allegations. Stadler testified that "in both 1985 and 1988" MM "fit a profile of characteristics of children who had been sexually abused." *Id.* at 886. Stadler reiterated her opinion on cross-examination and redirect examination. *Id.* Stadler provided these opinions – even though the State didn't tender or qualify her as an expert. *Id.* at 886.

The State qualified Dr. Sinal as an expert in pediatrics. Dr. Sinal – who examined MM in April 1988 – testified that when MM was admitted she'd been

19

"functioning as if she was paralyzed from the neck down."  However, when tests

for physical or neurological damage turned out negative, Dr. Sinal diagnosed

MM with "conversion reaction" – which she described as:

> A conversion reaction is where a person has a paralysis, for example, is unable to move an arm or a leg, but there is not anything wrong with muscles or nerves.  There is no neurological condition to explain that.  And the way I understand it is that it's the result, usually, of very severe anxiety and sometimes depression.

*Id*. at 886.

Moreover, Dr. Sinal told jurors that MM's conversion reaction was the

result of being sexually abused – which produced multiple objections from the

defendant. *Id*. at 886.

The State qualified Dr. Haberkern as a child psychiatry expert.  Dr.

Haberkern testified he treated MM from April to May 1988 – and continued to

treat her on an outpatient basis after her discharge.  Dr. Haberkern diagnosed

MM with PTSD and conversion disorder – and he told jurors MM's conversion

reaction was consistent with characteristics of sexual abuse. He testified that

"he knew of no other significant event in her life that could have led to such a

reaction." *Id*. at 886-887.

Notably, the trial court didn't limit the profile, conversion reaction, and PTSD expert testimony to any particular purpose. Instead, each was admitted for the substantive purpose of allowing the jury to infer that MM had, in fact, been raped by the defendant. *State v. Hall*, 412 S.E.2d at 884.

On direct appeal, the defendant "argue[d] that PTSD, conversion disorders, and the characteristics of child victims of sexual abuse are not proper subjects for expert testimony in North Carolina." *State v. Hall*, 390 S.E.2d 169, 172 (N.C. App. 1990). Thus, the defendant raised an *admissibility* claim – not a limiting of evidence trial error or *Strickland* claim as Randy raised. The North Carolina Court of Appeals rejected the defendant's *admissibility* argument regarding the profile expert testimony by citing and quoting *Kennedy*:

> Testimony by qualified experts about symptoms and characteristics typically exhibited by sexually abused children is also a proper topic for expert testimony because it could "help the jury understand the behavior patterns of sexually abused children and assist it in assessing the credibility of the victim."

*State v. Hall*, 390 S.E.2d at 173 (quoting *State v. Kennedy*, 357 S.E.2d at 366).

The North Carolina Court of Appeals also rejected the defendant's admissibility arguments regarding the conversion reaction and PTSD expert testimony. *State v. Hall*, 390 S.E.2d at 173.

21

When the defendant petitioned the North Carolina Supreme Court, however, the defendant only challenged the *admissibility* of the conversion reaction and PTSD testimony – not the profile expert testimony by Stadler:

> As we understand the petition for discretionary review, defendant was to argue that the statements of the three witnesses regarding conversion disorders and post-traumatic stress syndrome are inadmissible.

*State v. Hall*, 412 S.E.2d at 887.

In a rare move, however, the North Carolina Supreme Court "consider[ed]" Stadler's testimony – but did so "separately" from Drs. Sinal and Haberkern – because Stadler "never discussed conversion disorders or post-traumatic stress syndrome during her testimony." *State v. Hall*, 412 S.E.2d at 887. In "consider[ing]" Stadler's profile expert testimony – the North Carolina Supreme Court acknowledged "it may well be outside the parameters of our order allowing discretionary review." *Id.*

Despite falling outside of its discretionary review grant, the North Carolina Supreme Court "decided to discuss some difficulties" it "perceived to be present" in Stadler's trial testimony because it was "ultimately remanding the case for a retrial" because of the conversion reaction and PTSD expert testimony. *Id.* at 887. The North Carolina Supreme Court identified two "difficulties" with Stadler's testimony.

22

*First*, the trial court didn't limit the scope of Stadler's profile expert testimony.  Instead, the State introduced the profile expert testimony for the substantive purpose of allowing the jury to infer that MM had, in fact, been raped by the defendant.

In addressing this "<u>difficulty</u>" with Stadler's profile expert testimony, the North Carolina Supreme Court cited *Kennedy* – and emphasized how *Kennedy* allowed profile expert testimony "<u>only</u> to aid the jury in assessing the complaint's credibility." *Id.* at 887 (emphasis added).  Immediately after emphasizing this limiting aspect, the North Carolina Supreme Court said: "We note at the outset that the trial court here <u>did not limit the permissible uses</u> of the 'profile' evidence as presented by Stadler." *Id.* (emphasis added).

*Second*, the North Carolina Supreme Court said it was "[a]dditionally… concerned" that the trial court "never explicitly or implicitly qualified" Stadler as an expert. *Id.* at 887.  After a lengthy discussion regarding qualifying experts and who may give expert opinions, the North Carolina Supreme Court said: "Only an expert in the field may testify on the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent with this profile." *Id.* at 888.

23

In its summary judgment brief, the State disregarded the first "difficulty" identified by the North Carolina Supreme Court – and focused only on the second "difficulty." From the State's perspective, the North Carolina Supreme Court only "took issue" with the latter (*i.e.*, the fact Stadler provided profile expert testimony – without being qualified as an expert) and not the former (*i.e.*, the fact the trial court didn't limit Stadler's profile expert testimony):

> [The North Carolina Supreme Court] took issue with the fact that a witness in the case before it provided profile testimony while not being qualified as an expert, because "[o]nly an expert in the field may testify on the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent with this profile."[7]

The State's wrong – and a straightforward reading of *Hall* makes this plain – because the North Carolina Supreme Court clearly identified two problems (or "difficulties") with Stadler's testimony: (1) the trial court didn't limit her profile expert testimony; and (2) the trial court allowed her to give profile expert testimony – even though she wasn't qualified as an expert.

---

[7] E.C.F. #26, p. 15.

24

What's most remarkable about the North Carolina Supreme Court's opinion – particularly the section regarding Stadler's testimony, is that the Supreme Court even addressed Stadler's profile expert testimony in the first place. Stadler's profile expert testimony fell outside the scope of its discretionary grant. However, because it was so concerned with the two primary "difficulties" it saw in Stadler's profile expert testimony – the Supreme Court did an extraordinary thing: it addressed an evidentiary issue that fell outside its order granting discretionary review. That the Supreme Court went out of its way – and broke appellate protocol – to address Stadler's profile expert testimony is significant for multiple reasons:

*First*, it had to believe the trial court erred by not limiting Stadler's profile expert testimony. Why else would it break appellate protocol and emphasize the fact "the trial court… did not limit the permissible use" of Stadler's profile expert testimony. *State v. Hall*, 412 S.E.2d at 887.

*Second*, it strongly suggests – had this issue been properly before it, it would've also granted a new trial on the fact the trial court didn't properly limit Stadler's profile testimony. This can be gleaned from the fact the North Carolina Supreme Court ultimately granted a new trial because the trial court didn't limit the conversion reaction and PTSD expert testimony. Instead, the State presented both forms of expert testimony "for the substantive purpose of allowing the jury to infer that M.M. had in fact been raped." *Id.* at 891.

25

*******************

Other North Carolina cases confirm this clearly-established case law. In *State v. Hutchens*, 429 S.E.2d 755 (N.C. App. 1993), for instance, the North Carolina Court of Appeals held the following:

> An explanation of the symptoms and characteristics of sexually abused children is admissible (1) only through the testimony of an expert in the field, <u>and (2) only for the limited purpose</u> of assisting the jury in understanding the behavior patterns of sexually abused children. *Kennedy*, 320 N.C. at 32, 357 S.E.2d at 366; *Hall*, 330 N.C. at 818, 412 S.E.2d at 887. Evidence that a particular child's symptoms are consistent with those of children who have been sexually abused is admissible (1) only through the testimony of an expert in the field, and (2) only for the limited purpose of aiding the jury in assessing the complainant's credibility. *Id.* <u>The trial court is required to explain to the jury the permissible uses of the aforementioned evidence</u>. *Hall*, 330 N.C. at 817, 412 S.E.2d at 887.

*Id.* at 759 (emphasis added).

North Carolina cases post-dating Randy's trial reinforce this position. In *State v. Betts*, 833 S.E.2d 41 (N.C. App. 2019), the North Carolina Court of Appeals cited cases pre-dating Randy's trial when it held:

26

> [W]e note that experts are permitted to testify about the profiles of victims of sexual abuse. *State v. Stancil*, 355 N.C. 266, 267, 559 S.E.2d 788, 789 (2002); *see also State v. Hall*, 330 N.C. 808, 817, 412 S.E.2d 883, 887 (1992) (permitting the use of expert testimony "that a particular child's symptoms were consistent with those of sexual or physical abuse victims, but only to aid the jury in assessing the complainant's credibility."); *State v. Ware*, 188 N.C. App. 790, 656 S.E.2d 662 (2008). <u>This type of profile evidence should be limited to its "permissible uses," and if admitted, the trial court should generally provide a limiting instruction</u>. *See Hall,* 330 N.C. at 822, 412 S.E.2d at 891.

*Id.* at 45 (N.C. App. 2019) (emphasis added), *affirmed by, modified by State v. Betts*, 858 S.E.2d 601 (N.C. 2021).[8]

More recently, in *State v. Kelton*, 2025 N.C. App. LEXIS 359 (June 18, 2025), the North Carolina Court of Appeals held:

> As explained above, experts are permitted to testify as to the profiles of child sexual abuse victims. *See Stancil*, 355 N.C. at 267. This type of "profile" testimony "<u>should be limited to its permissible uses, and if admitted, the trial court should generally provide a limiting instruction</u>." *Betts*, 267 N.C. at 278 (citation and internal quotation marks omitted).

*Id.* at *19 (emphasis added).[9]

---

[8] Counsel argued *Betts* before the North Carolina Court of Appeals and North Carolina Supreme Court.

[9] Counsel argued *Kelton* before the North Carolina Court of Appeals.

27

### b.  Magistrate Auld's interpretation of the North Carolina case law

Based on the above case law, Magistrate Auld said: "[A]s of the time of [Randy's] trial in March 2017, North Carolina cases conflicted about whether *Hall* required the trial court to issue limiting instructions for profile testimony."[10]  Randy objects to this interpretation of the North Carolina case law.[11]  Moreover, Magistrate Auld interpreted the North Carolina case law to mean – even if trial counsel requested a limiting instruction, it's "not clear… the trial court would have issued one[.]"[12]  Randy also objects to this interpretation.

---

[10] E.C.F. #46, p. 44 (underlining in original).

[11] Magistrate Auld – it should be noted – did a tremendous job researching this issue because he cited *Betts* and even *Kelton* – even though *Kelton* was only decided two weeks before Magistrate Auld issued his R & R.  Randy, however, simply disagrees with Magistrate Auld's interpretation of the North Carolina state law.

Most notably, Randy disagrees with Magistrate Auld's reading of *State v. Isenberg*, 557 S.E.2d 568 (N.C. App. 2001) – as Magistrate Auld used his interpretation of *Isenberg* to create the "lack of clarity" finding he used to conclude trial counsel wasn't ineffective for not requesting a limiting instruction.

Most notably, in *Isenberg* – the North Carolina Court of Appeals said: "[W]e note the decisions in both *Hall* and *Hensley* are limited to post-traumatic stress disorders and conversion disorders."  *State v. Isenberg*, 557 S.E.2d at 575.

This is an incorrect factual statement – and a simple reading of *Hall* proves this by clear and convincing evidence.  *Hall* – without question – concerned profile testimony. *Supra*, pp. 19-25 (comprehensively discussing *Hall*).  While the North Carolina Supreme Court ultimately granted a new trial on the PTSD and conversion disorder expert testimony, it went out of its way – and broke appellate protocol – to discuss two significant "difficulties" it had with the State's profile expert testimony. The North Carolina Supreme Court did this because it remanded for a new trial – and wanted to make sure the State's profile expert testimony would be properly limited at retrial.

[12] E.C.F. #46, p. 44.

At the time of Randy's trial, North Carolina state law prohibited prosecutors from introducing profile expert testimony as substantive evidence the accuser had, in fact, been sexually abused by the defendant. *Hall* clearly established this when it discussed *Kennedy*: while *Kennedy* "allowed evidence that a particular child's symptoms were consistent with those of sexual or physical abuse victims" – the profile evidence was limited "<u>only</u> to aid the jury in assessing the complainant's credibility." *State v. Hall*, 412 S.E.2d at 887 (emphasis added). When evidence is limited to assessing "only" the accuser's credibility, logic dictates it can't be used as substantive evidence to prove the accuser was, in fact, sexually abused by the defendant.

Because North Carolina law clearly prohibited prosecutors from introducing expert profile testimony as substantive evidence of guilt – *Hall* and the other North Carolina cases clearly establish the trial court must give a limiting instruction – if requested. In short, there's no "lack of clarity"[13] regarding whether prosecutors are prohibited from introducing expert profile testimony as substantive evidence of guilt – or whether trial courts must provide a limiting instruction if requested.

---

[13] E.C.F. #46, p. 45 (quoting *Smith v. Singletary*, 170 F.3d 1051, 1053-1054 (11th Cir. 1999)).

<blockquote>

**c.** **How Magistrate Auld's interpretation of the North Carolina case law impacted his *de novo* deficient performance determination**

**(1).** **By 2017, North Carolina law had clearly established prosecutors can't introduce profile expert testimony as substantive evidence the accuser was, in fact, sexually abused by the defendant**

</blockquote>

Magistrate Auld concluded trial counsel can't be ineffective because – at the time of Randy's trial – North Carolina law "remained unclear whether the trial court <u>must</u> issue a limiting instruction for profile evidence… and thus also not clear that the trial court would have issued one if requested by trial counsel[.]"[14] Randy objects to these interpretations of the North Carolina case law – because the North Carolina law clearly established prosecutors can't introduce profile expert testimony as substantive evidence of guilt. Thus, if prosecutors can't introduce profile expert testimony for this purpose – defendants have a right to request a limiting instruction to ensure jurors don't impermissibly use the profile expert testimony as substantive evidence of guilt, and if requested – the trial court must provide said limiting instruction.

---

[14] E.C.F. #46, p. 44.

Consequently, it ultimately fell on trial counsel's shoulders to ensure the trial court prohibited the State from introducing its extensive profile expert testimony as substantive evidence that EVC had, in fact, been sexually abused by Randy – at some point – while attending Lindley Elementary School.  To trigger this prohibition, however, and to protect Randy's right to have his guilt determined only by legally permissible inferences, trial counsel had to request a limiting instruction.    Indeed, in North Carolina – the rule "has long been that an instruction limiting admissibility of testimony to corroboration is not required unless counsel specifically requests such instruction." *State v. Quarg*, 101, 431 S.E.2d 1, 5 (N.C. 1993).

Furthermore, had trial counsel requested a limiting instruction – the trial court would've had to give the limiting instruction because – again – the State was prohibited from introducing its extensive profile expert testimony as substantive evidence of guilt.

31

**(2).** *Strickland's* objective reasonableness standard required Magistrate Auld to conduct a holistic assessment – which he didn't do

Magistrate Auld also concluded trial counsel wasn't ineffective because trial attorneys "routinely pursue an objectively reasonable strategy of <u>not</u> requesting limiting instructions to avoid highlighting unfavorable evidence for the jury."[15] Randy objects to this conclusion because – as Magistrate Auld rightly conceded: "[T]he state court record does not elucidate trial counsel's reasons for refraining from requesting [a] limiting instruction[] for the profile evidence[.]"[16]

Moreover, Randy objects to Magistrate Auld's knee-jerk, speculative – "trial counsel didn't want to highlight unfavorable evidence" – conclusion because this isn't how *Strickland* deficient performance works. *Strickland* required the state courts and Magistrate Auld to consider the totality of the circumstances confronting trial counsel to accurately examine the reasonableness of the decision or conduct at issue.

---

[15] E.C.F. #46, p. 46 (underlining in original).
[16] E.C.F. #46, p. 49.

32

More specifically, under *Strickland* – "[a] fair assessment of attorney performance requires… [the reviewing court] to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time*." Strickland v. Washington*, 466 U.S. 668, 689 (1984).

Consequently, to determine if trial counsel acted reasonably, the Court must examine – or "reconstruct" – the extensive profile expert testimony – and ask itself the following question: Based on the extensive profile expert testimony – where three State experts provided profile expert testimony, if a limiting instruction isn't provided – will jurors know not to use this extensive profile expert testimony as substantive evidence of guilt? '

If a trial court doesn't limit the jury's consideration of extensive profile expert testimony, there's no doubt jurors will use it as substantive evidence that the defendant, in fact, sexually abused the accuser. Put differently, why wouldn't jurors use the extensive profile expert testimony as substantive evidence of guilt when the trial court didn't limit the permissible uses of this evidence?

Here, therefore, if trial counsel didn't request a limiting instruction – there's no question jurors would've used the extensive profile expert testimony as substantive evidence of Randy's guilt. This represented a tremendous illegal harm to Randy – which had to be factored into Magistrate Auld's deficient performance analysis. Furthermore, this tremendous harm had to be

33

compared to the speculative harm mentioned by Magistrate Auld, *i.e.*, the alleged harm of highlighting the profile testimony while asking for an instruction to limit the jury's consideration of the profile testimony.

In the end, consequently, the question of harm – and thus objective reasonableness – turns on this: what's more harmful – (1) jurors using the extensive profile expert testimony as substantive evidence of guilt or (2) the trial court briefly highlighting the profile expert testimony for the critical purpose of ensuring jurors don't improperly use it as substantive evidence of guilt?

The answer speaks for itself: Allowing jurors to use the extensive profile expert testimony as substantive evidence of guilt is far more prejudicial and damaging than briefly mentioning the profile expert testimony for the critical purpose of ensuring jurors don't improperly use it as substantive evidence of guilt. Put differently, <u>all reasonably competent North Carolina defense attorneys</u> in 2017 would've looked at the voluminous profile expert testimony and said and recognized the following:

- "Wow – three State experts repeatedly told jurors EVC presented with behaviors consistent with sexual abuse."

34

- "Darn – if jurors use this extensive profile expert testimony as substantive evidence that Randy, in fact, sexually abused EVC, Randy's screwed because we all know jurors give tremendous weight to expert testimony."

- "But wait a minute… under North Carolina law, it's impermissible for jurors to use profile expert testimony as substantive evidence of the defendant's guilt."

- "Hmm… but how will jurors know they can't use the extensive profile expert testimony as substantive evidence of guilt?"

- "Hmm… the only way jurors will know they can't use the extensive profile expert testimony as substantive evidence of guilt – is if I request a brief limiting instruction – informing them they can only consider the profile expert testimony when considering EVC's credibility – but not as substantive evidence that Randy, in fact, sexually abused EVC."

- "Moreover, under North Carolina law – jurors are presumed to follow the trial court's instructions, meaning if I request a limiting instruction – jurors will comply with the trial court's limiting instruction."[17]

---

[17] "Jurors are presumed to follow the instructions given to them by the court." *State v. Price*, 476 S.E.2d 317, 323 (1996); *accord State v. Parker*, 858 S.E.2d 595, 600 (N.C. 2021).

After saying and recognizing the above, <u>no reasonably competent defense attorney</u> in North Carolina would then use the following reasoning not to request a brief limiting instruction:

- "Hmm… a limiting instruction might harm Randy – because it'll highlight the profile expert testimony.  Hmm… this harm is greater than the harm created by not requesting the limiting instruction and <u>hoping jurors don't use</u> the extensive profile expert testimony as substantive evidence of guilt."

Accordingly, given the extensiveness of the State's profile expert testimony – no reasonably competent defense attorney in North Carolina in 2017 would've used the above logic to not request a limiting instruction.  Put differently, the harm of not requesting a limiting instruction was far greater – by a significant amount – than any harm created from simply mentioning the profile expert testimony for the critical purpose of ensuring jurors don't use it in an improper and prejudicial manner.  Trial counsel's representation, therefore, "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 688,

### (3). That trial counsel supposedly "thoroughly attacked" the profile expert testimony – only supports Randy's claim trial counsel should've requested a limiting instruction

Magistrate Auld also premised his – no deficient performance conclusion – on the alleged finding trial counsel "thoroughly attached" the profile expert testimony.[18]  With due respect to Magistrate Auld – this finding doesn't stand for what he thinks it stands for, so Randy objects to it.

To begin with, Magistrate Auld mentioned trial counsel's objection to Robyn Miller Ward's forensic interview testimony – and how trial counsel "successfully objected" to when the prosecutor tried to elicit profile expert testimony from her.[19]  This objection is irrelevant to the profile *Strickland* claim – because three other experts were permitted to give extensive profile expert testimony – which trial counsel didn't attempt to limit.

Next, it's debatable whether trial counsel "thoroughly attacked" the profile expert testimony – because all three of the State's profile experts still repeatedly told jurors that EVC's behaviors were consistent with someone who's been sexually abused.  Consequently, even if trial counsel "thoroughly attacked" the profile expert testimony – he didn't prevent these experts from

---

[18] E.C.F. #46, p. 52.
[19] E.C.F. #46, p. 52.

Case 1:23-cv-00937-TDS-LPA    Document 49    Filed 09/12/25    Page 41 of 89

repeatedly telling jurors EVC's behaviors were consistent with those of sexually abused children.

Furthermore, if trial counsel "thoroughly attacked" the profile expert testimony – this undermines Magistrate Auld's prior position where he claimed trial counsel didn't request a limiting instruction because he feared doing so would "highlight[] unfavorable evidence for the jury."[20]  In other words, if trial counsel "thoroughly attacked" the profile evidence – he had to repeatedly "highlight" this "unfavorable evidence" – as he attacked it.  If trial counsel truly didn't want to "highlight" this "unfavorable" evidence – he wouldn't have spent so much time "thoroughly attacking" it.  Consequently, if trial counsel didn't have a problem repeatedly attacking the "unfavorable" profile evidence – he wouldn't (and shouldn't) have had a problem asking for a brief limiting instruction to ensure jurors didn't improperly use the "unfavorable" profile evidence as substantive evidence of guilt.

Additionally, if trial counsel "thoroughly attacked" the profile evidence – he did so because he realized how "unfavorable" it was to Randy.  Accordingly, if trial counsel recognized this unfavourability – and tried to minimize it as much as possible by "thoroughly attacking" it, why didn't trial counsel do everything in his power to ensure jurors didn't improperly use this

---

[20] E.C.F. #46, p. 46.

"unfavorable" evidence as substantive evidence of guilt? Thus, as mentioned – if trial counsel had no problem repeatedly discussing – or highlighting – the extensive profile evidence so he could "thoroughly attack" it, he should've had no problem asking for a limiting instruction to protect Randy's right to a fair trial.

Lastly, based on his "thoroughly attacked" finding – Magistrate Auld seemed to hold the following: (1) because trial counsel did A, he didn't have to do B; or (2) because trial counsel did A, he couldn't also do B. Both are wrong – because nothing prevented trial counsel from doing A and B here. In other words, trial counsel could've (and should've) "thoroughly attacked" the profile evidence <u>and</u> asked for a limiting instruction to ensure jurors didn't improperly use this "unfavorable" evidence as substantive evidence of guilt. Indeed, reasonably competent defense counsel in 2017 would've done both.

In short, Magistrate Auld's "thoroughly attacked" finding actually proves why trial counsel's failure to request a limiting instruction "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 688.

### 2. Deficient performance for not requesting a limiting instruction regarding the PTSD expert testimony

Magistrate Auld correctly concluded this Court "should review" the deficient performance prong of this *Strickland* claim *de novo*.[21]

Counsel agrees with Magistrate Auld's recognition that "neither party contests" the following regarding Bobbie Bingham's extensive PTSD expert testimony:

• *State v. Hall*, 412 S.E.2d 883 (N.C. 1992) "requires a limiting instruction for PTSD evidence";

• Bobbie Bingham testified she diagnosed EVC with PTSD based upon his sexual abuse allegation against Randy;

• The trial court didn't "issue a limiting instruction" for Bingham's extensive PTSD expert testimony; and

• Trial counsel "neither objected to nor requested a limiting instruction for the PTSD evidence."[22]

---

[21] E.C.F. #46, p. 26.
[22] E.C.F. #46, p. 60.

Case 1:23-cv-00937-TDS-LPA    Document 49    Filed 09/12/25    Page 44 of 89

**a. The trial court's overruling of trial counsel's "qualifications" objection regarding Bobbie Bingham's profile expert testimony, had nothing to do with trial counsel's failure to request a mandatory *Hall* limiting instruction regarding Bobbie Binghman's extensive PTSD expert testimony**

Despite making the above four findings – Magistrate Auld determined: "Trial counsel reasonably could have concluded, given the trial court's earlier statements when overruling counsel's objection to Bingham's profile evidence… that pursuing a vigorous cross-examination of the PTSD evidence constituted a better strategy than further underscoring the importance of that evidence by requesting a limiting instruction."[23]

Randy objects to this determination because – with due respect to Magistrate Auld – it turns fundamental fairness, effective trial advocacy, and logic on their heads. However, before explaining the objection's basis – counsel must briefly summarize the overruled objection Magistrate Auld relied on to make this erroneous determination.

During Bingham's direct examination, ADA Thompson asked:

> Mrs. Bingham, during the course of your professional background and your practice as a counselor, can you describe for the jury any common characteristics that a child who makes an allegation of sexual abuse displays?[24]

---

[23] E.C.F. #46, p. 61.
[24] E.C.F. #39-8, p. 65.

41

Trial counsel objected – which prompted the trial court to clear the courtroom – so the parties could discuss the objection.[25]

Once cleared, the trial court asked trial counsel to state the "basis" of his objection. Trial counsel said he "[didn't] believe" Bingham was qualified to provide profile expert testimony.[26] The trial court overruled the objection – by ruling:

> All right. Clearly, if the question was, has the alleged victim been sexually abused, that would be sustained.
>
> I've read those cases. It does appear in talking about profiles of allegedly abused children it is appropriate for an expert witness to testify regarding the profiles that in the abstract sexually abused children have. That's *State V Hall*, 330 North Carolina 808 1992.
>
> And then there are more recent cases. *State v. Wear*, 656 S.E. 2d 662 and 2008, and that was a clinical social worker.
>
> Here we have a witness who has been tendered and accepted as a licensed professional counselor with a license in trauma therapy.

---

[25] E.C.F. #38-9, p. 65. Trial counsel's profile objection – notably – undercuts Magistrate Auld's prior statement where he claimed trial counsel didn't request a limiting instruction for the extensive profile expert testimony – because he didn't want to "highlight" the "unfavorable" profile evidence. With due respect to Magistrate Auld – by objecting to ADA Thompon's profile question, trial counsel "highlight[ed]" the profile expert testimony – so much so the trial court removed the jury from the courtroom to discuss trial counsel's profile objection.

Consequently, if trial counsel felt comfortable "highlighting" the profile evidence to the point where the trial court cleared the courtroom – he should've felt comfortable to request a brief limiting instruction to ensure jurors didn't improperly use the extensive profile expert testimony as substantive evidence of guilt.

[26] E.C.F. 339-8, pp. 65-66.

42

So the -- as to this question, the objection is overruled. I am cognizant of, and have been cognizant of since we began, the cases, particularly those recent cases, wherein the Appellate Court have made clear to the Trial Court that the Trial Court should be vigilant about not allowing witnesses, expert or otherwise, to vouch for the credibility of an alleged victim, particularly in these circumstances.

So I am cognizant of that and have been listening for that. But I'll hear from you further, if you wish to be heard further, Mr. Harris. But it appears to me the objection should be overruled.[27]

Trial counsel replied: "Your Honor, nothing further, just maintain the objection."[28]

With due respect to Magistrate Auld, counsel is dumbfounded how an overruled "qualifications" objection regarding the profile expert testimony made trial counsel's failure to request a mandatory *Hall* limiting instruction regarding the extensive PTSD expert testimony objectively reasonable – especially when Magistrate Auld conceded *Hall* requires a trial court to give a limiting instruction for PTSD expert testimony when requested by trial counsel.

---

[27] E.C.F. #39-8, pp. 66-67.
[28] E.C.F. #39-8, p. 67.

43

More importantly, trial counsel didn't object to the admissibility of the profile expert testimony. Rather, trial counsel challenged whether Bingham was <u>qualified</u> to give profile expert testimony. This distinction is significant because – how can an overruled "qualifications" objection regarding the profile expert testimony play any role in trial counsel's decision-making when it came to the mandatory *Hall* limiting instruction regarding the extensive PTSD expert testimony? From Magistrate Auld's perspective – trial counsel used the following reasoning to not request a mandatory *Hall* limiting instruction:

- "Darn… Bobbie Bingham's PTSD expert testimony was extensive – and she repeatedly told jurors the origins of EVC's PTSD came from Randy's alleged sexual abuse."

- "Gosh… I hope jurors don't use this extensive PTSD expert testimony as substantive evidence that Randy, in fact, sexually abused EVC. If so, Randy's screwed."

- "Wait… I just remembered *Hall* <u>requires</u> the trial court to limit PTSD expert testimony by informing jurors this type of expert testimony can only be used for corroboration purposes – and not as substantive evidence of guilt."

- "From my recollection of *Hall*, if I request a limiting instruction for the PTSD expert testimony – the trial court <u>must give</u> the limiting instruction."

44

After saying and recognizing the above, <u>no reasonably competent defense attorney</u> in North Carolina would then use the following reasoning not to request a mandatory *Hall* limiting instruction:

- "Wait… hold on… the trial court overruled my objection when I challenged Bingham's qualifications to give profile expert testimony. Hmm… because the trial court overruled my qualifications objection regarding Bingham's profile testimony, the trial court will presumably overrule my request for a <u>mandatory</u> *Hall* limiting instruction regarding Bingham's extensive PTSD expert testimony."

- "In other words, even though *Hall* makes clear the trial court <u>must give</u> a limiting instruction when one is requested by a defense attorney – because the trial court overruled my qualifications objection regarding Bingham's profile testimony, I still think the trial court <u>will disregard this clearly-established North Carolina law</u> – and it'll deny my request for a <u>mandatory</u> *Hall* limiting instruction."

- "Consequently, I guess the only thing I can do is vigorously cross-examine Bingham's PTSD expert testimony – and not request a mandatory *Hall* limiting instruction."

The absurdity – and quite frankly, stupidity – of this reasoning (or lack thereof) speaks for itself. No reasonably competent North Carolina defense attorney would've used this reasoning (or lack thereof) to not request a mandatory *Hall* limiting instruction. Most notably, it's based on the irrational premise a North Carolina trial court will purposely disregard clearly-established North Carolina law when it comes to limiting the permissible uses of PTSD expert testimony. Put differently, no reasonably competent North Carolina defense attorney would assume a trial court will purposely disregard clearly-established North Carolina law.

It's also premised on connecting two unrelated legal issues: (1) whether a witness is qualified to give profile expert testimony; and (2) whether the trial court is required to provide a limiting instruction for PTSD expert testimony – when trial counsel requests a *Hall* limiting instruction.

Lastly, when trial counsel made his qualifications objection regarding Bingham's profile expert testimony – Cindy Stewart and Dr. Stacy Thomas had already provided extensive profile expert testimony. However, despite the fact the trial court had already deemed their profile expert testimony admissible, the trial court's prior admissibility rulings didn't deter or stop trial counsel from challenging Bingham's profile expert testimony on "qualification" grounds.

46

Thus, trial counsel's willingness to challenge Bingham's profile expert testimony – despite the trial court's prior rulings regarding the profile evidence, invalidates Magistrate Auld's claim that trial counsel didn't request a mandatory *Hall* limiting instruction simply because the trial court overruled his prior "qualifications" objection regarding Bingham's profile expert testimony.

      **b.     Magistrate Auld's "thoroughly attacked" finding doesn't work for the same reason it didn't regarding trial counsel's failure to request a limiting instruction for the extensive profile expert testimony**

Magistrate Auld also based his – no deficient performance – conclusion on his finding that trial counsel "attacked the thoroughness and accuracy" of Bingham's PTSD diagnosis – and "her conclusion that alleged sexual abuse constituted the trauma that underlay that diagnosis."[29]  Randy objects to this finding – for the same reasons he objected to a similar finding regarding the profile expert testimony.

To begin with, if trial counsel thoroughly challenged the PTSD expert testimony – he did so because he knew how damaging the PTSD expert testimony was to Randy's defense.  Consequently, trial counsel wanted to

---

[29] E.C.F. #46, p. 63.

minimize the PTSD evidence's impact – because he knew the damage it caused to Randy's defense.

Thus, it's unsurprising trial counsel thoroughly challenged Bingham's PTSD expert testimony. Indeed, all reasonably competent North Carolina defense attorneys would've thoroughly challenged the PTSD expert testimony – especially where the triggering trauma is the sexual abuse allegations that prompted the criminal prosecution in the first place.

However, if trial counsel knew how damaging the PTSD expert testimony was to Randy's defense – this awareness should've prompted him to request the mandatory *Hall* limiting instruction to ensure jurors didn't improperly use the extensive PTSD expert testimony as substantive evidence of guilt. Therefore, contrary to Magistrate Auld's reasoning – trial counsel's thorough cross-examination of Bingham's PTSD expert testimony should've prompted him to further minimize the PTSD evidence's impact by requesting a mandatory *Hall* limiting instruction.

Lastly, based on the "thoroughly attacked" finding – Magistrate Auld seemed to hold the following: (1) because trial counsel did A, he didn't have to do B; or (2) because trial counsel did A, he couldn't also do B. Both are wrong – because nothing prevented trial counsel from doing A and B here. In other words, trial counsel could've (and should've) "thoroughly attacked" the PTSD expert testimony <u>and</u> asked for a mandatory *Hall* limiting instruction to

48

ensure jurors didn't improperly use the extensive PTSD evidence as substantive evidence of guilt. Indeed, all reasonably competent defense counsel in North Carolina would've done both.

### 3. Prejudice

#### a. Standard of review

Randy agrees with Magistrate Auld – that Claim One's prejudice component must be reviewed under AEDPA's more deferential standard – because Judge Cubbage adjudicated this component on the merits.[30]

#### b. *Strickland's* prejudice standard

Randy agrees with Magistrate Auld's conclusion that *Strickland* prejudice only requires one juror:

> A "reasonable probability" of a different outcome in Petitioner's trial would include not just an acquittal, but also a mistrial brought about by a hung jury. Only one juror must have reasonable doubt and insist on a not guilty verdict in order to prevent a unanimous verdict of guilty and to cause a mistrial, *i.e.*, a different outcome than occurred here. Thus, the Court's use of either version of the *Strickland* prejudice test should yield the same result.[31]

---

[30] E.C.F. #46, pp. 75-76.
[31] E.C.F. #46, p. 66.

49

### c. Magistrate Auld's no prejudice determination

Magistrate Auld determined <u>all</u> fairminded jurists would've concluded the following: even if trial counsel had performed effectively – and requested the proper limiting instructions regarding the profile and PTSD expert testimony, it's <u>not</u> reasonably probable said limitations would've impacted one juror's <u>consideration</u> of the State's case – where this juror would've not only harbored reasonable doubt regarding the second-grade counts, but would've also harbored reasonable doubt regarding the first-grade and third-grade counts.

According to Magistrate Auld, therefore, even if the trial court had prohibited jurors from using the extensive profile and PTSD expert testimony as substantive evidence that Randy, in fact, sexually abused EVC – all fairminded jurists would conclude that all twelve of Randy's jurors still would've harbored <u>no reasonable doubt</u> regarding the first-grade and third-grade counts – even though all twelve jurors harbored reasonable doubt for all seven second-grade counts.

Randy objects to this determination. No fairminded jurist would conclude <u>that all twelve</u> jurors would've still had no reasonable doubts regarding the first-grade and third-grade counts – had the trial court properly prohibited them from using the extensive profile and PTSD expert testimony as substantive evidence that Randy, in fact, sexually abused EVC.

50

In making his – "no prejudice" – determination, Magistrate Auld claimed Randy's prejudice argument "gloss[ed] over… significant trial evidence supporting the jury's guilty verdicts."[32] Randy objects to this finding.

To begin with, as mentioned up front – Magistrate Auld failed to mention and discuss the seven second-grade acquittals. By omitting any discussion of how jurors rejected an entire year's worth of EVC's sexual abuse allegations, Magistrate Auld's – "significant trial evidence" – finding represents a gross misrepresentation of the trial evidence.

In other words, how can there be "significant trial evidence" supporting the first-grade and third-grade verdicts – when jurors harbored so much doubt regarding the second-grade counts they acquitted Randy across the board for these counts? And here's the thing – EVC's sexual abuse allegations followed the same narrative for each grade: (1) Randy came to his primary classroom, (2) Randy walked him and other ESL students to his ESL classroom, and (3) once his ESL class ended – Randy supposedly allowed the other ESL students

---

[32] E.C.F. #46, p. 67.

to leave first, while holding EVC back so he could sexually abuse him inside the nearest boy's bathroom.

Consequently, if jurors rejected EVC's second-grade allegations/narrative – by harboring so much doubt about these sexual abuse allegations they fully acquitted Randy of every second-grade count, how can there be "significant trial evidence" supporting the first-grade and third-grade counts?  The jury's seven second-grade acquittals, therefore, plainly demonstrate the incorrectness of Magistrate Auld's – "significant trial evidence" – finding.

> **(2).** **The testimony and evidence underpinning Magistrate Auld's – "significant trial evidence" – determination shows just how flimsy the State's case was against Randy**

Magistrate Auld buttressed his – "significant trial evidence" – determination with thirty-one bullet points of allegedly incriminating facts. These thirty-one bullet points, according to Magistrate Auld, "provided the jury with a reason, other than fabrication, why [EVC] delayed disclosing the abuse and why [EVC's] recollection of the details of such abuse changed over time, and countered the defense's theories that [EVC's] grandmother's death caused his behavioral changes, and that exposure to sexual material explained his non-age-appropriate sexual knowledge."[33]

---

[33] E.C.F. #46, p. 74.

However, upon close inspection of these facts – they're far from incriminating, if incriminating at all – as the vast majority simply discuss EVC's post-allegation behavior and conduct. Noticeably absent in these thirty-one bullet points are (1) facts repeatedly placing Randy in the boy's bathroom with EVC (or even other students), (2) facts supporting EVC's claim Randy always shut and locked the bathroom door (from the inside), (3) facts supporting EVC's claim Randy sexually abused him in first-grade, second-grade, and third-grade, (4) electronic evidence (from Randy's electronics) indicating Randy had a fetish for pre-pubescent children, and (5) any discussions of how these facts stand up to Karen Sexton's exculpatory testimony, EVC's admitted lies, the innumerable inconsistencies in EVC's sexual abuse allegations, and the jury's seven second-grade acquittals.

- Bullet point #1: This bullet point references Dr. Aaron Woody's testimony – where he described EVC's post-allegation behavior.[34] The evidentiary shortcomings of this testimony and much of the testimony mentioned in Magistrate Auld's bullet points is obvious: the State's case against Randy – for all intents and purposes – involved people simply talking about EVC's post-allegation behavior. In other words, the State didn't present

---

[34] E.C.F. #46, pp. 67-68.

Case 1:23-cv-00937-TDS-LPA    Document 49    Filed 09/12/25    Page 57 of 89

a single witness to corroborate EVC's most significant claim: the alleged sexual abuse always occurred in the boy's bathroom.

Specifically, EVC claimed Randy – "always" – closed the wooden front door to the boy's bathroom when the abuse occurred – and Randy "always" locked the boy's bathroom door from the inside. However, Dr. Woody and multiple teachers testified they never saw any of the front doors to the boy's bathrooms closed because it violated Lindley's bathroom policies. Dr. Woody, moreover, said the doors to the student bathrooms don't lock from the inside – for obvious safety reasons.

• Bullet point #2: This bullet point references Margaret Sisk's testimony – where she claimed EVC began missing school – and had multiple "absences" in December 2013.[35] The problem with his testimony is that EVC's own attendance records disprove Sisk's – "multiple absences in December 2013" – claim. From August 2013 through December 2013, EVC only missed two school days: November 1, 2013 and December 3, 2013. EVC didn't have any absences or early dismissals leading up to the 2013 Christmas holiday – but Magistrate Auld failed to mention these facts while quoting Sisk's testimony:

---

[35] E.C.F. #46, p. 69.

Valdes-Camacho, Edher Greg   3   12232824          451

Meeting | Daily

Change Multiple Days

| 8/26-8/30 | 9/2-9/6 | 9/9-9/13 | 9/16-9/20 | 9/23-9/27 | 9/30-10/4 | 10/7-10/11 | 10/14-10/18 | 10/21-10/25 |
|---|---|---|---|---|---|---|---|---|
| M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F |

| 10/28-11/1 | 11/4-11/8 | 11/11-11/15 | 11/18-11/22 | 11/25-11/29 | 12/2-12/6 | 12/9-12/13 | 12/16-12/20 | 12/23-12/27 |
|---|---|---|---|---|---|---|---|---|
| M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F |

390  0
2L   2A

0
2A

| 12/30-1/3 | 1/6-1/10 | 1/13-1/17 | 1/20-1/24 | 1/27-1/31 | 2/3-2/7 | 2/10-2/14 | 2/17-2/21 | 2/24-2/28 |
|---|---|---|---|---|---|---|---|---|
| M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F |

0    390    0      0
2A          2A

0  0  0  0  0  0   390
2A 2A 2A 2A 2A 2A  1L

390
2L

390  0  0
2L   2A 2A

ABS -

| 3/3-3/7 | 3/10-3/14 | 3/17-3/21 | 3/24-3/28 | 3/31-4/4 | 4/7-4/11 | 4/14-4/18 | 4/21-4/25 | 4/28-5/2 |
|---|---|---|---|---|---|---|---|---|
| M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F |

0
2A

| 5/5-5/9 | 5/12-5/16 | 5/19-5/23 | 5/26-5/30 | 6/2-6/6 | 6/9-6/13 | | | |
|---|---|---|---|---|---|---|---|---|
| M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F | M T W H F |

Attendance Codes:
=Present | 2L=Unexcused Tardy | 2A=Unexcused Absence | 1M=Medically Fragile | 1H=Teacher-In-Treatment | 1A=Illness or Injury | 1B=Medical/Dental Appt | 1C=Death in family |
1D=Quarantine | 1E=Court/Admin Proc | 1F=Religious Observance | 1G=Educational Oppor | 1J=Local Sch Bd Policy | 1K=Child Care | 1L=Excused Tardy | 1N=Deployment Activity |
2B=Unex No Immunization | 3=Suspensions |

This bullet point also references Sisk's testimony where she described EVC's behavior after the 2014 New Year. This testimony, though, proves little – because EVC's grandmother passed away during his period, meaning his grandmother's passing could easily explain why EVC was upset and wanted to stay home with his mother.

- Bullet point #3: This bullet point references Sisk's testimony where she – again – described EVC's post-allegation behavior and how he eventually went "to homebound instruction."[36]

---

[36] E.C.F. #46, p. 68.

55

- Bullet point #4: This bullet point references JCP's testimony – where she claimed EVC – on one occasion – was the last student to leave Randy's ESL class.[37]  This fact has little to no incriminating value – especially when it's cross-referenced with the fact the State didn't present a single witness to corroborate EVC's most significant claim: the alleged sexual abuse always occurred in the boy's bathroom.

- Bullet point #5: This bullet point references Dr. Stewart's diagnostic interview of EVC – and how she claimed EVC appeared "standoffish" and "reluctant to keep going."[38]  Notably, Dr. Stewart relied on these alleged behaviors when she opined that EVC presented with behaviors consistent with suffering from sexual abuse.

Again, this testimony focuses on EVC's post-allegation behavior – which based on the jury's seven second-grade acquittals, didn't have an incriminating impact regarding those year-long sexual abuse allegations/counts.  According to Magistrate Auld, though, this post-allegation conduct testimony somehow constituted – "significant trial evidence" – supporting the first-grade and third-grade verdicts.

---

[37] E.C.F. #46, p. 68.
[38] E.C.F. #46, p. 68.

- <u>Bullet point #6</u>: This bullet point references more of Dr. Stewart's profile testimony: It didn't surprise Dr. Stewart EVC "did [not] give detailed statements about what happened in each grade" because, when something has happened more than a couple times[,] children often put what happened to them… into a composite of what usually happened."[39]

This testimony simply explains away a glaring shortcoming of EVC's allegations – namely his inability to describe numerous alleged sexual assaults – or the repeated instances where he added new and evolving allegations. Moreover, this testimony constitutes improper vouching – because it follows this logic:

-EVC couldn't give detailed statements about what happened during each grade.

-Dr. Stewart knew exactly why EVC couldn't give detailed statements: it wasn't because he'd fabricated his allegations; it was because children who've been sexually abused "more than a couple times" lump all the incidents "into a composite of what usually happened."

-Thus, Randy's sexual abuse caused EVC's inability to give detailed statements; it wasn't because EVC lied.

---

[39] E.C.F. #46, pp. 68-69.

57

This reasoning – without question – constitutes improper vouching because the – lumping together – opinion is premised on EVC, in fact, being sexually abused by Randy. Moreover, this reasoning disregards the fact EVC repeatedly admitted he'd lied multiple times before and during Randy's first trial[40] – and he EVC lied during Randy's second trial when he refused to admit he didn't go to Randy's ESL class during second-grade – as Karen Sexton testified.[41]

- <u>Bullet points #7 and #8</u>: These bullet points reference Dr. Stewart's delayed disclosure testimony.[42] This testimony – like the above testimony – doesn't implicate Randy. Instead, it simply explains away a glaring shortcoming of EVC's allegations – most notably, his inability to keep his narratives straight and consistent. Moreover, it's another example of improper vouching because delayed disclosure assumes the accuser has been sexually abused – and this is why the accuser keeps adding new facts to his narrative and allegations.

---

[40] E.C.F. #6, p. 60 (identifying all the times EVC admitted to lying before Randy's first trial).
[41] E.C.F. #6, pp. 61-62 (summarizing EVC's testimony where he refused to admit what Karen Sexton testified to – *i.e.*, Randy came to her classroom during EVC's second-grade year – and helped her team teach her ESL students).
[42] E.C.F. #46, p. 69.

• <u>Bullet points #9, #10, and #11</u>: These bullet points reference Dr. Thomas's CME testimony – where she claimed EVC appeared "nervous" during the CME, and when she tried to do her "genital and anal exams" – EVC's behavior "dramatically change[d]" because he "became very, very upset[.]"[43] How this testimony about EVC's post-allegation behavior constitutes – "significant trial evidence" – isn't clear, especially when the Court considers EVC's multiple admitted lies, countless inconsistencies, Karen Sexton's exculpatory testimony, and the jury's seven second-grade acquittals.

• <u>Bullet point #12</u>: This bullet point references Officer Little's testimony regarding EVC's initial statement to the GPD accusing Randy of sexual abuse. More specifically, it focuses on Officer Little's testimony where he summarized EVC's appearance and behavior when he made this initial statement. Like the other bullet points, this bullet point simply summarizes testimony describing EVC's post-allegation conduct and behaviors.

How EVC's post-allegation conduct can constitute – "significant trial evidence" – supporting the jury's first-grade and third-grade verdicts isn't clear, especially when the Court considers EVC's multiple admitted lies, countless inconsistencies, Karen Sexton's exculpatory testimony, and the jury's seven second-grade acquittals.

---

[43] E.C.F. #46, p. 69.

Thus, EVC's admissions – where he admitted to lying multiple times, make plain his "subdued" and "nervous" attitude – and his inability to "make eye contact" with Officer Little – could easily be caused by the fact EVC knew – from the get-go – his sexual abuse allegations were untrue – and he felt quite uncomfortable making these false allegations.

• <u>Bullet points #13, #14, #15</u>: These bullet points simply reference Robin Miller's delayed disclosure testimony[44] – which, as Randy argued in state court, constitutes improper vouching because it's built on the premise EVC was, in fact, sexually abused.  More significantly, this testimony – like much of the State's evidence – essentially explained away EVC's lies and numerous inconsistencies.

Put differently, Miller claimed the new facts and allegations EVC added to his sexual abuse narrative over time didn't represent false disclosures simply because they were inconsistent with his initial and prior allegations. Instead, the new facts or allegations simply represented the disclosure process for sexually abused children.  Thus, according to Miller – sexually abused children – as well as those who've claimed sexual abuse – are incapable of fully disclosing the true extent of the defendant's sexual abuse in one interview – or even over multiple interviews over multiple months.  Rather, according to

---

[44] E.C.F. #46, p. 70.

Miller – sexually abused children incrementally reveal the true extent of the defendant's sexual abuse over time because – disclosure is a process.

Again, the validity behind delayed and incremental disclosure is lacking. More problematic, however, is what's happening when experts offer this type of – "disclosure is a process" – opinion testimony. What's happening is the expert is vouching for the child's credibility by claiming (1) the new facts and allegations represent truthful disclosures, and (2) the reason why the child didn't disclose these new facts and allegations in their initial and previous allegations is because disclosure is a process. This is the epitome of circular reasoning.

More significantly, however, the – "disclosure is a process" – concept is based on no legitimate empirical research – and a substantially prejudicial assumption, namely that all new facts and allegations added to a child's sexual abuse narrative are true. This assumption is prejudicial because, when the State's expert discusses the – "disclosure is a process" – concept, the expert either explicitly or implicitly tells jurors that the new facts and allegations are true because, again, discovery is a process. This is what Robin Miller testified to at Randy's trial when ADA Thompson asked her about delayed disclosure.

Child sex prosecutors routinely rely on their experts to discuss delayed disclosure, incremental disclosure, and "disclosure is a process" for one simple reason: to vouch for the child's already damaged credibility because most child sex prosecutions turn entirely on the child's credibility – because the child medical exam rarely, if ever, produces physical evidence of sexual abuse. When discussing delayed and incremental disclosure, these experts have one primary goal: to convince jurors the child's inconsistencies aren't true inconsistencies, but truthful disclosures made over time because – <u>drum roll please</u> – "discovery is a process."

In the end, the State was permitted to present expert testimony that effectively explained away the numerous inconsistencies in EVC's ever-evolving sexual abuse narrative. Counsel is aware of no other instances in a criminal trial where the State can present expert testimony to explain away why its key witness(es) made so many inconsistent statements.

For example, suppose the State is prosecuting a bank robbery against Defendant A. Now suppose the State's key witness – Accomplice 1 – gave inconsistent statements regarding his and Defendant A's alleged involvement in the bank robbery. Under no circumstances could the State introduce expert testimony – or even lay opinion testimony – to explain away or justify Accomplice 1's inconsistencies. Specifically, the State can't present an expert to tell jurors that Accomplice 1's latter statements – although different from

his initial statements, represented truthful disclosures.  Instead, to gauge Accomplice 1's credibility, jurors can only rely on Accomplice 1's testimony where he explained why his latter statements differed from his initial statements.

Likewise, take the same bank robbery example – but let's focus on eyewitness Z.  Eyewitness Z described the bank robber as clean shaven in his first statement.  Eyewitness Z, however, then identified Defendant A from a photo array – but Defendant A had a mustache in the photo array.  During his second statement – after he identified a mustached Defendant A as the bank robber, eyewitness Z said he was now certain the bank robber had a mustache.

Under no circumstances could the State introduce a memory expert at trial to testify that – despite Eyewitness Z's initial "clean shaven" description, his identification of the mustached Defendant A is based on a true and actual event that Eyewitness Z accurately captured, stored, and retrieved from his memory.  Stated differently, a prosecution memory expert couldn't tell jurors that Eyewitness Z's identification of a mustached Defendant A – is credible and truthful.  Instead, to assess Eyewitness Z's credibility – jurors could only rely on Eyewitness Z's testimony where he explained why his description of the bank robber changed – and why he identified someone with a mustache after he described the bank robber as clean shaven.

Here, however, the State's experts – including Robin Miller – effectively told jurors EVC's inconsistencies weren't true inconsistencies – because sexually abused children don't disclose the full extent of the perpetrator's abuse up front. Instead, they disclose incrementally – over time. Not only is this circular reasoning, but it's also doubly prejudicial because (1) it's explaining away blatant inconsistencies and (2) the experts are effectively conveying to jurors they consider the accuser's new facts or belated allegations to be true – because, as we're repeatedly told, discovery is a process.

- <u>Bullet points # 16 through #21</u>: These bullet points reference Bingham's testimony – where she described EVC's post-allegation therapy.[45] However, as argued above – how EVC's post-allegation conduct can constitute – "significant trial evidence" – supporting the jury's first-grade and third-grade verdicts isn't clear, especially when the Court considers the jury's seven second-grade acquittals, EVC's admitted lies, Karen Sexton's exculpatory testimony, and the innumerable inconsistencies in his trial testimony.

- <u>Bullet points #22 through #27</u>: These bullet points reference CC's testimony – where she described EVC's post-allegation behavior and conduct.[46] Again, based on the seven second-grade acquittals, EVC's multiple admitted lies, the innumerable inconsistencies with EVC's trial testimony, and Karen

---

[45] E.C.F. #46, pp. 71-72.
[46] E.C.F. #46, pp. 71-72.

64

Sexton's exculpatory testimony – EVC's post-allegation behavior can easily be manufactured – like the admitted lies he manufactured.

- Bullet point #28: This bullet point references Detective Nero's testimony describing EVC's behavior during his forensic interview.[47] How Nero's testimony constitutes – "significant trial evidence" – supporting the jury's first-grade and third-grade verdicts isn't clear.

- Bullet points #29 and #30: These bullet points reference Detective Nero's testimony – where she described Randy's demeanor during his interview. Nero described Randy as "matter of fact" – when told about EVC's sexual abuse allegations. Magistrate Auld – apparently – viewed Randy's interview – and described Randy as having a "non-emotional reaction."[48]

With due respect to Magistrate Auld, bullet point #29 is significantly misleading and factually incomplete because Magistrate Auld never juxtaposed his "matter of fact" finding with the fact Randy has Asperger syndrome – which is a diagnostic label that's historically been used to describe a neurodevelopmental disorder characterized by significant difficulties in social interaction and nonverbal communication.

---

[47] E.C.F. #46, p. 73.
[48] E.C.F. #46, p. 7

65

Individuals with Asperger syndrome present with a lack of demonstrated empathy – which impacts aspects of social relatability. Individuals with Asperger syndrome experience difficulties in basic elements of social interaction, which may include a failure to develop friendships or to seek shared enjoyments or achievements with others (*e.g.*, showing others objects of interest); a lack of social or emotional reciprocity; and impaired nonverbal behaviors in areas such as eye contact, facial expression, posture, and gesture. *See* Baskin JH, Sperber M, Price BH (2006). *Asperger syndrome revisited".* *Reviews in Neurological Diseases.* 3 (1): 1–7.

Again, how Randy's non-emotional affect can constitute – "significant trial evidence" –supporting the jury's first-grade and third-grade verdicts is beyond counsel's understanding, especially when the Court considers the seven second-grade acquittals, EVC's multiple admitted lies, the innumerable inconsistencies with EVC's trial testimony, and Karen Sexton's exculpatory testimony.

66

- <u>Bullet point #31</u>: This bullet point references Karen Sexton's testimony – where she testified she didn't recall EVC "talking about sex."[49]  With due respect to Magistrate Auld, counsel is bewildered as to how this aspect of Sexton's testimony constitutes – "significant trial evidence" – supporting the jury's guilty verdicts.  This is especially true when the Court recognizes Sexton's testimony destroyed EVC's second-grade sexual abuse allegations.

### D.    Claim Two

In Claim Two, Randy raised the following *Strickland* claim:

> Trial counsel was ineffective because he failed to object and move to strike or request a mistrial when Dr. Stacy Thomas, Bobbie Bingham, and Detective Nero repeatedly vouched for EVC's credibility and truthfulness.[50]

### 1.    Dr. Stacy Thomas

### a.    The impermissible vouching

Dr. Thomas testified that EVC's self-reported behaviors/symptoms fit the profile of children who claimed to have been sexually abused. (T2p. 464)  A significant factor supporting her opinion was EVC's behavior during her medical exam, particularly EVC's refusal to allow her to examine his anal region.  This produced the following Q/A with ADA Thompson:

---

[49] E.C.F. #46, p. 73.
[50] E.C.F. #6, p. 138.

> ADA Thompson: Did [EVC's] reaction, when you tried to do that anal exam, factor into that opinion?
>
> Dr. Thomas: It did. That's not all that typical even in – the only – well, I don't know. I was going to say that the only time *I really see that is in very convincing, concerning cases.*
>
> Most of the time I can convince a child that I'm – that it's not – I let them know, reassure them it's not going to hurt. Have whoever they need to have, have a stuffed animal, have whatever it takes to get an exam.
>
> *It is – I really can only think of about five or six times in the four to five years I've been doing that, that it's happened this way.*

(T2pp. 464-465)

Dr. Thomas also told jurors EVC was, in fact, an "abused child." Dr. Thomas gave this opinion when ADA Thompson asked: "Now, did you make any recommendations for EVC?" Dr. Thomas replied:

> I did. I wanted him to have therapy. And I was happy that he was in therapy. And he had expressed to Cindy Stewart that the therapy was helping, and I was glad for that.
>
> He was having homebound school when we saw him. And that had actually been helpful. And I was in support of not having him go back to a place where this had allegedly happened. I feel like that was a good – a good choice.
>
> But at the same time the whole goal in *abused children* – with *abused children* is to get them back to their potential and their life and what should be normal for them and what's normal for most kids is going to a school. So it was my hope and my recommendation

68

> that he could return to some traditional school setting when it was emotionally healthy do so. I agreed that he should not go back to that school.

(T2pp. 466-467)

During cross-examination, Dr. Thomas – again – told jurors EVC had "been sexually abused." This occurred when trial counsel commented on the fact Detective Nero attended EVC's March 17, 2014 medical exam. Here's the relevant Q/A between trial counsel and Dr. Thomas:

> Trial counsel: I would think that most children don't take detectives with them to the pediatrician.
>
> Dr. Thomas: Our office is a pediatric office. And most children aren't referred by detectives. But when *they've been sexually abused* and there's a case, then *they are because they deserve medical care and medical treatment* and that's what he's there for and nothing else.

(T2p. 474)

**b. Magistrate Auld's no vouching determination**

Magistrate Auld recommended to the Court "that the challenged testimony did not amount to improper vouching."[51] Randy objects to this finding – as well as to Magistrate Auld's reliance on *State v. Oliver*, 354 S.E.2d 527, 533 (N.C. App. 1987), *State v. Wiggins*, 2017 N.C. App. LEXIS 403 (N.C.

[51] E.C.F. #46, p. 81.

App., June 6, 2017), and *State v. Dobbs*, 2011 N.C. App. LEXIS 416 (N.C. App.,, March 1, 2011) – as all three are distinguishable.[52]

<center>********************</center>

*Oliver* concerns the sexual assault of a sixteen-year-old mentally challenged girl. At trial, the State introduced Dr. Scott – who testified that children don't generally make up stories about sexual abuse and then report it to others. Dr. Scott also opined – he generally found a child's story "more believable" if the child was younger: "The younger the child, the more believable the story." *State v. Oliver*, 354 S.E.2d at 530.

The State also introduced Dr. Gordon who opined that it "would be extremely difficult" to coach a mentally challenged child to mimic a false sexual abuse allegation – because mentally challenged children "can't think or talk about things that they haven't in some way experienced." *Id.* at 350.

Defense counsel objected to Drs. Scott's and Gordon's testimony – and on appeal the defendant argued their testimony was inadmissible because it "enhanced" the accuser's credibility. *Id.* at 533. The North Carolina Court of Appeals rejected this argument – because Dr. Scott didn't "testify to the" accuser's credibility – but to "the general credibility of children who report sexual abuse." *Id.* The Court of Appeals also rejected the challenge to Dr.

---

[52] E.C.F. #46, p. 83.

<center>70</center>

Gordon's testimony – because all she did was tell jurors "mentally retarded children generally think in concrete terms and that it would be very difficult to teach them facts and details about sexual acts." *Id.* at 534.

Based on these facts, *Oliver* is distinguishable because it doesn't concern improper vouching – which occurs when a witness or expert speaks directly to the accuser's credibility or the credibility of their accusations. *State v. Giddens*, 681 S.E.2d 504, 508 (N.C. App. 2009), *aff'd*, 689 S.E.2d 858-859 (N.C. 2010).

In *Oliver*, Drs. Scott and Gordon spoke generally about young and mentally challenged children; neither commented directly on the accuser's credibility or the credibility of her sexual abuse allegations – and the defendant's appellate claim makes this clear – because the defendant argued this general expert testimony was inadmissible because it "enhanced" the accuser's credibility. The defendant, therefore, didn't make an improper vouching claim – as Randy repeatedly did in state court, which makes *Oliver* even more inapposite.

In Randy's case, however, Dr. Thomas spoke directly about EVC's credibility and the credibility of his sexual abuse allegations – when she told jurors she was "convince[d]" EVC had "been sexually abused" because he refused to allow her to examine his anal region. Dr. Thomas, therefore, told jurors she found EVC "convincingly" credible and truthful.

71

Simply put, if an expert tells jurors in a child sexual abuse case – she finds the child's narrative and self-reported symptoms "convincing" and/or repeatedly characterizes the child as an "abused child" or "sexually abused child" – especially when there's no physical evidence supporting the child's sexual abuse allegations, the expert is effectively telling jurors she found the child credible and truthful.

<p align="center">*******************</p>

*Wiggins* is also inapposite.

To begin with, *Wiggins* is an unpublished opinion by the North Carolina Court of Appeals.  Under N.C.R.A.P. 30(e)(3): "An unpublished decision of the North Carolina Court of Appeals does not constitute controlling legal authority."; *accord State v. Hensley*, 802 S.E.2d 744, 751-752 (N.C. App. 2017) (Stroud, J., concurring) (quoting and discussing Rule 30(e)(3)).  Consequently, "[a]n unpublished opinion 'establishes no precedent and is not binding authority[.]'" *Long v. Harris*, 528 S.E.2d 633, 639 (N.C. App. 2000) (quoting *United Services Automobile Assn. v. Simpson*, 485 S.E.2d 337, 339 (N.C. App. 1997)).

<p align="center">72</p>

In terms of the facts, the State in *Wiggins* presented multiple experts – including Holly Warner and Sara Kirk. Warner examined the accuser at the Child Advocacy Center shortly after he made his initial allegations. Kirk is a clinical social worker and child abuse evaluation specialist who counseled the accuser.

At trial, Warner described the CME results – namely that the CME produced "no evidence of trauma[.]" Based on this testimony, the prosecutor asked Warner if it was "unusual" for the CME to produce no evidence of trauma. Warner testified it wasn't unusual – and claimed "96 percent of children evaluated for possible sexual abuse have 'normal' exams." Furthermore, when asked specifically about the results for the child's anal examination, Warner said "99 percent of male children reporting anal sexual abuse have normal examinations." *State v. Wiggins*, 2017 N.C. App. LEXIS 403, *7. Moreover, Warner told jurors her CME findings were consistent with the child's disclosure.

> Q: So in your opinion, was your — were your findings consistent with [Daniel]'s disclosure?
>
> A: Yes.

*Id.* at *17.

On direct appeal, the defendant argued this testimony constituted improper vouching – which the Court of Appeals rejected because Warner "did not testify about any forbidden topic, such as whether [the accuser] was believable, had a record of lying, or had ever been untruthful." *Id*. at *19.

At trial, Kirk testified at length about her interviews with the accuser – and how the accuser's statements were internally consistent – which "signifies an increased likelihood… [the accuser's statement] is reliable[.]" *Id*. at *23. Trial counsel objected to this testimony – which the trial court sustained.

Kirk also described how – when children suffer multiple instances of abuse, they merge these instances together and create a "script" regarding the abuse. Kirk said these scripts "can be pretty reliable." Kirk then said the child's statements sounded "a little bit" like a "script":

> So something happens similar, an event that happened more than one time, it's a similar event, then your memory is going to form on top of the prior memory. So this happens for trauma or non-traumatic events, like an analogy is that if you're someone if you go to the dentist every six months, that you're likely to be able to tell well about what happened usually at the dentist, but it's a little harder to talk about the specific timing to the dentist, because it happens in the same way. <u>So, but overall, the scripted memory can be pretty reliable</u>.

74

> And so [Daniel] used a little bit of that, he talked about there's some parts of the four different incidents that were similar. And so, he didn't tell as much detail about those parts, but when something's unique, the worst last time, he was able to tell more detail about it and despite being two years later.

*Id.* at \*24-25.

On appeal, the defendant argued the trial court plainly erred by allowing Kirk to vouch for accuser's credibility and to categorize his memories as internally-consistent and reliable. The North Carolina Court of Appeals, however, ruled that Kirk didn't "impermissibly vouch" for the child's credibility" – because her "scripted memory" testimony wasn't "tantamount to an opinion that the child was credible" – and because she didn't "impermissibly make that inference for the jury." *Id.* at \*25, \*26.

Based on Warner's and Kirk's testimony – *Wiggins* is inapposite, as Warner's and Kirk's testimony don't come close to Dr. Thomas's challenged testimony.

*First*, Dr. Thomas told jurors EVC's case represented a "very convincing" case of sexual abuse – because in her career she'd only ever encountered EVC's level of angst "five or six" times. (T2pp. 464-465)

*Second*, unlike Warner and Kirk – Dr. Thomas repeatedly referred to EVC as an "abused child" when ADA Thompson asked her if she'd made any recommendations for him. (T2pp. 466-467)

75

*Third*, when trial counsel noted how a Detective Nero attended EVC's CME – Dr. Thomas justified Detective Nero's presence because EVC had "been sexually abused" and "there [was] a case[.]" (T2p. 474)  There's only one reasonable interpretation for Dr. Thomas's – "there's a case" – comment: Because she believed EVC had been sexually abused, she believed the GPD had a legitimate criminal case against EVC's abuser.

<div align="center">********************</div>

While *Oliver* and *Wiggins* are inapposite, *State v. Crabtree*, 790 S.E.2d 709 (N.C. App. 2016), *aff'd* 804 S.E.2d 183 (N.C. 2017) is on point.

In *Crabtree*, the State presented Dr. Karen Sue St. Clarie – who performed the accuser's CME.  Dr. St. Claire worked for Duke University's Child Abuse Medical Evaluation Clinic – and she testified about the clinic's "five-tier rating system for evaluating an alleged child victim's description of sexual abuse." *Id.* at 712.  Dr. St. Clarie "classified [the child's] description as level five" – which is the "most diagnostic" category.  Moreover, Dr. St. Claire told jurors the child's "description provided a 'clear disclosure' and a 'clear indication' of sexual abuse." *Id.*

<div align="center">76</div>

On appeal, the defendant argued Dr. St. Claire's testimony constituted improper vouching – and the North Carolina Supreme Court and Court of Appeals agreed. The Court of Appeals said the following testimony constituted "impermissible vouching":

> [Dr. St. Claire's] statement that "[w]e have sort of five categories all the way from, you know, we're really sure [sexual abuse] didn't happen to yes, we're really sure that [sexual abuse] happened" and her reference to the latter category as "clear disclosure" or "clear indication" of abuse, in conjunction with her identification of that category as the one assigned to [the child's] 23 December 2013 interview[.]

*Id.* at 715.

This testimony – the Court of Appeals said – "cross[ed] the line from a general description of the abuse investigation process into impermissible vouching." Also, the Court of Appeals said Dr. St. Claire's "testimony that her team's 'final conclusion [was] that [the child] had given a very clear disclosure of what had happened to her and who had done this to her' was an inadmissible comment on [the child's] credibility." *Id.*

Dr. St. Claire's testimony is indistinguishable from Dr. Thomas's testimony – because: (1) Dr. Thomas told jurors EVC's case represented a "very convincing" case of sexual abuse – because in her career she'd only ever encountered EVC's level of angst "five or six" times; (2) Dr. Thomas repeatedly referred to EVC as an "abused child" when ADA Thompson asked her if she'd

made any recommendations for him; and (3) when trial counsel noted Detective Nero's attendance at EVC's CME – Dr. Thomas justified Detective Nero's presence because EVC had "been sexually abused" and "there [was] a case[.]"

### 2. Bobbie Bingham

### a. The impermissible vouching

Bingham diagnosed EVC with PTSD.

On cross-examination, trial counsel asked Bingham a simple – yet general – question: if a therapist, like herself, was provided false information during her PTSD assessment, could the false information impact the validity of a PTSD diagnosis – should one be made?  Trial counsel, notably, didn't ask Bingham whether she found EVC's allegations credible and truthful.  Instead, trial counsel simply asked Bingham a general question regarding the impact of false information on the PTSD assessment process.

Instead of answering the general question – of how false information could impact the validity of her PTSD diagnosis, Bingham felt compelled to tell jurors she found EVC's disclosures to her truthful because she "had no reason to believe [they were] false":

> [EVC] was consistent in his physiological presentation, as well as his psychological presentation, as well as his verbal behavior over a period of five weeks.  <u>I had no reason to believe that any of that was false.  It was consistent over time, that's one of the measures in why we use 30 days to conduct an assessment</u>.

78

(T2p. 704)

Trial counsel then asked Bingham if she was familiar with the National Children's Advocacy Center's ("NCAC") statement regarding why and how false child sexual abuse allegations occur:

> Trial counsel: So do you agree or disagree with the position of the [NCAC] that false allegations may derive from three main things; [1] Submitting to suggestion by authority, [2] from pseudomemories, or [3] be the product of a child evading honest answers?
>
> Bingham: I would [agree] with that.

(T2pp. 712-713)

ADA Thompson, however, didn't want Bingham's testimony to end with this agreement. Thus, ADA Thompson asked Bingham whether EVC's allegations against Randy were "false" when she had this Q/A with Bingham:

> ADA Thompson: You just mentioned that you would [agree] with that statement [from the NCAC], [but] does [the NCAC statement regarding false allegations] apply in this case?
>
> Bingham: In my opinion, no. It does not.

(T2p. 713)

Based on Bingham's – "no" – response regarding the NCAC's statement, all reasonable jurors would infer this to mean: Bingham believed EVC's allegations were truthful because they weren't by-products of (1) improper suggestion, (2) pseudomemories, or (3) EVC's knowingly false answers.

79

### b. Magistrate Auld's no vouching determination

Regarding Bingham's – " I had no reason to believe that any of that was false" – opinion, Magistrate Auld determined this opinion "did not amount" to improper vouching. Instead, it merely "amount[ed] to testimony… that [Bingham] had no reason to believe [EVC's] physiological, psychological, and verbal behavior during [the] examination was false[.]"[53] Randy objects to this finding.

With due respect to Magistrate Auld, this determination epitomizes the phrase – "can't see the forest for the trees." All reasonable jurors would've construed Bingham's opinion to mean she had no reason to believe EVC's allegations were false – meaning she found EVC and his allegations truthful. This constitutes improper vouching.

Regarding Bingham's – "no" – response to the NCAC's statement regarding false allegations, Magistrate Auld determined this testimony didn't constitute improper vouching.[54] In making this determination, Magistrate Auld agreed with the State – meaning:

> If the jury took anything away from this exchange at all, it was likely not that Bingham believed [EVC] was telling the truth, but that she simply believed that the specific scenarios mentioned by the NCAC and noted by … [Randy's trial] counsel did not apply to his case.[55]

---

[53] E.C.F. #46, p. 107.
[54] E.C.F. #46, p. 109.
[55] E.C.F. #46, p. 109.

Randy objects to this determination.

This – yet again – is another example where Magistrate Auld and the State can't see the forest for the trees. Logic dictates that all reasonable jurors would interpret this to mean: Bingham believed EVC's allegations <u>were truthful</u> because they weren't by-products of (1) improper suggestion, (2) pseudomemories, or (3) EVC's knowingly false answers.

### 3. Prejudice

Magistrate Auld determined – even if the above testimony constituted improper vouching, all fairminded jurists would conclude there's no reasonable possibility this improper vouching would've impacted a single juror – where this juror would've harbored reasonable doubt not only for the second-grade counts, but also for the first-grade and third-grade counts.[56]

Randy objects to this determination – as well as the seventeen bullet points of facts Magistrate Auld claimed supported his no prejudice determination.

---

[56] E.C.F. #46, pp. 122-127.

## <u>REQUEST FOR CERTIFICATE OF APPEALABILITY</u>

If the Court adopts Magistrate Auld's recommendations, Randy is entitled to a certificate of appealability ("COA").

A federal habeas petitioner doesn't have an absolute right to appeal a District Court's denial of his federal habeas petition. Instead, the petitioner must obtain a COA from this Court or the Fourth Circuit Court of Appeals. 28 U.S.C. § 2253(c); *Buck v. Davis*, 580 U.S. 100, 115 (2017).

Under § 2253(c)(2), a petitioner is entitled to a COA if he has made a "substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

Accordingly, where a District Court rejects a petitioner's constitutional claim(s) on the merits – "the showing required to satisfy §2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. at 484; *accord Tennard v. Dretke*, 542 U.S. 274, 282 (2004).

The "threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 338 (2003); *accord Buck v. Davis*, 580 U.S. at 115. Likewise, issuance of a COA "does not require a showing that the appeal will succeed." *Id.* at 337; *Buck v. Davis*, 580 U.S. at 115. Thus, when a petitioner seeks a COA – the Court "should limit its examination to a threshold inquiry into the underlying merits of his claims." *Id.* at 327. In short, when ruling on a COA application – the Court must resolve any doubts "in favor of the petitioner." *Jones v. Warden*, 402 F.2d 776, 776-777 (5th Cir. 1968); *accord Whitehead v. Johnson*, 157 F.3d 384, 386 (5th Cir. 1998).

Here, even if the Court applies Magistrate Auld's recommendations – and dismisses Randy's 2254 petition, reasonable jurists could debate the correctness of the Court's dismissal and rejection of his *Strickland* claims – particularly these determinations made by Magistrate Auld:

- North Carolina law doesn't prohibit prosecutors from introducing profile expert testimony as substantive evidence of guilt.

- Trial counsel wasn't ineffective for not requesting a limiting instruction regarding the extensive profile expert testimony.

• The reason trial counsel didn't request a limiting instruction regarding the extensive profile expert testimony was because trial counsel didn't want to highlight this unfavorable evidence – even though trial counsel thoroughly challenged (and thus highlighted) this unfavorable evidence.

• The reason trial counsel didn't request a limiting instruction regarding the extensive profile expert testimony is because he thoroughly challenged the profile expert testimony.

• Even if trial counsel performed ineffectively – by moving to limit the permissible uses of the extensive profile expert testimony, the limiting of the extensive profile expert testimony <u>wouldn't have impacted one juror</u> – where this juror would've harbored reasonable doubt for not only the second-grade counts, but also the first-grade and third-grade counts.

• Trial counsel wasn't ineffective for not requesting a mandatory *Hall* instruction regarding the extensive PTSD expert testimony.

• Trial counsel didn't request a mandatory *Hall* instruction regarding the PTSD expert testimony because the trial court overruled his qualifications objections regarding Bingham's profile expert testimony. Trial counsel, therefore, had to assume the trial court would've disregarded clearly-established law (*i.e.*, *Hall*) – because *Hall* says the trial court must provide a limiting instruction if requested by trial counsel.

• Trial counsel wasn't ineffective for failing to object to Dr. Thomas's and Bobbie Bingham's testimony – because their testimony didn't constitute improper vouching.

• Even if trial counsel performed ineffectively – by objecting to and prohibiting the improper vouching testimony, said effectiveness <u>wouldn't have impacted one juror</u> – where this juror would've harbored reasonable doubt for not only the second-grade counts, but also the first-grade and third-grade counts.

## <u>CONCLUSION</u>

WHEREFORE, Randy Clawson respectfully requests the Court to sustain his objections to Magistrate Auld's R&R – and to grant him a writ of habeas corpus based on trial counsel's ineffectiveness.  In the alternative, if the Court adopts Magistrate Auld's R&R – Randy is entitled to a COA.

Respectfully filed September 12, 2025.

<div align="right">

*/s/Craig M. Cooley*
**COOLEY LAW OFFICE**
**5000 Centre Greenway, Ste. 500**
**Cary, NC 27513**
**craig.m.cooley@gmail.com**
**412-607-9346 (cell)**
**www.pa-criminal-appeals.com**

</div>